**Exhibit 2**

# PLAINTIFF DEKALB COUNTY SCHOOL DISTRICT'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ) Case No.
ADOLESCENT ADDICTION/ ) 4:22-md-3047-YGR
PERSONAL INJURY PRODUCTS )
LIABILITY LITIGATION ) MDL No. 3047
)
_____)
This Document Relates to: )
)
DeKalb County School District )
v. Meta Platforms Inc., et al. )
)
Case No. 4:23-cv-05733-YGR )
_____)


CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER


VIDEO-RECORDED RULE 30(B)(6) DEPOSITION OF

DEKALB COUNTY SCHOOL DISTRICT by KISHIA TOWNS, Ph.D.

Beasley Allen Law Firm

2839 Paces Ferry Road SE, Suite 400

Atlanta, Georgia 30339

Monday, March 17, 2025, 8:12 a.m.

- - - -


Reported by: Karen Kidwell, RMR, CRR

APPEARANCES:

For the MDL Plaintiffs DeKalb County School District:

BY: DAVIS S. VAUGHN, ESQ.
SLADE METHVIN, ESQ.
JAMES LAMPKIN, ESQ. (Via Zoom)
Beasley Allen Law Firm
218 Commerce Street
Montgomery, AL  36104
334.495.1585
davis.vaughn@beasleyallen.com
slade.methvin@beasleyallen.com

For DCSD Plaintiffs:

BY: SAVANNAH LINER AVERA, ESQ.
General Counsel for DCSD
Hall Booth Smith, P.C.
191 Peachtree Street NE, Suite 2900
Atlanta, GA  30303
404.954.6973
savera@hallboothsmith.com


For the Defendants TikTok, Ltd.; Tiktok, LLC;
Tiktok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:

BY: ADAM REINKE, ESQ.
LARKIN CARDEN, ESQ.
King & Spalding
1180 Peachtree Street, N.E., Suite 1600
Atlanta, GA  30309
404.572.2774
areinke@kslaw.com
lcarden@kslaw.com

(Appearances continued on next page.)

APPEARANCES CONTINUED:

For the Defendants Meta Platforms, Inc., f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; and Mark Elliot Zuckerberg:

        BY: DANA STRUEBY, ESQ.
           KIMBERLY B. COOK, ESQ. (Via Zoom)
          (Tampa Office)
        Shook, Hardy & Bacon L.L.P.
        2555 Grand Boulevard
        Kansas City, MO  64108
        816.559.2749
        dstrueby@shb.com
        kcook@shb.com

For the Defendant Snap:

        BY: KATHARINE C. COLLINS, ESQ. (Via Zoom)
        Kirkland & Ellis LLP
        333 West Wolf Point Plaza
        Chicago, IL  60654
        773.339.4752
        katharine.collins@kirkland.com

For the Defendants Alphabet Inc., Google LLC, and YouTube LLC:

        BY: DANIEL WHITELEY, ESQ. (VIA ZOOM)
        Williams & Connolly LLP
        680 Maine Avenue SW
        Washington, DC  20024
        202.434.5405
        dwhiteley@wc.com

Also Present:
    Josh Coleman, Videographer
    James Arndt, Document Technician

I N D E X

WITNESS/EXAMINATION                                    Page

KISHIA TOWNS, Ph.D.
   By Mr. Reinke                                          9
   By Mr. Whiteley                                      316
   By Mr. Vaughn                                        325


E X H I B I T S

   Number                 Description                    Page

DeKalb-Towns Exhibit 1   .......................17
                 Kishia K. Towns, Ph.D.
                 Curriculum Vitae

DeKalb-Towns Exhibit 2   .......................24
                 Defendants' Amended
                 Supplemental Notice of Oral
                 and Videotaped 30(b)(6)
                 Deposition of Plaintiff DeKalb
                 County School District

DeKalb-Towns Exhibit 3   .......................33
                 DeKalb County School District
                 Code of Student Conduct
                 2024-2025, Elementary, Middle,
                 High, Bates DEKALB000992-1087

DeKalb-Towns Exhibit 4   .......................61
                 Social Media Guidelines for
                 students, Communications
                 Department, Updated 3/3/16,
                 DeKalb County School District,
                 Confidential, Bates
                 DEKALB037868-878

E X H I B I T S (Cont'd)

Number          Description                    Page

DeKalb-Towns Exhibit 5  ......................71
            Social Media Guidelines for
            Students, Department of
            Communications, Updated July
            2019, Confidential, Bates
            DEKALB1252467-470

DeKalb-Towns Exhibit 6  ......................80
            12/19/2016 Letter with Family
            Social Media Guidelines,
            Highly Confidential
            (SII)-Attorneys' Eyes Only,
            Bates DEKALB726221-229

DeKalb-Towns Exhibit 7  .....................105
            What is a Digital Dreamer?
            document

DeKalb-Towns Exhibit 8  .....................115
            3/22/2024 Meeting Invitation,
            Kyia Clark to Kyia Clark and
            others, in relation to
            Lightspeed Alerts with Student
            Support Services,
            Confidential, Bates
            DEKALB603429-430

DeKalb-Towns Exhibit 9  .....................117
            4/3/2018 E-mail Heather Hopper
            to Vasanne Tinsley, Highly
            Confidential (SII) -
            Attorney's Eyes Only, Bates
            DEKALB1039319-322

DeKalb-Towns Exhibit 10  ....................121
            Plaintiff Fact Sheet - School
            Districts

DeKalb-Towns Exhibit 11  ....................128
            2/22/2022 Dekalb County School
            District letter from
            Superintendent Cheryl Watson
            Harris, Confidential, Bates
            DEKALB080243-244

E X H I B I T S (Cont'd)

Number         Description            Page

DeKals-Towns Exhibit 12 ....................134
         Finding Unique Counts, Excel
         spreadsheet

DeKalb-Towns Exhibit 13 ....................154
         4/8/2024 E-mail, Darnell Logan
         to Kishia Towns, Confidential,
         Bates DEKALB1141723-725

DeKalb-Towns Exhibit 14 ....................159
         Spreadsheet DeKalb County
         Schools, Discipline Incidents
         (Offenses) Reported to the
         State, 20 Year Comparison,
         Confidential, Bates
         DEKALB8277577-579

DeKalb-Towns Exhibit 15 ....................178
         Presentation Reducing Cell
         Phone Use in High School,
         Enhancing Academic Performance
         and Supporting Student
         Well-being, Disconnect to
         Reconnect, Highly Confidential
         (SII)-Attorney's Eyes Only,
         Bates 797660-683

DeKalb-Towns Exhibit 16 ....................197
         Presentation Enhancing Student
         Engagement: Implementing
         Cellphone Pouches In Schools,
         June 2024

DeKalb-Towns Exhibit 17 ....................215
         Empowering Education through
         Technology, Overview of DeKalb
         County School District
         Technology Plan 2015-2018,
         Confidential, Bates
         DEKALB133314-315

CONFIDENTIAL

E X H I B I T S (Cont'd)

Number                Description                         Page

DeKalb-Towns Exhibit 18  .....................219
Superintendent Dr. Devon
Horton 90-Day Plan, DeKalb
County School District

DeKalb-Towns Exhibit 19  ....................223
11/4/2022 E-mail, Portia
Kirkland to Vasanne Tinsley
and others, Confidential,
Bates DEKALB1381292-294

DeKalb-Towns Exhibit 20  ....................252
E-mail chain, first e-mail
11/1/2023 E-mail, Devon Horton
to Kishia Towns and others,
Confidential, Bates
DEKALB631851-853

DeKalb-Towns Exhibit 21  ....................259
DeKalb County Governor's
Office of Planning and Budget,
Public Safety and Community
Violence Reduction Grant
Proposal, Proposal Summary,
Confidential, Bates
DEKALB1255651-662

DeKalb-Towns Exhibit 22  ....................274
2/24/2022 E-mail, Denise
Revels to Deborah
Moore-Sanders, Confidential,
Bates DEKALB063478

DeKalb-Towns Exhibit 23  ....................281
Plaintiff Fact Sheet - School
Districts (Supplemental)

DeKalb-Towns Exhibit 24  ....................286
Primary Referral Reason Report
2022 Chart, Confidential,
Bates DEKALB040599

E X H I B I T S (Cont'd)

Number                Description                      Page

DeKalb-Towns Exhibit 25  .....................296
1/13/2022 E-mail, Cheryl
Watson-Harris to Deborah
Moore-Sanders, Re: School
Psychologists and Social Work
Ratio Meeting, Confidential,
Bates DEKALB063301-302

DeKalb-Towns Exhibit 26  .....................302
DeKalb County School District,
Project SERV Grant Application
document, Confidential, Bates
DEKALB041819-823

REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

MONDAY, MARCH 17, 2025, ATLANTA, GEORGIA

P R O C E E D I N G S

- - -

VIDEOGRAPHER: We are now on the record. My name is Josh Coleman. I'm the videographer for Golkow. Today's date is March 17th, 2025, and the time is approximately 8:12 a.m.

This video deposition is being held in Atlanta, Georgia, in the matter of In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation in relation to DeKalb County School District versus Meta Platforms Incorporated, et al. This is for the United States District Court, Northern District of California.

The deponent is Kishia Towns. Counsel will be noted on the stenographic record. The court reporter is Karen Kidwell, and will now swear in the witness.

KISHIA TOWNS, Ph.D.

being first duly sworn, testified as follows:

EXAMINATION

BY MR. REINKE:

Q. Good morning, Dr. Towns.

A. Good morning.

Q. My name is Adam Reinke, and I'm an attorney who represents the Defendants in this case. I'll be taking your deposition this morning.

Can you please state your name for the record?

A. Kishia Towns.

Q. And can you please spell that?

A. K-i-s-h-i-a, Towns, T-o-w-n-s.

Q. And you are currently employed by the DeKalb County School District, correct?

A. That's correct.

Q. What is your current position?

A. Chief of Wrap Around Services.

Q. And can you please briefly describe for me what your day-to-day job responsibilities are as chief of Wrap Around Services?

A. So as chief of Wrap Around Services for DeKalb County School District, I oversee the division of wrap-around services, which includes several departments: Department of student relations, department of student advancement, department of school counseling. School social work. Student health services. After-school extended-day programs.

Q. Thank you. You mentioned that one of the departments that you oversee is the department of

student relations.

A. Yes.

Q. What is that department?

A. So the department of student relations consists of several employees who work with student due process hearings; so if students are in violation of the code of conduct and it rises to the level of a due process hearing, meaning they are out of school -- requesting the student be out of school for 11 days or more, or if they are requesting a student be placed in a different school setting, they are afforded a due process hearing.

Also in student relations they oversee positive behavioral interventions and supports, which is a framework implemented within the schools, within about 50 of our schools.

And then also we have administrators there for -- to address bullying in the District.

Q. Okay. So the department of student relations primarily deals with student behavior and discipline issues?

A. That's correct.

Q. You also mentioned the department of student advancement as one of the departments you oversee. Correct?

A.   Yes.

Q.   What does the department of student advancement do?

A.   So student advancement is a department that works with students in post-secondary options, once they graduate from high school.  And so mainly dealing with post-secondary transitional specialists and student engagement coaches; these are all staff members that assist with students transitioning through high school, ensuring that they meet requirements for graduation.  Looking at college applications, job applications, et cetera, to ensure that they graduate and then have a plan after high school.

Q.   Okay.  You mentioned school counseling as another department you oversee, correct?

A.   Yes.

Q.   What does the school counseling department do?

A.   So of course they're responsible for ensuring that students have a graduation plan; that they are scheduled in their appropriate courses for graduation; that they receive college and career guidance and individual counseling when they do.

Q.   Does the school counseling department play

any role with respect to student mental health?

A. They do.

Q. And can you talk about what role they play with respect to student mental health?

A. Of course they provide programming for those students. They deliver training for staff. Students are able to come to the counseling office to receive individual counseling. Of course they do small-group counseling. Just depending on what the services necessary are.

Q. And the school counseling department would consist of guidance counselors?

A. Correct.

Q. Does it also consist of other types of individuals who are responsible for dealing with student mental health?

A. Can you clarify the responsibility you're saying?

Q. Sure. Well, for example, would school psychologists fall within the school counseling department?

A. No, they would not.

Q. What department would they fall under?

A. Student services.

Q. Okay. Is student services one of the

departments that you oversee?

A.   No.

Q.   Who oversees that department?

A.   That would be Dr. Norman Sauce, in the division of student services.  And so -- psychology is a department of its own, so we have a department of psychological services.

Q.   You also mentioned social work as one of the departments you oversee, correct?

A.   Yes.

Q.   What is the social work department?

A.   So the social work department consists of about 75 social workers.  And then we have a lead social worker, and then we have a senior social work coordinator.  And their role is, again, to provide services related to mental health, child abuse, attendance protocol; making sure they implement attendance protocol.  Ensuring that students are coming to school, and the overall mental health and well-being of students.

Q.   And then I believe you mentioned -- and I didn't write it down, but I believe you mentioned student health services as a department?

A.   Yes.  So that's the department where we have our nurses.  So that includes nurses.  Nurse --

consulting nurses that oversee the nurses, and then also the senior nurse coordinator.

Q. Do the nurses within student health services play any role with respect to student mental health?

A. It just -- it varies. That varies.

Q. And what types of factors does it vary based on?

A. There may be some issues, immediate issues where they may participate in a crisis team, or in some of our schools we have school-based health centers, where students are -- they may come in there, and they are referred from the nurse to the school based officer.

Q. Typically speaking, would a nurse spend a majority of their time addressing mental health issues?

A. No.

MR. VAUGHN: Object to form.

BY MR. REINKE:

Q. What -- what would a nurse typically spend the majority of their time doing?

A. Typically they will spend their time dealing with immediate illnesses. There may be some acute or chronic medical issues that students have

within the building.  Ensuring that medication is distributed appropriately.  Making sure that medication is updated, and that -- different medical forms, ensuring that they are appropriate for students.  Day-to-day nursing.

Q.  And -- and then you also mentioned -- well, let me just ask you this:  Is -- is student health services one of the departments that you supervise?

A.  Yes.

Q.  And you also mentioned, I believe, after-school programs is a department that you supervise?

A.  Yes.

Q.  Tell me about that department.

A.  It is a -- programming that we offer for students beyond the school day.  I think currently we have over 50 programs in different schools, and so students are able to participate in extracurricular activities.  Also academic activities, to a degree; different opportunities beyond the school day. Typically runs from 4:00 o'clock, or when school is out, until about 6:00 or 6:30.

Q.  Other than the departments that we've just discussed, are there any additional departments that

you oversee for the DeKalb County School District?

A. No.

Q. I'm going to show you a document that we'll mark as Exhibit 1, and this is Tab 54.

And it looks like I only have an electronic copy of this, so my apologies for that. But you should be able to see it up on your screen, and I think you have the ability to scroll through the document as well.

DOCUMENT TECHNICIAN: I have it.

MR. VAUGHN: Could we get it on this screen too?

(DeKalb-Towns Exhibit 1 was marked for identification.)

BY MR. REINKE:

Q. Dr. Towns, do you recognize the document that I've marked as Exhibit 1?

A. Yes.

Q. What is this document?

A. My CV.

Q. Okay. And is this a current, up-to-date version of your CV?

A. Yes.

Q. And you provided this to your lawyers in advance of today's deposition, correct?

A.   Yes.

Q.   According to your CV, you have worked for the DeKalb County School District in various different roles since 1997; is that correct?

A.   That's correct.

Q.   You started as a chemistry instructor --

A.   Yes.

Q.   -- at a high school in DeKalb County?

A.   Yes.

Q.   And then after that, you were an instructional coordinator for the Academy of Science and Mathematics magnet school?

A.   Yes.

Q.   And then you worked as a school choice coordinator in the Schools Choice Office, correct?

A.   Yes.

Q.   In your role as an instructional coordinator at the Academy of Science and Mathematics magnet school, did your job duties include regularly interacting with students?

A.   Yes.

Q.   Can you briefly describe what your job duties were?

A.   So within the Atlanta Public School District, they had several schools within schools.

And so at Mays High School, they had an Academy of Math and Science for high-achieving students. And so I oversaw the Academy of Math and Science, about 550 students, included about 35 staff members. And I oversaw the daily operations of that academy. I worked with those students directly; at one point even taught a class, a chemistry class, for the students.

And there were some issues, but the overall daily operations of the students, met with the students as it relates to instruction. Discipline, in some cases; attendance, in some cases.

Q. And then as the school choice coordinator, did you regularly interact with students in that role?

A. Not as often. It was a district-level position. I would interact with students as it related to -- during lottery -- lottery time, or if they were in the District office to inquire with their parents. Or -- yeah, that was -- it was very limited.

Q. This -- so this was a position at the administrative offices --

A. Yes.

Q. -- of the District; so you were not in an

individual school, correct?

A. No.

Q. And then from 2009 to 2012, you were the gifted coordinator?

A. Yes.

Q. In that role, did you regularly interact with students?

A. So not regularly, but I would go out to the schools to test students for giftedness, as well as acceleration to another grade.

Q. Other than when you were going to the schools to test students, was your primary work location at the District's administrative offices?

A. Yes.

Q. From 2015 -- well, let's back up.

From 2012 to 2023, you were the director of student relations, correct?

A. Yes.

Q. As the director of student relations, were you working in the administrative office, primarily?

A. Yes.

Q. So not in an individual school?

A. No.

Q. Did you regularly interact with students in that role?

A.   On an irregular basis.  Irregular basis.

Q.   Okay.  Approximately how often would you say you interacted with students in that role?

A.   Maybe once a month.  That would typically be if I had to go out to a school to maybe speak with students regarding behavior, or if they were in the office because they had a behavior issue, or they were enrolling back, due to some extenuating circumstances.

Q.   So during the time you were the director of student relations, you also held a position, from 2015 through 2023, as the positive behavioral interventions and supports district coordinator, correct?

A.   Yes.

Q.   And in that role, did you regularly interact with students?

A.   Again, that was a district-level position, and it was a -- almost like an appointed position through the Department of Education, Georgia Department of Education.  Because we were implementing positive behavior interventions and supports, we were required to have a coordinator that worked directly with the Department of Education to ensure that we were implementing with fidelity.  So

not -- typically, on a day-to-day basis, I would not have contact with students.

Q. And in your current role, you work primarily out of the District's administrative offices, correct?

A. Yes.

Q. In your current role, do you regularly interact with students?

A. Typically I would interact with students, again, if there was some type of programming going on, if it rises to the level of having to speak with a large group of students. But not regularly.

Q. So is it fair to say that since the time you transitioned out of the role of instructional coordinator for the Academy of Science and Mathematics magnet school in 2006, you have not had a position in the DeKalb County School District where you regularly interacted with students?

MR. VAUGHN: Object to form.

THE WITNESS: Can you -- give me some more explanation on whether the -- interacted with the students?

BY MR. REINKE:

Q. Well, I mean, would you consider yourself to have had a position since 2006 where you have

regularly interacted with students in the DeKalb County School District?

A. I have interacted with the students.

Q. I understand that you've -- I understand that you've interacted with the students on certain occasions. My question is a little bit different.

Since 2006, have you had a position where you have routinely interacted with students in the DeKalb County School District?

MR. VAUGHN: Object to form.

THE WITNESS: Not routinely.

BY MR. REINKE:

Q. Have you held any positions in education other than what is reflected on your CV?

A. No.

Q. And you have a bachelor's degree in chemistry?

A. Yes.

Q. And a Ph.D. in organic chemistry?

A. Yes.

Q. Do you have any formal training in mental health?

A. No.

Q. Do you have any certifications in mental health?

A. No.

Q. I'm going to show you a document that we'll mark as Exhibit 2. And this is Tab 1.

(DeKalb-Towns Exhibit 2 was marked for identification.)

BY MR. REINKE:

Q. Dr. Towns, do you recognize the document that I've marked as Exhibit 2?

A. Yes.

Q. Okay. And this is the -- the notice of the deposition, the 30(b)(6) deposition of Plaintiff DeKalb County School District, correct?

A. Yes.

Q. And there are certain topics listed in this deposition notice, true?

A. Yes.

Q. In fact there are 65 topics?

A. Yes.

Q. Some of these topics are highlighted in orange.

A. Yes.

Q. And the topics that are highlighted in orange are topics that you have not been designated to cover, true?

A. Yes.

Q.   Other than the topics that are highlighted in orange, have you been designated as DeKalb County School District's representative to testify about the remaining topics in this notice?

A.   Yes.

Q.   Are you prepared to testify today about each of these topics?

A.   Yes.

Q.   And do you understand that your testimony about each of these topics is the testimony of the DeKalb County School District?

A.   Yes.

Q.   So if I refer to "DeKalb County School District," or, you know, "Board of Education of DeKalb County," or "DeKalb," you understand I'm referring to the DeKalb County School District which is the Plaintiff in this case, and your employer, correct?

A.   Yes.

Q.   Have you ever had your deposition taken before?

A.   No.

Q.   Did you do anything to prepare for your deposition today?

A.   Yes.

Q. What generally did you do to prepare?

A. I looked at the fact sheet, the responses to the interrogatories, as well as looked at documents that I sent related to the case.

Q. When you say you looked at documents you sent, are you referring to e-mails?

A. E-mail documents.

Q. Do you recall any specific documents?

A. Discipline reports, code of student conduct. Yeah, those types of reports.

Q. Do you recall any other specific -- looking at any other specific documents to prepare for your deposition?

A. No.

Q. Did you meet with your lawyers to prepare for your deposition?

A. Yes.

Q. How many times did you meet with your lawyers to prepare for your deposition?

A. I believe around six times.

Q. When was the first time, approximately, that you met with your lawyers to prepare for your deposition?

A. Sometime in February.

Q. And approximately when was the most recent

time that you met with your lawyers to prepare for your deposition?

A. Last week.

Q. Okay. So between February and last week, you met with your lawyers approximately six times to prepare for your deposition, true?

A. Yes.

Q. Did each of these meetings, these six meetings, last approximately the same amount of time?

A. No. They typically lasted between two to six hours.

Q. Do you have an estimate of how many hours, in total, you spent meeting with your lawyers to prepare for your deposition today?

A. I would say at least 24 hours.

Q. Other than your lawyers, have you discussed your deposition with anybody else?

A. No.

Q. Have you met with anybody other than your lawyers to prepare for your deposition?

A. I met with Ms. Denise Revels. She is the director for wrap-around services. She works in my division. And Ms. Shelly Bishop. She's also the senior social work coordinator.

Q. How many times did you meet with

Ms. Revels to prepare for your deposition?

A.   Once.

Q.   Approximately when was that?

A.   Last week.

Q.   And what did you discuss with Ms. Revels?

A.   Some of the mental health programming that we have in the District.

Q.   Do you recall any specific programming that you discussed with her?

A.   I discussed the PREPaRE programming that we have -- I believe that's for psychologists -- and then also GRIP.

Q.   And what is GRIP?

A.   This is a program for students who have been participating in violence, drug use, bringing weapons to school.  And it is run by social work as well as public safety.  Kind of an intervention program for students, held on Saturdays.

Q.   Okay.  Other than this mental health programming that you've just discussed, did you discuss anything else with Ms. Revels to prepare for your deposition?

A.   No.

Q.   Then you also said that you met with Shelly Bishop to prepare for your deposition?

A. Yes. She's -- she coordinates our attendance intervention program.

Q. And what did you discuss with Ms. Bishop?

A. Just spoke with her about trends in attendance in the District.

Q. Okay. And can you just briefly summarize what she told you about that?

A. We just talked about the attendance since COVID, and also we have a priority that includes increasing attendance rate for the District, utilizing some platforms that we have.

Q. When you say you talked about the attendance since COVID, did you talk about attendance rates since COVID?

A. Yes.

Q. And tell me what you talked about with respect to attendance rates.

A. Just whether they were increasing or decreasing.

Q. Did you discuss -- what did you discuss about whether they were increasing or decreasing?

A. Just looking at that data, in and of itself.

Q. Did the data that you looked at show whether they were increasing or decreasing?

A.   At one point it was decreasing; then students returned.  But now it seems to be increasing.

Q.   Do you recall what the attendance rates were during this time period?

A.   I do not recall.

Q.   Do you recall approximately what they were?

A.   Well, during -- during COVID, for clarity?

Q.   After --

A.   What time are you asking about?

Q.   Just -- just the time period after COVID.

A.   I don't recall the exact numbers.  If -- there's a document attendance report; I certainly can refer to that.

Q.   Sure.  And I understand you don't recall the exact numbers.  But do you recall approximately what those rates were?

A.   No, I don't.

Q.   Okay.  I think you mentioned that you also discussed with -- with Ms. Bishop the priority of increasing attendance rates?

A.   Yes.

Q.   Tell me about that conversation.

A.   We have a priority as it relates to our

strategic plan for the District, as well as what we call "miracles priorities," in an effort to increase attendance rates for the District. And so we regularly have conversations about that. Use of the platform by the staff, training for staff to use that platform. All the other things we're doing to increase attendance.

Q. Does this priority include a particular goal for an attendance rate?

A. It does.

Q. And what is that goal?

A. To increase the attendance rate by 2 percent.

Q. What is an attendance rate?

A. So essentially it is the percentage of days students are coming to school each day, which varies, based on the grade levels.

Q. Is it like the percentage over the entire school year? Or some other --

A. Yes. Percentage over the entire school year, which would be 180 days.

Q. Okay. Other than what we've just discussed, did you talk about anything else with Ms. Bishop to prepare for your deposition?

A. No.

Q. Did you meet with any DeKalb County School District employees, other than Ms. Revels and Ms. Bishop, to prepare for your deposition?

A. No.

Q. Other than your lawyers and Ms. Revels and Ms. Bishop, did you meet with anybody else to prepare for your deposition?

A. No.

Q. Have you reviewed any deposition transcripts to prepare for your deposition?

A. No.

Q. Okay. I want to shift gears a little bit and talk about some District policies.

So the DeKalb County School District has district-wide policies regarding student use of electronic devices; is that true?

A. That's true.

Q. And some of these policies at least are contained within the Student Code of Conduct. Is that correct?

A. Yes.

MR. REINKE: So I'm going to mark a document as Exhibit 3, which is Tab 70.

(DeKalb-Towns Exhibit 3 was marked for identification.)

MR. REINKE: And again, I think this is going to be one that's just electronic. I think we had a printing error, so my apologies for that.

BY MR. REINKE:

Q. Dr. Towns, can you see Exhibit 3 on your screen?

A. Yes.

Q. And this document is the DeKalb County School District Code of Student Conduct for 2024 and 2025, correct?

A. Yes.

Q. Could we please scroll to page 28.

And -- and while we're doing that, can you briefly just describe for me what the Student Code of Conduct is?

A. So the Student Code of Conduct is a document that we are required to provide to students as it relates to behavioral expectations. It also includes some additional information related to strategies, interventions, attendance protocol, bullying awareness information, information -- exceptional education, et cetera.

Q. Does the Student Code of Conduct apply to all students district-wide?

A. It does.

Q. Can individual schools adopt policies that vary from the Student Code of Conduct?

A. When you say "vary," can you tell me what you mean by "vary"?

Q. Well, so, for example, the Student Code of Conduct has a policy on tobacco and other tobacco products, correct?

A. Yes.

Q. Could an individual school adopt a different policy for tobacco and other tobacco products than what is referenced in the Student Code of Conduct?

A. No. Must be aligned to the Code of Student Conduct.

Q. And is that true for all of the policies that are contained within the Student Code of Conduct?

A. Yes. Any document that they adopt must be in alignment with the Student Code of Conduct.

Q. So it's fair to say that an individual school could adopt its own policies, but that policy would have to be aligned with the Student Code of Conduct; did I understand that correctly?

MR. VAUGHN: Object to form.

THE WITNESS: They would not adopt a policy.

BY MR. REINKE:

Q. Okay.

A. They may have a rule or an expectation, but it must be aligned to all policies and rules and expectations from the Code of Student Conduct.

Q. When you say "they would not adopt a policy," why would they not adopt a policy?

A. That would be the responsibility of the Board of Education, not the school itself.

Q. So the Board of Education is the entity that sets policies for the entire district, right?

A. That's correct.

Q. Could an individual teacher adopt a rule or expectation that's different than the Student Code of Conduct?

A. No. It must be aligned to the Code of Conduct.

Q. And if you could actually scroll down to the next page.

So I'm showing you -- it's marked page 27 on the bottom. But this is a section of the Student Code of Conduct that begins with "Offenses And Consequences," correct?

A.   Yes.

Q.   Are you familiar with this section of the Student Code of Conduct?

A.   Yes.

Q.   Okay.  What is the "Offenses And Consequences" section of the Student Code of Conduct?

A.   So essentially, the "Offenses And Consequences" portion of the code of conduct allows parents, students, staff, administrators, and other community stakeholders to see if a student is in violation of any of the rules or expectations for DeKalb County School District; that there is some type of discipline that may be given by the administrator or designee.

Q.   And if we scroll down about halfway down this page, there's a section beginning with the number "2," that says "Electronic Communication Devices, Including Cellar Phones, Smartphones, Tablets, Walkie-Talkies And Similar Devices."  Do you see that?

A.   Yes.

Q.   Is this the portion of the Student Code of Conduct that governs student use of cell phones?

A.   Yes.

Q.   Okay.  And the very first paragraph states

"Students will not use any electronic communication device, including but not limited to, cellar phones, smartphones, tablets, walkie-talkies, and similar devices during traditional and/or virtual instructional time or on school buses and must not interfere with the educational mission of the school or pose a safety hazard."  Did I read that correctly?

        A.    Yes.

        Q.    Okay.  And then it goes on to define the instructional day.  And then the next sentence, beginning with "At all times," says "At all times, students are expected to adhere to the following rules relative to electronic communication devices: (1) Phones must be turned completely off (not on silent or vibrate mode) and put away out of view (as directed by the school) during instructional time (official start of school day to the end of the school day), (2) No text messaging is allowed, (3) Students with serious medical conditions or other unusual circumstances may be given special permission by the school principal to use an electronic device if it is determined to be essential for the health of the student.  Even for approved instructional purposes, use of a personal electronic communication device such as a smartphone is optional; students

will not be required to provide personal electronic communication devices and will be furnished with a device or an alternative means to conduct the activity."  Did I read that correctly?

A.   Yes.

Q.   So is it -- is it fair to say that DeKalb's Student Code of Conduct does not prohibit students from having cell phones or other personal electronic devices on school property?

A.   Yes.

Q.   They're allowed to possess them; they're just not allowed to use them.  Is that fair?

A.   Yes.

Q.   Could DeKalb prohibit students from possessing cell phones or other personal electronic devices on school property?

MR. VAUGHN:  Object to form.

THE WITNESS:  Not clear on -- I'm not sure if the District has the authority to do that.  I don't know that.

BY MR. REINKE:

Q.   Okay.  And is there any reason why you think the District may not have the authority to do that?

MR. VAUGHN:  Object to form.

THE WITNESS: That seems like that might be a question for legal.

BY MR. REINKE:

Q. Okay. Are you aware of any particular law that would prohibit the District from preventing students from bringing cell phones or other electronic devices to school property?

A. Currently I'm aware that there is a bill for Georgia, that is now I guess at the House, to ban cell phones from schools. I'm not clear on whether that is possession of the phone or the use of it during school day.

Q. And is it your understanding that that bill has not been enacted yet?

A. That is my understanding.

Q. Are you -- well, has there been any point in time in which DeKalb has banned students from possessing cell phones or other electronic devices on school property?

A. So when you say "ban," are you speaking of possession or use?

Q. I'm speaking of possession.

A. Not to my knowledge.

Q. Okay. But currently, according to the current version of the Student Code of Conduct that

we're looking at, DeKalb bans students from using cell phones and other personal electronic devices on school property during the instructional time, correct?

A.    Yes, the use of them.

Q.    Okay.  Are there any approved uses of cell phones or electronic -- personal electronic devices for students during instructional time?

A.    I'm sorry, can you repeat the question?

Q.    Sure.  Are there any approved uses for students to use cell phones or other personal electronic devices during instructional time?

A.    So as a district, in some cases related to exceptional education, a student may have an individual education plan.  They may have a 504 plan.  Or they may have some exceptionality, medically -- this is certainly not an exhaustive list of reasons why they may use an electronic communication device.

Q.    Okay.  So for a person that has an individual education plan -- and let me just clarify the terminology that you used.

You mentioned an individual education plan and a 504 plan.  Are those different?

A.    So an individual education plan -- both are federally mandated; however, an individual

education plan, from my understanding, allows for students to receive additional services because they have been evaluated and it has been concluded that they needed services. And that also may entail some type of accommodations.

With a 504 plan, that would be more specifically related to accommodations.

Q. Are you aware of specific instances where an individual education plan allows a student to use a cell phone or other personal electronic device on campus during instructional time?

A. I am not personally aware of it.

Q. But you're -- you're aware that those incidents exist?

A. Yes.

Q. Okay. And do you know like what circumstances -- under what circumstances a student who is subject to an individual education plan would be allowed to use a cell phone or other personal communication device during instructional time?

A. Again, that would be dependent on the individual education plan. That could be because of a cognitive reason; that could be because of a -- some type of medical reason; et cetera.

Q. Are you aware of any students who are

allowed to use social media during instructional time pursuant to an individual education plan?

A. I am not personally aware of that.

Q. Do you know if any such incidents exist?

A. I do not.

Q. Are you aware of any students who are allowed to use social media during instructional time pursuant to a 504 plan?

A. I'm not aware.

Q. Do you know if any such incidents exist?

A. I do not.

Q. And then you also mentioned medical exceptions as a reason why a student could use a cell phone or personal electronic device during instructional time.

A. Yes.

Q. And I think -- if we can go back to the Code of Conduct, about --

DOCUMENT TECHNICIAN: Which page?

BY MR. REINKE:

Q. It's this -- this one. Where -- where it's highlighted; the line that begins with the Number 3. It's about five or six lines up from the bottom.

A. Yes.

Q. It says "Students with serious medical conditions or other unusual circumstances may be given special permission by the school principal to use an electronic device if it is determined to be essential for the health of the student."

Is that what you were referring to as the medical exceptions?

A. Yes, they have a medical exception. It would not necessarily be an IEP or 504.

Q. Are you aware of any students who are allowed to use social media during instructional time because of a medical exception?

A. I am not aware.

Q. Do you know if any such incidents exist?

A. No. I'm not aware.

Q. Now, the very next sentence in the student code of conduct says "Even for approved instructional purposes, use of a personal electronic communication device such as a smartphone is optional."

Are there approved instructional purposes for use of a cell phone or personal electronic communication device?

A. So -- yes, students are not required to utilize a DeKalb or district-issued electronic communication device such as a Chromebook.

Q. Okay. So I understand that students are not required to utilize a personal device, but my question is a little bit different.

Are there approved instructional purposes for which students are allowed to use cell phones or personal electronic communication devices during instructional time?

MR. VAUGHN: Object to form.

THE WITNESS: Can you -- can you rephrase or restate that question?

BY MR. REINKE:

Q. Sure. So the Code of Conduct refers to approved instructional purposes. Correct?

A. Yes.

Q. And my question is just, are you aware of any approved instructional purposes for which a student could use a cell phone or personal electronic communication device during instructional time?

A. I'm not specifically aware.

Q. Are you generally aware of that occurring?

A. It could occur.

Q. What would approved instructional purposes for using a cell phone or personal electronic communication device be?

A. Any academic practice, possibly.

Q. Okay. And when you say "academic practice," what specifically are you referring to?

A. That could be showing children how to do math problems, or going over some type of historical context. Academic-related.

Q. Do you know what types of software or apps or programs would be used for the academic practices that you just described?

A. No, not specifically.

Q. Do you have a general understanding of what types of software or apps or programs would be used for those academic practices?

A. I don't have any specific knowledge of all of those apps. If there's a report or documentation that we provided so I could view it and let you know.

Q. Are you aware of any -- well, let me ask it this way: Are there any teacher -- okay, let's back up for a second.

Approved instructional purposes: Who determines whether an instructional purpose would be approved?

A. Generally, if it's for the entire district, that would come through the division of curriculum and instruction, which is headed by a chief academic officer.

Q. Okay. And for an instructional purpose to be approved, would it have to be approved at the district level? Or could an individual school or teacher approve use of a personal electronic device in their classroom for an instructional purpose related to their particular circumstances?

MR. VAUGHN: Object to form.

THE WITNESS: I'm not -- not quite sure who would make the necessary rule for teachers to use it.

BY MR. REINKE:

Q. Okay. So it's possible that a teacher could allow their students to use a cell phone or other personal electronic communication device for an instructional purpose without violating the Student Code of Conduct, true?

A. Yes.

Q. And it's possible that the teacher could make that determination on their own, without going through the division of curriculum and instruction?

MR. VAUGHN: Object to form.

THE WITNESS: I think that's very individual for the teacher and the school.

BY MR. REINKE:

Q. So there is a circumstance in which that

could occur, correct?

A. Yes. They would have the opportunity to at least request.

Q. Are there any teachers within the DeKalb County School District who are using Facebook for approved instructional purposes?

MR. VAUGHN: Object to form.

THE WITNESS: I would not have any specific knowledge of that.

BY MR. REINKE:

Q. Are there any teachers within the DeKalb County School District who are using Instagram for approved instructional purposes?

MR. VAUGHN: Object to form.

THE WITNESS: I wouldn't have any specific knowledge of that.

BY MR. REINKE:

Q. Are there any teachers in the DeKalb County School District who are using TikTok for approved instructional purposes?

MR. VAUGHN: Object to form.

THE WITNESS: Would not have any specific knowledge of that.

BY MR. REINKE:

Q. Are there any teachers within the DeKalb

County School District who are using Snapchat for improved instructional purposes?

MR. VAUGHN: Object to form.

THE WITNESS: Would not have any specific knowledge of that.

BY MR. REINKE:

Q. Are there any teachers within the DeKalb County School District who are using YouTube for approved instructional purposes?

MR. VAUGHN: Object to form.

THE WITNESS: I wouldn't have any specific knowledge of it.

BY MR. REINKE:

Q. Are there any teachers within the DeKalb County School District who are using any social media platform for approved instructional purposes?

MR. VAUGHN: Object to form.

THE WITNESS: As a district, would -- would not have any specific knowledge of that.

BY MR. REINKE:

Q. And when you say you don't have specific knowledge of that, do you have any general knowledge of that?

A. No.

Q. Who is responsible for drafting the Code

of Conduct?

A. The director of student relations.

Q. And does the Code of Conduct need to be approved before it goes into effect?

A. Yes. The Office of Legal Affairs will take a look at that and review it to make sure that it's a legal document.

Q. Does it also need to be approved by the Board of Education?

A. No.

The superintendent will also review it.

Q. Okay. So just so I understand this correctly: The Code of Conduct is drafted by the director of student relations or that person's staff, correct?

A. Yes.

Q. And then it's reviewed by the Office of Legal Affairs?

A. Yes.

Q. And then ultimately the superintendent decides whether to approve the Code of Conduct?

A. Yes, informally.

Q. Did you say "informally"?

A. Yes.

Q. What do you mean by that?

A.   It's not a -- it doesn't go in front of the Board of Education or anything like that.  He again reviews it to --

(Reporter clarification requested.)

THE WITNESS:  He reviews it as -- as a form.

BY MR. REINKE:

Q.   When was this -- well, so this electronic communication devices policy that we've been discussing, you understand that this version is from the current school year Code of Conduct, correct?

A.   Yes.

Q.   Has this electronic communication device policy changed within the last five years?

A.   Yes.

Q.   How many times has it changed within the last five years?

A.   I don't recall how many times it's changed, but within five years, we reviewed it each year.

Q.   It's reviewed each year, you said?

A.   Yes.  It's reviewed each year.

Q.   Okay.  So I understand that this policy is reviewed every school year.

A.   Yes.

Q. Are you aware of any changes that have been made to this electronic communication devices policy within the last five years?

A. Yes. I believe we've updated it, yes.

Q. Okay. What types of changes have been made?

A. The types of devices, and of course the included virtual instruction time, as well as, I believe, defining that instructional day.

Q. When you say "the types of devices," what types of changes have been made with respect to the types of devices?

A. Well, as we have evolved with technology, the previous Code of Conducts may have had beepers and pagers and things that are obsolete at this point.

Q. Okay. Other than the changes to the types of devices, the reference to virtual instruction time, and the definition of the instructional day, as you sit here today, can you tell me if there have been any other changes to this electronic communication devices policy within the last five years?

A. If you could scroll down? Because I can't see all of it.

Q. Sure.

A. Scrolling . . .

DOCUMENT TECHNICIAN: This page is okay?

BY MR. REINKE:

Q. And I do think it goes on to the next page. So when you're ready to go to the next page, if you could indicate for him.

A. I believe we indicated we changed some of the usage or put in some language about technological resources, because those have evolved as well.

Any type of disruption to school because of the use of these technology resources.

You can scroll.

Q. And when do you believe that change was made?

A. As students started having more access to different applications, utilizing electronic communication devices, we of course had to evolve and include all of the positive expectations, because we received negative -- negative behaviors.

Q. Okay. And so you think this change was made around the time that students started having more access to different applications, correct?

A. Correct.

Q. Approximately what year was that?

A.    I guess maybe 2016, '17, '18, with the evolution of the electronic communication devices.

Q.    Okay.  I think if we continue to scroll down, we'll come to the end of this section soon.

And if you could just tell me, Dr. Towns, if there are any other changes you recall being made to this particular policy within the last five years?

A.    I don't.  However, we as a district have submitted several iterations of the Code of Student Conduct which -- if you allow me to observe those, then we could clearly see what the evolution of this particular rule has been.

Q.    Understood.

Is it fair to say that within the last five years, DeKalb has generally prohibited students from using cell phones and other personal electronic devices during instructional time?

A.    Yes.

Q.    And is it fair to say with that -- within the last ten years, DeKalb has generally prohibited students from using cell phones and other personal electronic communication devices during instructional time?

A.    Yes.

Q.    So you're not aware of any time period

within the last ten years in which DeKalb did not have a policy that generally prohibited students from using cell phones and other personal communication devices during instructional time?  Is that true?

A.   That's true.

Q.   Is this Student Code of Conduct communicated to students in the district?

A.   It is.

Q.   How is that communicated?

A.   We provide hard copies if requested.  And we also place it on each school's website, as well as on the District's website, in electronic form.  And then we put it in various languages.

Q.   Is -- is this Student Code of Conduct also communicated to parents and guardians?

A.   Yes.

Q.   How is it communicated to them?

A.    It is communicated, again, through our District website.  It is also placed on our Infinite Campus portal, which is our student information system, for which parents have access.

Q.    And is it also communicated to like staff, including teachers and administrators, at the school level?

A.    Yes.

Q. How is it communicated to them?

A. Again, they have access to hard copies within the school. Also electronically. Also they have access to Infinite Campus as well.

Q. So I want to make sure I understand this correctly. Is it fair to say that a hard copy of the Student Code of Conduct is not given to each student?

A. It is not. In the past we have done that. But if it is requested, it is available.

Q. You said "in the past," DeKalb has done that. So there was some point in time when DeKalb stopped doing that?

A. Yes.

Q. When was that?

A. Oh, I don't know the exact year. I'd say somewhere around 20- -- I don't know exactly.

Q. Okay. Was it within the last five years?

A. Not -- I don't know exactly.

Q. Was it within the last ten years?

A. Yes.

Q. So I understand that students are not provided with a hard copy of the Student Code of Conduct. Are students -- is there a process by which DeKalb students are made aware of the provisions of the Code of Conduct?

A. Yes. The teachers are required to review the Code of Conduct with students. Students are required to take what we call a discipline test on the Code of Student Conduct.

Q. Okay. When you say "teachers are required to review the Code of Conduct with students," is that something that the District requires teachers to do like at the beginning of the school year?

A. That is required at the beginning of school year. And then we also say -- it doesn't necessarily have to be a teacher. It could be a counselor or a designee; put it that way.

Q. And then you also referred to a "discipline test."

A. Yes.

Q. What is that?

A. That is a test that covers some of the most important and most frequently or -- violations or rules that could be violated. Could be some of the most egregious, or some of the rules that we see students typically violate.

Q. Is it a written test?

A. It's electronic. It could be provided in written form if needed.

Q. Is every student in DeKalb County School

District required to take this test?

A. Yes.

Q. And is there like a certain score that's required to pass the test?

A. It's a -- it's a test where the student is required to get all of the answers correct. So it isn't punitive in any way, but if they get an answer wrong, then the teacher will review that question to ensure that the student understands the correct answer.

Q. Does the District do anything to verify that its teachers are actually reviewing the Student Code of Conduct with students?

A. They do. Once the students have reviewed the Student Code of Conduct and completed the discipline test, they are required to have the students complete a signature log, and then they keep that signature log at the school.

Q. Okay. And the -- does anybody from the District review those signature logs?

A. That would only be reviewed at the time of a due process hearing.

Q. So as a routine matter, nobody from the District is verifying that the teachers educated the students on the Code of Conduct; is that true?

MR. VAUGHN: Object to form.

THE WITNESS: Can you -- can you give me that question again?

BY MR. REINKE:

Q. Yeah. I mean, so sort of just in the ordinary course, like outside the context of a due process hearing, is it accurate to say that nobody at the District level is reviewing whether teachers actually educated the students on the Code of Conduct?

MR. VAUGHN: Object to form.

THE WITNESS: I can't -- I don't know the answer to that.

BY MR. REINKE:

Q. Are you aware of anybody at the district level that is, on a regular basis, outside of the context of a due process hearing, reviewing signature logs to -- you know, associated with the Code of Conduct?

A. No.

Q. This discipline test: I think you mentioned that this is something that each student needs to take at the beginning of every school year. Is that correct?

A. Yes.

Q. Do the --

A. Whenever they enter into the school.

Q. Okay. So if somebody transfers in like mid school year, they would take it at the middle of the school year?

A. Yes.

Q. Okay. Do the questions vary from year to year?

A. They could.

Q. Do the questions vary depending on -- like the age or grade level of the student?

A. Yes.

Q. Okay. So let's focus first on, you know, the discipline test that would be given to, let's say, elementary students. Is it the same for all elementary students, or would it be different for different grade levels?

A. It may be different for different grade levels.

Q. Okay. Would the discipline test for a first-grader, for example, cover the same subjects as the discipline test for a tenth-grader?

A. I would have to -- I'm not sure. As a District, we may have submitted those. But if you have the documents, I could take a look at them and

be more specific on the answer.

Q. Who is responsible for developing these discipline tests?

A. The director of student relations.

Q. Do any of these different versions of the discipline test cover the policy on electronic communication devices?

A. I would have to just take a look at the documents, if you have them available.

Q. Okay. So just as you sit here, without having the documents in front of you, you don't know? Is that fair?

A. Well, because they vary.

Q. So some might, and some might not?

A. Again, I can take a look at the documents, if you have them, and answer more specifically.

Q. So other than the Code of Conduct, does DeKalb County School District have any district-wide policies that govern the use of cell phones or electronic devices?

A. Yes.

Q. What are those policies?

A. I don't know the exact policy, but I believe that's part of the documentation that we provided.

Q.    Okay.

A.    I can certainly review those documents, if you have them.

Q.    Sure.  And I'm just trying to get a sense of -- kind of generally speaking -- what those policies are, right?  Because DeKalb has provided a lot of documentation in this case, and I want to make sure I didn't overlook anything.

So other than the Code of Conduct, are -- are you aware of, you know, other policies within the District that govern electronic communication devices?

A.    Yes, I am aware of policy that governs them.

Q.    And do you know what any of these policies are called?

A.    I don't know verbatim, but there is a policy, acceptable use of social media.  We have an Internet use agreement.

Q.    Okay.  I'll show you a document that we'll mark as Exhibit 4.

(DeKalb-Towns Exhibit 4 was marked for identification.)

MR. REINKE:  This is Tab 69, which I think is also -- because of printing errors, it's only

going to be electronic.  Apologies for that.

Tab 69.  And we'll go ahead and mark this as Exhibit 4, if I didn't do that already.

DOCUMENT TECHNICIAN:  This -- oh, I'm sorry.  This is page?

MR. REINKE:  Yeah, it's a new tab.  Tab 69.

DOCUMENT TECHNICIAN:  That was my mistake.  I was in the wrong folder.

BY MR. REINKE:

Q.   All right.  Dr. Towns, the document that I've marked as Exhibit 4 is titled "Social Media Guidelines for Students," from DeKalb County School District.  Do you see that?

A.   Yes.

Q.   And this particular version of the document says "Communications Department, Updated March 3rd of 2016," correct?

A.   Yes.

Q.   Is this document -- and I'm happy to have you scroll through it, if you'd like to.  But is this document one of the additional policies related to the use of electronic devices or social media that you were just talking about?

A.   I would need to take a look at this.

Q. Sure. Yeah. And I'm happy for you to do that, if you want to scroll through it.

DOCUMENT TECHNICIAN: Let me know when to scroll.

THE WITNESS: You can keep scrolling. You can keep scrolling. Can you hold? Yeah, thank you.

Okay. If you can scroll now. If you can stop. Okay. You can scroll up. Okay. You can scroll up, please. You can keep scrolling. Thank you. Okay. You can scroll. Hold. Okay. You can scroll, please. Okay. Hold. You can scroll up. Okay. Scroll up. Okay. Scroll. Okay. Scroll up. Okay. Okay. Scroll up. Okay, scroll up.

Okay.

BY MR. REINKE:

Q. I think that's the end of the document.

A. Yes.

Q. So you -- you have now reviewed this document, correct?

A. Yes.

Q. And my question was, is this one of the additional policies related to use of electronic devices or social media that you were just talking

about?

A. So as I understand your question, it's not a policy; it is -- they're guidelines.

Q. Okay.

A. Just the guidelines.

Q. And what is your understanding of who publishes these guidelines?

A. The guidelines are published by the Department of Communications.

Q. And what is your understanding of what the purpose of these guidelines is?

A. My understanding is to safeguard students when they are utilizing social media.

Q. Okay. And if we could scroll to page 4, please.

And the very first bullet point says "The DeKalb County School District works hard to provide students with access to an education that prepares them to succeed in a global society utilizing 21st century technology. Therefore is the important to remember that social media and digital communication are key components to our everyday lives that must be understood and used responsibly."

Did I read that correctly?

A. Yes.

Q.   Do you agree that the DeKalb County School District should educate students to utilize 21st Century technology?

A.   Yes.

Q.   And that would include social media?

A.   Yes.

Q.   Would you agree that social media and digital communication are key components to our everyday lives?

A.   Yes.

Q.   If you scroll down to page 5, it says "Social Media -- Defined."  And the first bullet point says:  "Social media the collective of online communications channels dedicated to community-based input, interaction, content-sharing and collaboration.  Social media at DeKalb County School District is important because social media tools offer exceptional transparency, support effective communication by helping to expand reach, foster engagement, and increase access to credible information externally and internally."

Did I read that correctly?

A.   You did.

Q.   Would you agree that social media is important at DeKalb County School District?

MR. VAUGHN:  Object to form.

COURT REPORTER:  Excuse me?

MR. VAUGHN:  Sorry, I just -- objection.

BY MR. REINKE:

Q.   And what was your answer?  Could you repeat your answer for me?

A.   Could you repeat the question?

Q.   So the question is, would you agree that social media is important at DeKalb County School District?

MR. VAUGHN:  Objection to form.

THE WITNESS:  Based on the document, it states that.

BY MR. REINKE:

Q.   Right.  And I'm not asking you about what the document states; I'm asking if you agree with that.

A.   As a District, that's what we communicated.

Q.   And do you agree with what the District has communicated on that?

MR. VAUGHN:  Object to form.

THE WITNESS:  I agree with what's communicated, but I will share that it has had a negative impact as well.

BY MR. REINKE:

Q.   The District has also communicated that "social media tools offer exceptional transparency"?

A.   When utilized appropriately, yes.

Q.   The District has also communicated that social media supports effective communication "by helping to expand reach, foster engagement, and increase access to credible information externally and internally," correct?

A.   Yes, that's what the document indicates.

Q.   Okay.  And this is a document that DeKalb County School District published, correct?

A.   Yes.

Q.   Then the next bullet says "Some examples of social media uses include," and the very last bullet point is "Using YouTube to work on a class project."  Do you see that?

A.   Yes.

Q.   Does this document refresh your recollection about whether teachers within the DeKalb County School District are using YouTube for educational purposes?

MR. VAUGHN:  Object to form.

THE WITNESS:  It indicates that it could be used.  I don't know if they're using it or

Golkow Technologies,
877-370-3377                    A Veritext Division                    www.veritext.com

not.

BY MR. REINKE:

Q. Now, before I started asking you questions about this document -- or I guess when I started asking you questions about this document -- you spent a few minutes reviewing the document. Correct?

A. Yes.

Q. Did you read the entire document?

A. As much as I could in the time that I had.

Q. Did you see anything in this document about the potential for addiction to social media?

A. Can I -- can we actually scroll back? It's a long document that I read in a short amount of time.

Q. Sure.

DOCUMENT TECHNICIAN: Start down?

THE WITNESS: Yes. Can you scroll, please? Thank you. Can you scroll? Okay. Hold one second. Okay. Keep scrolling. Okay, keep scrolling. Okay. Scrolling. Keep scrolling. Okay.

No, I don't see that, but I do -- it does indicate that this is not -- does not cover every potential issue in social media situations.

BY MR. REINKE:

Q. Okay. And where is that indicated?

A. Under "Adhere to the Guidelines." The "general recommendations only and do not cover every potential social media situation."

Q. Understood. But you'd agree with me that there's no warning in this document that if you use social media, you might get addicted, true?

A. No, I think the warning is "do not cover every potential social media situation." That situation could be negative.

Q. I'm sorry, I want to make sure I understand your testimony.

Is your -- is your testimony that that reference to "this document are general recommendations only and do not cover every potential social media situation," it's your testimony that that is a warning about the risks of social media addiction?

A. I would say that this document isn't exhaustive of all of the potential negative situations that could occur with our students. They are just general guidelines, recommendations, as stated; but it is not covered in this document, every potential social media situation; that being a

negative situation, such as addiction.

Q. Right. And so the risk of addiction to social media is not covered in this document. True?

MR. VAUGHN: Object to form.

THE WITNESS: Again, it's not covering every potential social media situation.

BY MR. REINKE:

Q. Right. I understand that. And my question is, is one of the situations that it is not covering the risk of social media addiction?

A. It doesn't -- it doesn't say that specifically.

Q. Okay.

MR. VAUGHN: We've been going for about an hour-twenty. Do you mind if we take a quick break?

MR. REINKE: Sure.

VIDEOGRAPHER: We are now going off the video record. The time is currently 9:36 a.m.

(A recess transpired from 9:36 a.m. until 9:57 a.m.)

VIDEOGRAPHER: We are now back on the video record. The time is currently 9:57 a.m. -- excuse me; 9:58 a.m.

BY MR. REINKE:

Q.   Okay, Dr. Towns, I'm going to hand you a document that I've marked as Exhibit 5.  I actually have a printed copy of this one.

(DeKalb-Towns Exhibit 5 was marked for identification.)

BY MR. REINKE:

Q.   This document --

DOCUMENT TECHNICIAN:  What's the tab for this?

MR. REINKE:  Oh, this is Tab 205.

DOCUMENT TECHNICIAN:  I don't have 205.  Was that just uploaded?

MR. REINKE:  No.  One moment.  It's at the very top.

DOCUMENT TECHNICIAN:  It's just named slightly different.  One second.  It will only take a moment.

BY MR. REINKE:

Q.   Sure.  And Dr. Towns, this document is titled "Social Media Guidelines For Students, Department of Communications, Updated July 2019."  Is that correct?

A.   Yes.

Q.   And this is a document that was published

by DeKalb County School District, correct?

A. Yes.

Q. And specifically the Department of Communications?

A. Yes.

Q. Is this an updated version of the guidelines that we looked at in Exhibit 4 before the break?

A. I don't know that it's an updated version of that previous one, but it -- yeah, I don't know if it's an updated version, but it -- it does cover social media guidelines for students.

Q. Okay.

A. It doesn't indicate a version.

Q. Okay. And if you flip to the second page, there's a "Definition of Social Media," and then there's a heading that says "Be Respectful." Do you see that?

A. Yes.

Q. And the second paragraph under "Be Respectful" says "sometimes social media will be used for a class assignment and the same classroom rules will apply online as they do at school."

Does this document help refresh your recollection about whether teachers in the DeKalb

County School District were using social media for instructional purposes?

MR. VAUGHN: Object to the form.

THE WITNESS: Yes, they're allowed to use it.

BY MR. REINKE:

Q. They were allowed to use it?

A. Based on what this document indicates, that it can be used for class assignments.

Q. Okay. And if you could please -- I understand you'll have to take a moment to review the document.

A. Uh-huh.

Q. But can you please review the document, and tell me if there is any warning within this document about the risk of social media addiction?

A. So within the document, it isn't, but I would say it's not the responsibility of the School District to provide warnings about social media.

Q. Okay.

A. It's not their responsibility to do it.

Q. So you don't think it's the responsibility of the School District to provide warnings about social media?

A. Well, no, I think it's social media's

responsibility to provide warnings.

Q. Okay. And why do you think that?

A. They control the platform. It's their platform. So if there are problems, then they should provide those warnings.

We do a lot in school to ensure that students are able to learn and teachers are able to teach. The mere fact we have guidelines -- and these guidelines are about six years old -- would indicate that just like our policies have evolved, social media has evolved as well.

And so this document being six years old, there's some other even evolutions that have taken place in social media that we're -- as a district, we're just trying to keep up. We're just trying to keep up. While -- while teachers are teaching, the students are learning.

Q. Okay. Can you go back --

MR. REINKE: Can we put back up what we previously marked as Exhibit 4?

DOCUMENT TECHNICIAN: Which tab is that?

MR. REINKE: That was Tab 69.

And if you could scroll, please, to page 4.

BY MR. REINKE:

Q. And the very first bullet point, Dr. Towns, says "The DeKalb County School District works hard to provide students with access to an education that prepares them to succeed in a global society utilizing 21st century technology." Correct?

A. Yes, that's what the document says.

Q. So you would agree then, that it's part of the role of the School District to educate students on technology, correct?

A. We do educate students on technology.

But I do want to bring to your attention that this document is about -- I guess nine years old.

If you could scroll back? To the first part of the first page, where it gives the date?

Q. That's all right. This is from March 3rd of 2016.

A. 2016. And so we're talking about nine years, a nine-year-old document. And -- and so things have -- have evolved, yes. We want students to succeed in a global society, using 21st century technology that's positive; that doesn't negatively impact our students, does not cause a distraction in the class consistently, each and every day, where

students are distracted from learning and teachers are having to stop instruction.

But again, this is a nine-year-old document, so we're talking about, at the very beginning, of our students being -- having access to technology.

Q. I understand that. But I think you agree with me that part of DeKalb County School District's role is to educate students on safe and appropriate uses of technology, correct?

A. Well, I'd say it's become our role. Because, again, those -- those channels for technology are not necessarily educating the students on the warnings and issues with their technology, so it's become our role to do that.

Q. Okay. So you'd agree, then, that the School District should step in and educate students about the risks of social media?

A. No, I think social media should step in and -- and warn us about the issues that we're having.

Q. So --

A. It's the role of DeKalb County School District to educate students, and with the least amount of distractions as possible. That's the role

of the District.

Q. Okay. Is it -- is it your testimony that it is not the role of the District to educate students about the risks of social media?

A. It is the -- it's social media's responsibility to educate the students.

Q. Right. And my question is --

A. It is not --

Q. So it is not DeKalb County School District's role to educate students about the risks of social media?

A. No, it is not our responsibility. We do it because we want to keep our students safe. So . . .

Q. Okay.

A. It is -- it is our responsibility to keep our students safe.

Q. So if we could turn back to Exhibit 5 which is the document you have in front of you, the "Social Media Guidelines For Students," updated July 2019.

Does this document warn students about the risks of social media addiction?

A. While it doesn't warn the students about the addiction of social media, again, I want to state

that it is not the District's responsibility to warn the students about the issues and addiction of social media.  It is social media's responsibility to do that.

Q.  Okay.  And because it's not the District's responsibility, is it fair to say that DeKalb County School District has not in any point in time warned students of the risks of social media addiction?

MR. VAUGHN:  Object to form.

THE WITNESS:  We provide documentation for responsible use.

BY MR. REINKE:

Q.  Okay.  Right.  And that documentation includes the guidelines that we looked at from March of 2016, in Exhibit 4?

A.  Well, that -- again, that's a nine-year-old document; and again, social media has evolved, so much so, in nine years, that this is just very broad guidelines, and -- and again, that -- it covers parental responsibility, and that's more in a legal manner.  Parents are responsible for students, legally, as minors.

But that -- those guidelines don't cover in respect to warnings against social media.  I mean, we have the Surgeon General warning us now against

social media.  We have research that's been done to say, you know, that there are negative issues that are presented by utilizing social media.  Addictive behaviors of students utilizing social media.

Q.  Right.  I understand that.  And I guess my question is, you know, has DeKalb undertaken to inform its students about those risks that you've just described?

A.  As far as our guidelines, as far as our policies, we have -- I mean, we've taken some steps to make sure students are utilizing social media responsibly, as to not harm themselves.

I think -- within the guidelines, we're indicating to the students things to do and not to do.  It is clear that social media can pose a threat to students.

Q.  And I guess --

A.  -- guidelines.

Q.  My question is just a little bit different.  My question is, has DeKalb specifically warned students of the risks of social media addiction?

MR. VAUGHN:  Object to form.

THE WITNESS:  Not specifically.

BY MR. REINKE:

Q. I want to show you another document that we'll mark as Exhibit 6. And this is Tab 201.

(DeKalb-Towns Exhibit 6 was marked for identification.)

BY MR. REINKE:

Q. And if you could, please, take a moment, Dr. Towns, to review this document. And let me know if you recognize this.

A. I'm not specifically familiar with the letter, but it's a document provided by the District.

Q. Okay. So this is a DeKalb County School District document?

A. Yes.

Q. And it is titled "Family Social Media Guidelines," it looks like from SY 2016?

A. Yes.

Q. Does "SY" mean school year?

A. Yes.

Q. So would the school year 2016 be like the 2016-2017 school year?

A. This would be the '16-17 school year, uh-huh.

Q. Okay. And this document, again, is titled "Family Social Media Guidelines." And under the

introduction, the second bullet point --

DOCUMENT TECHNICIAN: What page?

MR. REINKE: Page 3.

BY MR. REINKE:

Q. Well, the first bullet point says "The DeKalb County School District is committed to providing students with access to an education that prepares them to succeed in a global society utilizing 21st century technology. Family members play a key role in ensuring students use social media responsibly. These parent and family social media guidelines have been created to help you guide your children in using social media responsibly and effectively." Did I read that correctly?

A. Yes.

Q. Would you agree that family members play a key role in ensuring students use social media responsibly?

A. Overall, I would say that parents have some responsibility in assisting students using technology. But we also are -- are asking parents who didn't grow up with this type of technology to know all of the details and ins and outs of social media, and different types of technology, for which they didn't grow up with. And so -- generally

speaking, yes.

Q. Okay. And, yeah, I mean, that's a fair point about parents not having grown up with this technology, so is that the reason why DeKalb provides guidelines to parents about social media?

A. They provide guidelines because -- and again, this is a nine-year-old document, so I do want to keep emphasizing that this, along with the other document, they're nine years old. And technology has evolved.

And this -- these are general guidelines as to what was happening back in 2016. That's not necessarily applying to what's happening today.

I mean, some of these -- some of the social media that we have today wasn't -- wasn't what it was then. Didn't have the algorithm -- algorithms and certain properties that's causing our students this negative behavior that we see, the time taken away from learning, the distractions that we have in schools. They -- they weren't designed as they are now.

So, again, these are general guidelines.

Q. Okay. Yeah. And I want to just follow up on what you mentioned about the algorithms and certain properties and design features of social

media.

Are you familiar with the algorithms of any particular social media platform?

MR. VAUGHN: Object to form.

THE WITNESS: Not specifically.

BY MR. REINKE:

Q. Okay. Well, you just testified that the algorithms and certain properties and design features of different social media platforms were different in 2016 than they are now.

A. Uh-huh.

Q. What specifically were you referring to?

A. Well, based on looking at 2016 and -- and thinking about the social media platforms, some were very static. Just pictures. And I'm not an expert on all of the different social media platforms, other than just recognizing specific changes. It just -- posting pictures, or static platforms.

But now, students are able to -- it's able to provide trends, or ways of determining whether likes, and all these -- these types of things that cause students to feel like they're missing out -- they have notifications now -- all of these things that are distractions during the school day, causing students to react, to see whether someone is

contacting me, or am I getting a like, or giving rewards.

These things didn't necessarily exist in 2016. So I go back to -- this document, again, it's very general.

Q. Okay. So one of the things you mentioned was static pictures. And I think, if I'm understanding your testimony correctly -- is it your testimony that certain social media platforms in 2016 only had static pictures, and now they contain additional content?

MR. VAUGHN: Object to form.

THE WITNESS: I don't want to speak specifically. I don't have that knowledge specifically.

BY MR. REINKE:

Q. Okay. Another thing you mentioned was notifications. Are there any specific social media platforms that you're aware of that have made changes to the way that notifications are sent out through the app since 2016?

A. I don't have the specific knowledge of how that happens.

Q. Okay. Do you have any general knowledge about changes to social media notifications since

2016?

A. I believe, in some instances, that there were notifications; but I can't go into specifics of the -- did they have sound? Vibrate? Et cetera. Those types of features.

Q. To your knowledge, have the notifications sent out by Facebook changed since 2016?

MR. VAUGHN: Object to form.

THE WITNESS: No, I don't know. I have -- I don't know.

BY MR. REINKE:

Q. Okay. To your knowledge, have the notifications sent out by Instagram changed since 2016?

MR. VAUGHN: Object to form.

THE WITNESS: No, I don't know what type of changes that would have been.

BY MR. REINKE:

Q. Do you know if there have been changes?

A. Well, I will say this: There have been changes that have impacted the school environment. Our students are receiving more notifications than they did in 2016.

We actually did a walk-through of our schools, because we are trying to ensure that

students are able to learn without distractions, they're able to engage more socially with each other, free of distractions. And through these walk-throughs -- on average, we walk through for 30 minutes in a classroom -- and on average, each student received 16 notifications in 30 minutes. On average, a class received almost 300 notifications in 30 minutes. When we looked in our middle schools, there was almost a thousand notifications in 30 minutes, on average. When we looked at our high schools, it was almost 900 notifications in 30 minutes. And on average, about 76 percent of those notifications were due to social media.

So students are being notified during -- during class, during instructional day.

Q. Okay.

A. We fight against that, again.

Q. I understand. And I -- I think my question was a little unclear, so I apologize for that. So let me rephrase my question.

My question is, do you know if there have been changes to the way Instagram sends out notifications since 2016?

MR. VAUGHN: Object to form.

THE WITNESS: No, I do not, but I know

that they are sending out notifications.

BY MR. REINKE:

Q.   Okay.  Do you know if there have been any changes to the way that Snapchat sends out notifications since 2016?

MR. VAUGHN:  Object to form.

THE WITNESS:  I don't have any expert knowledge.  But I know that it's happening more frequently, just based on, you know, the research, based on Surgeon General, all these things are happening quite frequently.

BY MR. REINKE:

Q.   Right.  And I guess what I'm trying to get at, right, is -- is the reason why this is happening more frequently, in your view -- do you know why that is?

MR. VAUGHN:  Object to form.

THE WITNESS:  No.

BY MR. REINKE:

Q.   Okay.  So you don't know if it's because of a change that was made to the particular social media app, correct?

A.   I don't know that.

Q.   Right.  And you don't know if it's just because more people are using that app now than were

in the past, correct?

    A.   I don't know that.

    Q.   Do you know if there have been any changes to the way YouTube sends out notifications since 2016?

    MR. VAUGHN:  Object to form.

    THE WITNESS:  I don't know that.

BY MR. REINKE:

    Q.   Do you know if there have been any changes to the way TikTok sends out notifications since 2016?

    MR. VAUGHN:  Object to form.

    THE WITNESS:  I don't know that.

BY MR. REINKE:

    Q.   And do you know if there have been changes to the algorithm of any social media app since 2016?

    MR. VAUGHN:  Object to form.

    THE WITNESS:  I wouldn't have any expert -- expert testimony to that.

BY MR. REINKE:

    Q.   Right.  And I am not only asking about expert testimony; I'm just asking about knowledge in general.

    Do you have any knowledge about whether there have been any changes to the algorithm for any social media app since 2016?

MR. VAUGHN: Object to form.

THE WITNESS: I'll share -- I'll say this about my knowledge, as -- as representing the District. Students -- based on what we see in the schools, based on the behaviors of the students, we've seen them more distracted and more disengaged as it relates to social media.

Again, more notifications, and more negative behavior as it relates to social media.

So we've seen the symptoms of these changes.

BY MR. REINKE:

Q. Okay. And my question is a little bit different. I'm not asking about what you've seen in schools. My question is just about -- do you know if there have been any changes to Facebook's algorithm since 2016?

MR. VAUGHN: Object to form.

THE WITNESS: No.

BY MR. REINKE:

Q. Was that a "no"?

A. No. I'm sorry.

Q. Okay.

Do you know if there have been any changes to Instagram's algorithm since 2016?

MR. VAUGHN: Object to form.

THE WITNESS:  I know that it looks different.

BY MR. REINKE:

Q.   Sure.

A.   It looks different.

Q.   So when you say "it looks different" --

A.   Nine years ago, it was just posting pictures.  Now that's not the case.

Q.   And is that based on your personal experience with using Instagram?

A.   I guess I'm representing the District, not me personally.  Is that correct?

Q.   Well, I'm just trying to understand what the basis for your statement that Instagram looks different now than it did in 2016 is.  So, I mean, is --

A.   Yeah.  I mean, I have viewed it, sure.

Q.   Thank you.

A.   Sure.

Q.   Other than personally viewing the Instagram app, do you have any other knowledge of any differences in the Instagram app since 2016?

A.   Not any expert knowledge on it.

Q.   Do you have -- do you know if there have been any changes to the algorithm for Snapchat since

2016?

MR. VAUGHN: Object to form.

THE WITNESS: Not specific changes, no.

BY MR. REINKE:

Q. Do you know if there have been changes?

A. I know that it looks different.

Q. Okay. But other than a different visual appearance, it's fair to say you don't know if there's been any other changes, correct?

MR. VAUGHN: Object to form.

THE WITNESS: I know that there's been research on -- on these social medias that indicate that there have been some changes that cause negative effects for students and people utilizing social media. By Surgeon General, the research companies.

BY MR. REINKE:

Q. Okay. So you mentioned the Surgeon General. Are you thinking of any other research?

A. I know that -- I believe Hanover Research has -- has done some studies as it relates to social media and cell phone usage.

Q. Do you recall any specific studies that Hanover Research has done?

A. I don't recall the specific title of the

documents.

Q. Okay. Other than the Surgeon General and Hanover Research, is there other research that you're aware of about this topic?

A. I mean, there's always news publications and -- you know, recently, more recently -- they have news coverage. I watch the news. They have news coverage about the harms of social media on children, addictive nature of social media on children. The lack of parental controls that social media has. You know, fact that -- the lack of age verifications.

All these things which impact students negatively.

Q. Yeah, and my question is just about the research that you were referring to in your previous testimony.

And so you mentioned the Surgeon General, Hanover Research, and news publications. Other than those three sources, was there any other research that you were referring to?

A. No.

Q. Do you know if there have been changes to the YouTube algorithm since 2016?

MR. VAUGHN: Object to form.

THE WITNESS: No.

BY MR. REINKE:

Q. Do you know if there have been changes to the TikTok algorithm since 2016?

MR. VAUGHN: Object to form.

THE WITNESS: No.

BY MR. REINKE:

Q. Now, you recited some data that has been collected by DeKalb County School District about notifications during class time, correct?

A. Yes.

Q. When was this data collected?

A. In 2024.

Q. Okay. At any point prior to 2024, did DeKalb collect data about notifications that students were receiving during class time?

A. As a district, if it was reported up to us, it would be documented, and that would be found in our student information system.

Q. Okay. But just so I understand correctly, if there was a particular disciplinary incident resulting from a student receiving a notification during class, prior to 2024, that would have been documented in the student information system?

A. That's correct.

Q. But other than that documentation in the

student information system, did DeKalb engage in any kind of analysis of how many notifications that students were receiving during class time prior to 2024?

MR. VAUGHN: Object to form.

THE WITNESS: Can you clarify "analysis"?

BY MR. REINKE:

Q. Any kind of research or study or collection of data.

A. If there was collection of data, again, it would have been reported up to the District, and it would be documented.

Q. In the student information?

A. In the student information system.

Q. Right. So I understand that the data would exist in the student information system, and we'll talk about that in a little bit. My question is a little bit different.

My question is, did DeKalb County School District, before 2024, ever undertake to determine how many notifications students were receiving during class time?

A. No.

Q. So when you previously testified that there are more notifications now than there were in

2016, what was the basis for that testimony?

A. Because we were -- were seeing more students, with more cell phones, based on the data regarding cell phone usage, based on disciplinary action.

Q. Okay. And then I guess what --

A. So --

Q. Sorry. Go ahead.

A. Because that's really rare that -- those platforms sit on personal cell phone devices, or personal electronic devices; then it would be reasonable to say, more cell phones, there's a possibility of more usage, social media, on those cell phones.

Q. Okay. And I guess what I'm struggling to understand is, is there something that you're comparing this data from 2024 against?

A. Well --

MR. VAUGHN: Object to form.

THE WITNESS: I'll say we -- we did not collect any formal data as it relates to notifications.

BY MR. REINKE:

Q. So is it just based on anecdotal reports?

A. It's based on students having more cell

phones in school, where that is the avenue for them to utilize social media.

Q. Right. And what's -- what's the basis for your testimony that students have more cell phones in school now than they did in 2016?

A. Based on seeing students every day. It being reported up to us as a district. Teachers and administrators are seeing students with cell phones, sometimes more than one cell phone, bringing them into school every day, based on the student -- the teachers seeing the students with cell phones on their person, as a distraction to the learning environment, based on teachers and administrators having to interact with students as it relates to having these cell phones.

And really -- really, the time and distraction of them on the cell phones with social media, having to deal with that issue. And again, just having them visually see their phones.

Q. At the beginning, when we started your deposition, you testified that you currently work in the administrative office, correct?

A. Yes.

Q. You're not routinely in the school buildings?

A.  No.

Q.  So you're not routinely observing what students are doing with cell phones or -- or electronic devices at school, correct?

MR. VAUGHN:  Object to form.

THE WITNESS:  Not regularly.  But as reported up to me in the role specifically as director of student relations, that information would be reported up to me.

BY MR. REINKE:

Q.  Okay.  And how is that information reported up to you?

A.  It could be reported by a phone call; it could be from the administrators; it could be reported, again, as a referral.  Because of repeated behaviors, egregious behaviors, as it relates to negative use of social media with cell phones.

Q.  Okay.  So you mentioned phone calls, referrals.  Are there other ways in which that information would be reported to you?

A.  Reported by parents.  It could be reported, really, through other community stakeholders.  Depending on what the circumstances are.

Q.  And when you say "other community

stakeholders" --

A. It could be volunteers that come in the building. Partners. Et cetera.

Q. Have you had instances where volunteers have reported things to you about student cell phone use?

A. Not -- not that I recall. But if -- if reported, it has been documented.

Q. Now I want to go back to what we previously marked as Exhibit 6, which was the family social media guidelines.

DOCUMENT TECHNICIAN: 201?

MR. REINKE: Yes.

BY MR. REINKE:

Q. And if you could, please, take a moment the review this document.

My question is, does this document warn parents and guardians about the risk of social media addiction?

A. Yes, I believe it warns them.

Q. Okay. Where is that?

A. It doesn't explicitly have "Warning" on the front of it. But the mere fact that we have to create guidelines for appropriate use, and we're asking, you know, children -- we're telling them what

they need to know:  Did you know that no one under the age of 13 is permitted to join Facebook?

We're letting them know those things, because age verification is not the strongest, so just click "Yes, I'm over the age of 13," and here we are.

So yes, I would consider that a warning. I would consider any -- any of the statements in here that are encouraging our students to be responsible, letting them know that your content that you post is not gone if you delete it.  It may not be harmless.

Just overall, having this document and having to provide this document is a warning to our students and parents.

Q.   Okay.  Yeah, and my question was a little bit different.  My question is not about the warning of the risks of social media in general; my question is specific to the risk of social media addiction.

So does this document warn parents that their children might get addicted to social media?

MR. VAUGHN:  Object to form.

THE WITNESS:  No, it doesn't explicitly warn from addiction.  However, it does tell students and parents how to use it so it wouldn't impact them negatively.

BY MR. REINKE:

Q. Okay. Is there anything within that -- in this document that warns parents or guardians to limit the time that their students spend on social media?

A. Well, in here, if we turn to page 7, it does -- in Bullet 3, it does allow for certain hours of use, to be online certain hours.

Q. Okay. And I think the bullet point you're referring to is the --

A. Is the third one.

Q. -- the third one, right, which says "Set ground rules for cell phone use. For example, set hours for phone usage or if you have teenagers of driving age, enforce the 'no texting while driving rule.' Keep in mind that if your children see you online often, they'll also want to be online."

But that bullet point isn't specific to social media, is it?

A. Well, certainly, if social media is on the phone. So yes, I would say so.

And then also it's warning them about things that could possibly be on social media, such as things that appear to be fun but are not, and that's the sixth bullet point down.

And also warning that online, there may be certain asks from children who may not know if it's safe to share with a letter -- or social security numbers, et cetera. So all of those are warnings.

Q. Okay. You'd agree with me that students can use their cell phones for other purposes, other than accessing social media, correct?

A. Yes, but they use it mostly for social media. They're scrolling on social media. The reality is, you know, the phone is the phone, but the students are using this for social media. The students -- the students are using these for social media. They -- that's what they're using it for.

Q. Okay. And what's the basis for that testimony?

A. I mean, teachers are reporting up to us that they're, you know, continually to be off task. They're continually, you know, distracted from the learning environment, continuing to have these negative social interactions on social media.

I mean, these kids are on social media. And there's no -- it's not like social media turns off during the instructional day. Social media's on 24 hours, 7 days a week; they don't turn it off. We know when kids are in school. They could easily turn

it off. They can easily stop their notifications during the school day. These kids are on social media during the school day.

Q. But my question is, students could also access text messaging on their phones during the school day, correct?

A. They could, but that's -- that's not what they're doing, primarily.

Q. Okay. What percentage of time are students in DeKalb County School District spending on social media versus other uses of their phone?

MR. VAUGHN: Object to form.

THE WITNESS: We don't -- I don't know -- I don't know that. I just know that the teachers are reporting that students are on -- on their phones, and they're being distracted, this time off task.

Students may be going to the counselors and social workers as a matter of being referred. And if they are, if it is because of that, if it is because of this like addictive behaviors, then that would be reported, in possibly staffing notes and things like that. Of course that's confidential.

BY MR. REINKE:

Q. You'd agree with me, though, that like if a student was watching a Netflix movie during class, they'd be distracted, right?

A. They could be.

Q. Right. And that's something that they could do on their phone?

A. They could.

Q. And that's something that might cause the teacher to report that the student was off task, because they were using their phone during class, right?

A. They could.

Q. Okay. We can set that document aside. I want to shift gears a bit and ask you some different questions.

Does DeKalb County School District provide any electronic devices to its students?

A. They do. They provide a -- a Chromebook.

Q. And when you say they provide a Chromebook to students, is this something that's provided to all students within the District?

A. Yeah, it's a one-to-one device.

Q. "One to one" meaning each student gets one device?

A. Yes.

Q. When was this program to provide Chromebooks -- well, let me ask you this: Does the program have a name, the program to provide Chromebooks to students?

A. I don't recall the name, but it may -- it may have a name. I don't recall it. It may be in a document.

Q. Okay. So there is a program called the Digital Dreamers Program?

A. Yes.

Q. Are you familiar with that?

A. To some degree.

Q. Okay. Is that the name of the program that provides Chromebooks to students?

A. Yes, to my -- to my recollection, it is.

Q. Okay. When was the Digital Dreamers Program first implemented?

A. I believe it was implemented around 2017. But we have a -- we may have recorded it and have it documented, the exact year.

Q. And I know you mentioned that currently, DeKalb students are provided with a Chromebook, correct?

A. Yes.

Q. Have DeKalb students been provided with any other type of device at any point in time through that Digital Dreamers Program?

A. If they have, it may be in the responses that we provided. I don't know.

Q. Okay. But as you sit here today, you're not aware of any other device, correct?

A. No.

Q. I'll show you a document that we'll mark as Exhibit 7.

(DeKalb-Towns Exhibit 7 was marked for identification.)

DOCUMENT TECHNICIAN: What's the tab number on that one?

MR. REINKE: Tab 186. Sorry.

DOCUMENT TECHNICIAN: That's all right.

BY MR. REINKE:

Q. Okay. Exhibit 7 is a document that I printed from DeKalb's website about the Digital Dreamer Program. And the very first paragraph states "Digital Dreamers make up 98,957 21st century digital learners in the 139 schools and centers of the DeKalb County School District." Do you see that?

A. Yes.

Q. 98,957, is that approximately the full

number of students that are currently within the DeKalb County School District?

A. We -- yeah, I would say approximately.

Q. Right.

A. We turned in a document that says the exact amount.

But what date was -- I see the date it was printed, but what date is this document?

Q. That's a good question. And it doesn't say on the face of the document, but it was printed on March 14th, 2025, from the DeKalb County School District's website.

A. Okay.

Q. So if you flip to the second page, the first full paragraph, that begins with "Over the last 3 years."

It says "Over the last 3 years, there have been persistent efforts to bridge the digital equity gap for Digital Dreamers. The learning environment is constantly accessible and supported by innovative technology that encourages all students to be active, creative, knowledgeable, and ethical participants in our globally connected society. This program has increased the district's digital footprint to provide continuous access to devices, connectivity, and a

virtual learning environment both during and beyond the school day. With the use of the devices and connectivity, students have been able to focus on academic achievement while engaging in practical ways to effectively collaborate, properly troubleshoot and care for devices, and promote digital citizenship. These all involve critical thinking skills that are needed to navigate beyond the traditional classroom environment."

Did I read that correctly?

A. Yes.

Q. Is that an accurate description of the goals of the Digital Dreamers program?

A. Yes, as stated in this document, yes.

Q. And this is a document that was printed from DeKalb County School District's website?

A. Yes.

Q. So when students are provided a Chromebook through this Digital Dreamers Program, are they allowed to take that Chromebook home with them?

A. Yes.

Q. So they can use the device both at school and at home?

A. Yes.

Q. At the end of the school year, does the

student give the device back to the District?

A. It has varied.

Q. Okay.

A. In some cases we've collected the devices. In some cases they've been able to keep them over the summer.

Q. Okay.

A. During summer school, it varies, on educational programming for students.

Q. So if students have some sort of educational programming over the summer, they may be able to keep the device during the summer; is that true?

A. Yes.

Q. But if they don't, then they would give the device back at the end of the school year?

A. Yes. I believe it varies.

Q. Are there any types of restrictions on websites that students can access on the devices that are provided to them through the Digital Dreamer Program?

A. Yes, there are restrictions.

Q. And what is your understanding of what those restrictions are?

A. My understanding is that they're

restricting different social media sites, anything that could be negatively impacting students, any harmful sites, adult sites, et cetera.

I don't have an exhaustive list. I believe that information has been provided to you from IT, which is our technology division. That information is available.

Q. And who at IT would be most knowledgeable of this?

A. It would be Ms. Monica Davis, who is -- she's currently retired. Then Dr. Kermit Belcher, who is our current chief information officer.

Q. When you say that access is restricted to social media sites, does that mean that the students cannot access a social media site at all from the device?

A. I wouldn't say that. Students are quite innovative, and they may be able to get around that.

Q. Okay.

A. Yeah.

Q. So setting aside the students who might figure a way around that, is it your understanding that access to social media sites would be blocked on these devices?

A. Yes, that's -- that's what I recall, best

of my understanding.

Q. And specifically, would access to Facebook be blocked?

A. Yes.

Q. Would access to Instagram be blocked?

A. Yes.

Q. Would access to TikTok be blocked?

A. Yes.

Q. Would access to Snapchat be blocked?

A. Yes.

Q. Would access to YouTube be blocked?

A. I believe there's a filter, such that -- for educational use, it would not be blocked.

Q. Okay. So fair to say that students would be able to access some content on YouTube from these devices?

A. Yes.

Q. But there may be other content that is blocked?

A. Yes.

Q. The content that is blocked on these devices, is it blocked only when the devices are connected to like a DeKalb County School District Internet network? Or is it blocked at all times?

MR. VAUGHN: Object to form.

THE WITNESS: I wouldn't -- I wouldn't know that. That would be information provided through the division of technology.

BY MR. REINKE:

Q. Okay. And more specifically, the students are allowed to take these devices home, correct?

A. Yes.

Q. If a student takes one of these Chromebooks home, can they access Facebook from home, from this device?

MR. VAUGHN: Object the form.

THE WITNESS: I wouldn't know that.

BY MR. REINKE:

Q. Okay. Do you know if they can access any social media platforms from home from this device?

A. I wouldn't know that.

Q. And again, would Monica Davis or Dr. Belcher be the person who would be knowledgeable about that?

A. Yes.

Q. Does the DeKalb County School District employ any tools to monitor students' activity online?

A. Can you tell me what you mean by "monitor"?

Q. Sure. Well, let's just look at a specific example of it. So let's pull up Tab 76. And again, I don't think I have a hard copy of this one.

A. Okay.

Q. Okay. And this is an e-mail that DeKalb County School District produced in this case. It looks like you were one of the people copied on the e-mail; you are listed on the "CC" line. Do you see that?

A. Yes.

Q. Okay. And this e-mail is from Kyia Clark?

A. Yes.

Q. Do you know who Ms. Clark is?

A. Yes.

Q. Who is she?

A. I believe she's a -- one of the directors in IT.

Q. Okay. And this e-mail was sent on March 22nd, 2024, correct?

A. Uh-huh.

Q. Yes?

A. Yes, I'm sorry.

Q. And the "Subject" line of the e-mail is "Lightspeed Alerts with Student Support Services," correct?

A.   Yes.

Q.   And I think Student Support Services -- is that one of the departments you oversee?

A.   Yes.

Q.   Okay.  And it looks like Ms. Clark, if you scroll down to the second page, sent a Teams meeting invite for a Lightspeed Alert Training.  Do you see that?

A.   Yes.

Q.   And then scrolling back up to the e-mail that accompanied this, which looks like it was sent at the exact same time, it says "The District will be rolling out the Lightspeed Alert System in the upcoming weeks.  The system will monitor online student activity, e.g. violence, self-harm, bullying, or sexually explicit content and if it is determined that the child is in danger, specific school-based staff members will be alerted for follow-up with the student.  Lightspeed will host an initial training with pertinent staff members (counselors and social workers) on Tuesday, March 26th from 10:00 a.m. to 10:30 a.m.  We need all social workers and counselors to participate in this initial virtual training."  Did I read that correctly?

A.   Yes.

Q.   So are you familiar with the Lightspeed Alert System?

A.   Only that it is an alert system that we were using.  If students had any experiences with these types of activities online, that we would be warned of it, and then we would take the necessary safety precautions and -- and notify the appropriate personnel.

Q.   Okay.  So at least according to this e-mail, the Lightspeed Alert System monitors online student activity for violence?

A.   Yes.

Q.   It monitors it for self-harm?

A.   Yes.

Q.   It monitors online student activity for bullying?

A.   Yes.

Q.   And it monitors online student activity for sexually explicit content?

A.   Yes.

Q.   Okay.  This e-mail was sent on March 22nd, 2024, and said that "The District will be rolling out the Lightspeed Alert System in the upcoming weeks."

Is it consistent with your recollection that DeKalb County School District started using the

Lightspeed Alert System around March or April of 2024?

A. So it is my recollection that we were going to start using it. And I -- if I recall, it may have been put on pause. But Ms. Davis would be the better person to ask about it specifically.

Q. Okay. Are you aware of whether DeKalb has used, at any point within the last ten years, any tools other than the Lightspeed Alert System to monitor online student activity for violence?

MR. VAUGHN: Object to form.

THE WITNESS: Yeah, I'm not aware, specifically, if we are using it I'm sure it has been -- a document has been provided to you.

BY MR. REINKE:

Q. Okay. And that would be something that Ms. Davis would be aware of?

A. Yes.

MR. REINKE: Oh, sorry. Yeah, I meant to mark this as Exhibit 8. So we'll mark this as Exhibit 8.

(DeKalb-Towns Exhibit 8 was marked for identification.)

BY MR. REINKE:

Q. Are you aware of whether DeKalb, within

the last ten years, has used any software or tool other than the Lightspeed Alert System to monitor online student activity for self-harm?

A. I'm not aware.

Q. Are you aware of whether DeKalb has used, within the last ten years, any tool other than the Lightspeed Alert System to monitor online student activity for bullying?

A. I'm not aware.

I will state that we do collaborate with our local agencies such as Homeland Security, among the federal agencies and local agencies, whereby they monitor online activity, and will make us aware if any of these activities and some other activities occur --

Q. Okay.

A. -- that may impact our school district.

Q. Okay. So you mentioned Homeland Security.

A. Uh-huh.

Q. Is that like the federal Department of Homeland Security?

A. Yes. Yes.

Q. Okay. Other than Homeland Security, are there other agencies that DeKalb collaborates with to monitor potential threats online?

A.   Online, I'm not aware.

Q.   Okay.  Do you know when DeKalb began collaborating with Homeland Security to monitor online activity?

A.   No, I don't recall the date.

Q.   Okay.  One more question about the Lightspeed Alert System, just to close it out:  Are you aware of any tool that DeKalb has used within the last ten years, other than the Lightspeed Alert System, to monitor online student activity for sexually explicit content?

A.   Not aware.

Q.   Okay.

I want to show you a document that we'll mark as Exhibit 9, which is Tab 77.

(DeKalb-Towns Exhibit 9 was marked for identification.)

BY MR. REINKE:

Q.   And this is a document that DeKalb produced in this case.  It's a series of e-mails.  And I want to draw your attention in particular to the second e-mail from the top.

DOCUMENT TECHNICIAN:  Second page, or second e-mail?

MR. REINKE:  Second e-mail, on the first

page.

BY MR. REINKE:

Q. And this -- this is an e-mail from -- is it pronounced "Vasanne"? --

A. Yes.

Q. -- Vasanne Tinsley, sent on March 28th, 2018, to somebody with an e-mail address heather@hoppersoft.com. Do you see that?

A. Yes.

Q. Do you recognize the name Vasanne Tinsley?

A. Yes.

Q. And who is that?

A. Dr. Tinsley was the current deputy superintendent of students supporting intervention. And then she served as the interim superintendent.

Q. Do you know what position she held on March 28th, 2018?

A. She would have been the deputy superintendent at the time.

Q. Okay. And there's an e-mail that is -- that she was -- a person or an e-mail address that she sent this e-mail to: Heather@hoppersoft.com.

Do you recognize that address?

A. No.

Q. The name associated with that e-mail

address is Heather Hopper; do you recognize that name?

A. No.

Q. Okay. So in the second paragraph here, Dr. Tinsley states "My calls were to speak to you regarding your questions asked and hear suggestions from you. Let me begin by stating that school threats (written and verbal) are investigated by our internal DeKalb County School District Police Department. The department is fully functioning (open 365 days a year) and collaborates closely with other law enforcement agencies when concerns arise. Uniquely, the department has the capacity to monitor and search social media platforms, when necessary. This helps us rapidly address threats or other inappropriate social media postings (by students and members of the community) that might impact schools."

Did I read that correctly?

A. Yes.

Q. Are you aware of the capability that the DeKalb County School District Police Department has to monitor and search social media platforms?

A. Not specifically what that platform is or how it functions.

Q. Okay.

A.   Yeah, I'm not -- looking at this, I'm assuming that that's the collaboration with other agencies.

Q.   Okay.

A.   That could be, again, Homeland Security, et cetera.

Q.   Is the DeKalb County School District Police Department routinely monitoring social media platforms today?

A.   I think that would probably be a better question to ask Public Safety.  I know that they, again, collaborate with other agencies.

Q.   Okay.  Yeah.  I understand that.

A.   Uh-huh.

Q.   But as you sit here today, you don't know one way or another.  Is that fair?

A.   No, I don't -- I don't know the method in which the -- that happens.

Q.   Right, right.  And I'm not asking about the method; I'm just asking about if you know whether that is something that the DeKalb County School District Police Department is doing today.

A.   I -- I wouldn't know that.

Q.   Okay.

A.   I would say, based on this document -- I

mean, the document was provided, so it indicates that. And she -- at this time, Dr. Tinsley would have been over public safety at this time.

Q. Okay.

A. In her capacity.

Q. And who would be over public safety today?

A. That would be Chief Tracy Whaley. W-h-a-l-e-y. Tracy, T-r-a-c-y.

MR. REINKE: Okay. We've been going for a little over an hour, so I'm at a good place to take a break. So we can take another break.

VIDEOGRAPHER: We are now going off the video record. The time is currently 11:05 a.m.

(A recess transpired from 11:05 a.m. Until 11:29 a.m.)

VIDEOGRAPHER: We are now back on the video record. The time is currently 11:29 a.m.

BY MR. REINKE:

Q. All right, Dr. Towns, I'm going to show you a document which we have available electronically, that I'll mark as Exhibit 10. This is Tab 5.

(DeKalb-Towns Exhibit 10 was marked for identification.)

BY MR. REINKE:

Q. And this document -- it's 40 pages. But this is a Plaintiff fact sheet that the DeKalb County School District has submitted in connection with this case. Do you see that?

A. Yes.

Q. Okay. And if you can -- if you can scroll down to page 3, please.

Under the heading "Representative Capacity," Question Number 7 is the "Name of individuals completing this fact sheet."

And you are listed on that line, correct?

A. Yes.

Q. As well as Denise Revels, who I think we've already talked about her job description?

A. Yes.

Q. Who is Larry Wright?

A. So he was at the time, I believe, the acting chief of public safety.

Q. Okay. But he is no longer the acting chief of public safety?

A. No. He's currently a major --

Q. Okay.

A. -- for DeKalb County School District Public Safety.

Q. Understood. And then I believe you said that Chief Tracy Whaley took over for him --

A. Yes.

Q. -- is that true?

A. Yes.

Q. Okay. Did you assist with completing this Plaintiff fact sheet?

A. Yes.

Q. Did you personally fill out the forms on the Plaintiff fact sheet?

A. Yes.

Q. And then if you want -- if you can scroll to the last page, please.

This is a certification page. And it states "I have made reasonable inquiries to answer the foregoing questions. Based on my personal knowledge and the information provided by other district employees, I declare under penalty of perjury that the information provided in this Plaintiff fact sheet is complete, true, and correct to the best of my knowledge and information, and that I have provided all of the requested documents that are reasonably accessible to me and/or my attorneys, to the best of my knowledge."

Did I read that correctly?

A.   Yes.

Q.   And that is your electronic signature on the certification, is it not?

A.   Yes.

Q.   And if you can now scroll up to page 16, please.  Under a heading that says "Section V, Damages," Question 22 states:  "State generally in what way or how you claim you have been damaged by each Defendant's alleged acts at issue in this lawsuit and approximately when that injury began."

And it states:  "As a result of Defendants' conduct, as alleged in Plaintiff's complaint, Plaintiff has had to expend, divert, and increase financial and personnel resources to address the disruption and other impacts caused by Defendants' conduct, including to:  Properly store cell phones and other devices; respond to increased mental and behavioral health issues among students; repair property damage; communicate and engage with parents and guardians; investigate and respond to threats to schools and students; implement new information technology as well as physical resources to limit access to, and mitigate risks caused by, Defendants' platforms; develop and revise bullying and harassment awareness presentations, policies, and

regulations; provide additional learning support; hire additional mental health personnel; address student disciplinary issues; modify mental health curricula; create education materials about proper Internet etiquette and use of social media and harm it may cause; route students to counselors and mental health service providers; develop additional mental health resources; train teachers to support student mental health and social emotional health; train staff to address students' use of Defendants' platforms and related issues; update student handbooks to address use of Defendants' platforms; and update school policies to address use of Defendants' platforms."

Did I read that correctly?

A.   Yes.

Q.   And is this a paragraph that you personally wrote?

MR. VAUGHN:  I'm just going to object to form, and just state that to the extent, Dr. Towns, that any of this was done in conjunction with attorneys, that is protected attorney work product, and you do not have to answer the question.

MR. REINKE:  Okay.  So my question is

just, "Did you personally write this paragraph?" And are you instructing her not to answer that?

MR. VAUGHN: "Did you personally write" -- no, I'm not instructing her not to answer that. But I am instructing her not to provide any information that would reveal attorney work product or attorney-client privileged information in your response.

MR. REINKE: Okay. Let me just clarify the question.

BY MR. REINKE:

Q. So without telling me anything about conversations that you had with your counsel, did you personally write this paragraph?

A. I provided the information that -- that is in this paragraph.

Q. Okay. So you -- you did not personally type it out?

A. No.

Q. Okay. Does this paragraph accurately reflect the harms that the DeKalb County School District has suffered as a result of social media addiction?

A. Yes.

Q. Are there any other harms that the DeKalb

County School District has suffered as a result of social media addiction that are not specifically listed in this paragraph?

MR. VAUGHN: Object to form.

THE WITNESS: I don't think this is an exhaustive list.

BY MR. REINKE:

Q. Okay.

A. This is -- this is a lot of the -- the issues that we've had to address, but I don't think it's an exhaustive list.

Q. Okay.

A. I'm sure that there's more documentation that's been provided to -- as to other damages.

Q. When you say that it's not an exhaustive list, are there any specific examples of harms that DeKalb County School District has suffered as a result of School District -- as a result of social media addiction that are not listed here, that you can think of?

A. I'm sure there are other personnel in the District that can speak to those additional items.

Q. Okay. And my question is just, are there any other harms that are not listed here that you are aware of, as you sit here today?

A.   No.

Q.   Okay.  So one of the -- one of the harms that is listed in this paragraph is developing and revising bullying and harassment awareness presentations, policies, and regulations.  True?

A.   Yes.

Q.   But you -- you would agree with me, wouldn't you, that like bullying could occur without social media?

A.   Yes.  It could.

Q.   Right.  So there are certain types of bullying that don't have anything to do with social media, correct?

A.   Yes.

Q.   And I want to show you a document that we will mark as Exhibit 11, which is Tab 56.

Again, it will be an electronic document.

(DeKalb-Towns Exhibit 11 was marked for identification.)

BY MR. REINKE:

Q.   So this is a document that DeKalb has produced in this case.  It appears to be a letter dated February 22nd, 2022.  Correct?

A.   Yes.

Q.   And if you scroll down to the second page,

this letter is signed by Superintendent Mrs. Cheryl Watson-Harris?

A. Yes.

Q. Was Cheryl Watson-Harris the DeKalb County School District Superintendent on February 22nd, 2022?

A. As listed on this document, yes.

Q. And is that consistent with your recollection?

A. It is.

Q. So this letter states "Dear DeKalb County School District Community.

"DeKalb County School District is committed to the safety and education of all of our students. Essential to this commitment is open communication and transparency with our families regarding safety issues when they arise. For this reason, I'd like to make you aware of recent concerns surrounding our district in the last" --

MR. VAUGHN: I just want to -- sorry. We just can't see it.

MR. REINKE: Can you scroll up to the --

MR. VAUGHN: So I didn't want you to get all the way through it.

MR. REINKE: Yeah.

MR. VAUGHN: Yeah, I just want her to be able to see what you're reading.

MR. REINKE: Thanks. First page. First paragraph.

MR. VAUGHN: Sorry.

MR. REINKE: And if you could just take -- no, I appreciate you letting me know that.

BY MR. REINKE:

Q. If you could just take a moment to read that first paragraph, Dr. Towns.

A. Okay.

Q. And it states in this letter "I'd like to make you aware of recent concerns surrounding our district in the last few weeks." Do you have any idea what prompted this letter?

A. If I could review the letter --

Q. Sure.

A. -- I haven't, you know, been able to review the entire letter.

Q. Okay.

A. Okay. Can you scroll up some, please? Okay. That's good. Thank you. Can you scroll back down.

DOCUMENT TECHNICIAN: Back to the top?

THE WITNESS: Yes. Thank you.

BY MR. REINKE:

Q. Okay. So you've taken a moment to review the letter, correct?

A. Yes.

Q. Based on your review of the letter, do you have an understanding of what prompted this letter?

A. Just based on what it's saying; I don't have any specific knowledge of the specific interactions.

Q. Okay. The second paragraph states "Our school community has witnessed cases involving bullying, fighting, and other disturbing behavior. What is unfortunate is that violence has been a concern not only in our district, but also across the nation. Many experts have attributed this erratic and troubling behavior to the arrested social emotional development of our students resulting from the pandemic. The physical disconnection our students experienced has manifested into behaviors signaling an outcry for help."

Did I read that correctly?

A. Yes.

Q. This statement, "Many experts have attributed this erratic and troubling behavior to the arrested social emotional development of our students

resulting from the pandemic," do you agree that the pandemic has caused behavioral issues with students in DeKalb County schools?

MR. VAUGHN: Object to form.

THE WITNESS: Yes.

BY MR. REINKE:

Q. Okay. And specifically, this letter attributes certain instances of bullying and fighting and other disturbing behavior to the pandemic. Correct?

A. Yes.

Q. And that is one of the harms that DeKalb has also attributed to social media, correct?

A. Yes.

Q. Has DeKalb reviewed any data to determine like what portion of the bullying that is going on in schools is attributable to social media versus the pandemic?

A. No.

MR. VAUGHN: Object to form.

BY MR. REINKE:

Q. Has DeKalb conducted any studies to try to understand what portion of the bullying that is going on in DeKalb County schools is attributable to social media versus the pandemic?

MR. VAUGHN:  Object to form.

THE WITNESS:  Can you -- can you clarify "studies"?

BY MR. REINKE:

Q.   Sure.  Like any kind of research or analysis.

A.   Well, if it's reported to us that the bullying stemmed from social media, then we document it in our school's information system.

Q.   Okay.  And when you refer to your school's information system, are you referring to Infinite Campus?

A.   Yes.

Q.   Other than documenting that in Infinite Campus, has DeKalb conduct -- can't talk right.

Other than documenting that in Infinite Campus, has DeKalb collected any other data to try to determine whether bullying is attributable to social media or some other factor?

MR. VAUGHN:  Object to form.

THE WITNESS:  No, not to -- not in -- in -- formally in that way.

BY MR. REINKE:

Q.   Have student disciplinary incidents increased as a result of social media?  And -- and

when I refer to "student disciplinary incidents," I'm referring specifically to in the DeKalb County School District.

A. So as of -- as a district, we are seeing an increase in discipline matters. And these are of course reported and documented in Infinite Campus. This -- these are shared by teachers, administrators. So as a district, and, you know, reported up to us, we can see that discipline matters have -- have increased.

Q. And DeKalb believes that that is a result of social media?

A. Yes, some of which is attributed to social media.

(DeKalb-Towns Exhibit 12 was marked for identification.)

BY MR. REINKE:

Q. Okay. I want to show you a document that we will mark as Exhibit 12, which is Tab 200. And this one is a big spreadsheet, so it's just going to be available online.

A. Okay.

Q. And so this is a document that DeKalb produced in this case, which appears to be an export of data from Infinite Campus. And if we could -- I

think if -- you can see where it says "Source: Infinite Campus Server," on row 7 in the document. Do you see that?

A. Yes.

MR. REINKE: And can you zoom out of this document a bit?

DOCUMENT TECHNICIAN: Yes. Trying to get it pushed over there.

MR. REINKE: Okay.

DOCUMENT TECHNICIAN: She has to see it on the screen.

MR. REINKE: Right. Right. Yeah.

DOCUMENT TECHNICIAN: Can you see it on the screen in front of you, ma'am?

THE WITNESS: Yes.

DOCUMENT TECHNICIAN: Oh, wonderful.

MR. REINKE: And if you could just sort of scroll --

DOCUMENT TECHNICIAN: I'm sorry. I'll go back up.

MR. REINKE: Okay.

BY MR. REINKE:

Q. And Dr. Towns, I guess my question for you is, are you familiar with this type of report?

A. Yes.

Q. Okay. And is it your understanding that this report is an export of disciplinary incidents that were in DeKalb's Infinite Campus system?

A. Yes, based on -- based on the title of what's showing me, sure.

Q. And it looks like there are various -- each line, it looks like, represents a specific incident; is that correct?

A. Yes.

Q. Okay. And if we scroll over -- well, before we do that, does DeKalb use currently any other system other than Infinite Campus to track discipline data?

A. No, they -- we simply use Infinite Campus.

Q. Okay. How long has DeKalb used Infinite Campus for this purpose of tracking disciplinary incidents?

A. I'm going to say at least seven or eight years. We've -- sometimes we'll change information systems.

Q. Okay.

A. So -- maybe going back maybe seven or eight years. It could be ten.

Q. Okay. So this spreadsheet, if you look at the first few lines in the spreadsheet, these appear

to be incidents from the 2015 to 2016 school year. Is that correct?

A. Yeah. So minimum ten years.

Q. Okay. So, fair to say that DeKalb County School District has been using Infinite Campus to track disciplinary incidents since at least the 2015 through 2016 school year?

A. Yes.

Q. And has DeKalb been using Infinite Campus continuously for that purpose since that time?

A. Yes.

Q. Okay. So there hasn't been like any time period between 2015-2016 school year and today when DeKalb was using a different program, or different system, to track disciplinary incidents; is that correct?

A. Not to my knowledge.

Q. Okay. And so if we take a look at these columns, it looks like the first column is the school year and the school at which the incident occurred. Is that correct?

A. Yes.

Q. Okay. And then we have the school year, is Column B. Correct?

A. Yes.

Q. Incident date is Column C?

A. Yes.

Q. Incident D is -- it looks just the month and the year in which the incident occurred?

A. Yes.

Q. Column E is the behavior comment?

A. Yes.

Q. And what is that?

A. So that would be the narrative or description of what occurred.

Q. Okay.

A. The incident that occurred, which would be placed in by a teacher or an administrator.

Q. Okay. So when a student is disciplined in a classroom, let's say -- I take it that not every instance of student discipline would be reported in Infinite Campus; is that true?

A. That's true.

Q. Like a student might be passing a note to somebody in class, and the teacher reprimands the student but doesn't report it in Infinite Campus?

A. That's true.

Q. Is there a particular threshold for when a teacher is required to report an incident in Infinite Campus?

A. So there are -- there are instances when that occurs.

Q. And typically, what determines whether a teacher reports a disciplinary incident in Infinite Campus, versus handles it, you know, informally in class, if you will?

A. So there are State reportable offenses, based on the Georgia Department of Education, and those are typically reported in Infinite Campus.

Q. Okay. And what are State reportable offenses?

A. Those rules that are -- or offenses listed in the Code of Student Conduct.

Q. So that would include violations of the electronic device policy?

A. Yes.

Q. So is it fair to say that teachers are required to report violations of the electronic device policy in Infinite Campus?

A. If there is a report of it, it is documented in Infinite Campus.

Q. So I just want to make sure I understand that. So let's just say if a student is using a cell phone in class during instructional time, and it's not for an instructional purpose, that would violate

the electronic device policy, correct?

A. Yes.

Q. Okay. And so the teacher observes the student using the cell phone in class; teacher sees that this violation of the policy has occurred. Is the teacher supposed to log that incident in Infinite Campus?

A. I think the teacher -- yes. They have some level of discretion. Yes, they would log it in Infinite Campus.

Q. Okay. You also said that they have some level of discretion.

A. I mean -- if a teacher had to stop class each and every time when students are using cell phones, then there would be no learning or teaching happening. And so generally, that is a verbal warning; yes, it could be reported in Infinite Campus.

But to the extent that we want to continue teaching and learning, that may be an instance where it's not -- the teacher doesn't stop to write a referral -- which would take 30 minutes, at a minimum, to write that, get an administrator, move the child to an office, et cetera.

That is not typically happening, day after

day, when teachers see students using cell phone in the class.

Q. Okay. Is there a policy that requires teachers to report violations of the Code of Conduct in Infinite Campus?

A. That is -- I'm not aware if -- they are -- they have to report State reported offenses in Infinite Campus, and that is the -- the platform that they report it in. The specific policy, we would just have to take a look at the Board policies.

Q. Okay.

A. Yeah.

Q. But your -- your understanding is that there's a policy that they're required to report State reported offenses --

A. Yes.

Q. -- in Infinite Campus?

A. Yes.

Q. And has that policy been in effect for at least the last ten years?

A. Yes.

Q. When a teacher observes a State reported offense, they don't need to stop teaching and log it in Infinite Campus, do they?

MR. VAUGHN: Object to form.

THE WITNESS: They could, depending on the circumstances.

BY MR. REINKE:

Q. Sure. They -- they could, but they could also log it after class?

A. They could.

Q. Or they could log it at the end of the school day?

A. They could.

Q. So going back to the "Behavior" comment field that we were discussing on this spreadsheet, is it fair to say that the person who reports the incident in Infinite Campus is the person who types that comment into that field?

A. It varies.

Q. Okay. Explain to me how it varies.

A. So a teacher may -- it would vary. The teacher may even write a referral by hand, and then it is reported to the administrator, and the administrator will then put it in Infinite Campus.

It varies from school to school.

Q. From school to school?

A. Yeah, as to how the -- how the student is referred up and placed in the system.

Q. Okay. So I want to just make sure I

understand that.

So if a teacher wants to report a State reported offense in Infinite Campus, at some schools they would have access to do that themselves?

A. Yes.

Q. And they would just do it on a computer in the classroom?

A. Yes.

Q. Okay. And then at other schools, they would not have access to do it themselves?

MR. VAUGHN: Object to form.

THE WITNESS: Yes, they would have access to do it themselves. It may not be in electronic form.

BY MR. REINKE:

Q. Sure. Okay. So at other schools, certain teachers may not have electronic access to Infinite Campus, right?

A. No, they all have access to Infinite Campus. It may be a -- guideline or procedure that may differ, but they all have access to electronic -- to Infinite Campus.

Q. So at certain schools, the procedure would be for the teacher to input the incident into Infinite Campus themselves?

A. Yes.

Q. Okay. And then at other schools, the procedure would be for the teacher to write out -- handwrite on a form?

A. Yeah, possibly.

Q. Okay. And then an administrator or somebody else would later input it into the Infinite Campus system?

A. Yes.

Q. Are there other ways that teachers can report incidents in Infinite Campus?

A. No, I'm not aware of any other ways.

Q. Okay. And if we continue scrolling to the right, the next column is "Student Person ID"; is that just like a student ID number?

A. Yes.

Q. And then the next column is "Role, Offender."

A. Yes.

Q. Are there other types of roles reflected in Infinite Campus? I see one says "Participant."

A. "Participant," and could be "Witness," possibly, depending on -- "Witness."

Q. "Offender," "Participant," and "Witness." What is an offender?

A.    So that is the student that is to have --
alleged to have violated the Code of Conduct.

Q.    And what is a participant?

A.    That could be a person who maybe
participated, but they're not a part of the
violation.  Participated in some way.

Q.    Okay.  And then what would a witness be?

A.    A person who had some firsthand knowledge
of what occurred.

Q.    But they didn't participate or perpetrate
the incident?

A.    Correct.

Q.    Okay.  And then there is a column to the
right of that that says "DCSD Behavior Event Type."
What is that column?

A.    So the event type is that rule -- that
rule -- that is aligned to the Code of Student
Conduct.

Q.    Okay.

A.    They call it "Event Type" in Infinite
Campus.

Q.    Right.  So the -- each event type
corresponds with a particular section of the Code of
Student Conduct?

A.    Yes.

Q. Okay. And so I see 02, right, "Possession of Unapproved Item, Electronic Communication Device." That's referring to the fact that when we looked at the Code of Conduct, the electronic communication device policy was numbered Section 2?

A. 2, that's right.

Q. That Section 2, electronic communication device policy, that's not specific to social media, is it?

A. No.

Q. Okay. So it could include other uses of electronic communication devices that are not using social media?

A. Yes.

Q. Is there any category or event type within the various options that are available in this column that is specific to social media?

A. Possibly the bullying.

Q. Okay.

A. When they get to cyber bullying --

Q. Okay.

A. -- that one could be specific.

Q. So let's just take a look at a couple of instances of, you know, the bullying, right, in Column H.

So the first one is on the second line, it looks like, where it says "Alleged_Bullying_Other." Correct?

A. Yes.

Q. Is that what you were referring to as the bullying?

A. Yes, so the State -- we have to report allegations as well as -- if the student is actually to have found to have bullied.

Q. Okay. And if we scroll to the left, under the "Behavior" comment, it says "Student has been accused of calling another student's names. 5th grade students. Harris's class. Investigation results. No evidence to support bullying. Bullying unfounded." Right?

A. Yes.

Q. So based on that comment, is it fair to say that that particular incident doesn't appear to have anything to do with social media?

A. Yes.

Q. Okay. So you'd agree, then, that the category "Bullying" would not be specific to social media?

A. This is allegations of bullying. Again, the difference is the State requires us to collect

data on allegations of bullying, but there are additional bullying rules.

Q. Okay. Let's take a look at the next one down. There is -- I think it's the fourth line. "07G, bullying, general, first incident." See that?

A. Yes.

Q. So would this be, I guess, a bullying incident that went beyond just an allegation?

A. Yes.

Q. Okay. And if we look at the comment on this particular incident, it says, "Offender threatened to cut victim's throat. Offender also said he was going to keep messing with victim every single day for the rest of the year, now that the victim had so-called snitched on him. Offender said it twice to the victim and directly to the teacher."

It says "Investigation results on 8-17-15 incident was investigated and found to be true. Student charged with 7G bullying per Ms. Moss."

Based on that description in that comment, fair to say that this incident doesn't appear to have anything to do with social media?

A. Yes.

Q. Okay. So then you'd agree that this category 07G, Bullying, can include incidents that

are unrelated to social media?

A. Yes, it could.

Q. Are there other bullying categories that you're aware of that would be limited to bullying that occurs on social media?

A. There are various types. We have to type out the various types of bullying, based on protected groups. So it is recorded based on protected groups as well. That could be gender, race, national origin, et cetera.

Q. Right. That --

A. And that could include that happening on social media.

Q. Okay.

A. Uh-huh.

Q. So I want to just -- if we can scroll down to line 223.

DOCUMENT TECHNICIAN: This line?

MR. REINKE: Yes.

DOCUMENT TECHNICIAN: So you can see that -- I'm not sure how to find that right.

MR. REINKE: If you just scroll down, like the -- the row number on the left, row number 223.

DOCUMENT TECHNICIAN: On the TV, here's

all I have.

MR. REINKE: Oh, sorry. Keep scrolling. I'll tell you when we get to it.

I see it's cut off on the TV.

DOCUMENT TECHNICIAN: We can fix that on a break.

MR. REINKE: Okay. Stop, stop. Put your cursor right there. Move down two. Okay. So this is line -- row 223.

BY MR. REINKE:

Q. Can you see the row number, Dr. Towns?

A. Yes, I can.

MR. REINKE: Okay. And if we scroll over to Column H on this particular row. That's the right row.

BY MR. REINKE:

Q. I think this is an example of what you were just testifying about, Dr. Towns: Bullying -- and this one appears to be based on sexual orientation or gender identity, correct?

A. Uh-huh.

Q. Is that an example of what you were just testifying about?

A. Yes.

Q. Okay. And I guess -- I understand that

some of this bullying could occur on social media. My question is, is there a particular category of bullying within the event types in Column H that distinguishes between bullying that occurs on social media and bullying that occurs somewhere else?

A. No.

Q. Okay. And if we continue --

A. Cyberbullying.

Q. I'm sorry, cyberbullying?

A. Cyberbullying, yes.

Q. So there is a separate category for cyberbullying?

A. It's reported -- it should be reported as cyberbullying, under 7G.

Q. Okay. So --

A. If I'm making myself clear.

Q. Sure. Yeah, and I want to make sure I understand that.

So bullying that takes place on social media should be reported as cyberbullying?

A. That's correct.

Q. Okay. Does the category of cyberbullying include anything other than bullying that takes place on social media?

A. Not to my knowledge.

Q. What about like bullying via text messages? Would that be considered cyberbullying?

A. That would be considered cyberbullying.

Q. Okay. If we can go back up to the very top of this spreadsheet.

And Column I is the "Event ID"; what is that column?

A. So each event has a different number. And so it's given a number; I guess it's automatically generated through Infinite Campus.

Q. Okay. So that's just -- sort of like an automatically generated number?

A. It's attached to the rule.

Q. Understood. Understood.

And then the "Incident ID": What is that number?

A. That is another number that is generated through Infinite Campus.

Q. The next column, Column K, is "DCSD Resolution of Behavior Event." What does this column represent?

A. So those are the approved discipline for those violations.

Q. Okay. And when you say "approved discipline," who approves the discipline that is

associated with a particular violation?

A. So, legally, the principal is the administrator -- or the principal's designee -- that would administer that discipline. So that's kind of what I mean by "approved."

Q. Okay. So ultimately it's the decision of the principal or the principal's designee to decide how a student -- what punishment a student gets for a particular reportable violation?

A. Yes.

Q. And it looks like there's a wide variety of different types of punishments that can be employed. Is that correct?

A. Yeah. Different disciplines or interventions.

Q. Right. And it could just be a warning, or discussion --

A. Yes.

Q. -- all the way up through an out-of-school suspension?

A. Yes.

Q. Could there also be an expulsion?

A. Yes. Or a change in placement.

Q. Okay. And what is a change in placement?

A. Movement to a different school.

Q.   A different school that's still within the DeKalb County School District?

A.   Yes.

Q.   Is that different than an expulsion?

A.   Yes.

Q.   What is an expulsion?

A.   The student doesn't have any opportunity to earn any credits towards graduation, and they may not enter a physical building.

Q.   So if a student receives an expulsion, they cannot enroll at any other DeKalb County School District school?

A.   That's correct.

Q.   Is that a permanent thing?

A.   It varies, depending on the violation.

MR. REINKE:  Okay.  We can set that aside.

BY MR. REINKE:

Q.   I'll show you a document that we'll mark as Exhibit 13.  It's Tab 116.

(DeKalb-Towns Exhibit 13 was marked for identification.)

MR. REINKE:  Okay.  And if we scroll -- so this is an e-mail chain.  If we scroll down to the very bottom e-mail, which is the first-in-time e-mail on the chain.

DOCUMENT TECHNICIAN:  You mean third page?

MR. REINKE:  Yeah, the last page.

DOCUMENT TECHNICIAN:  Last page.

BY MR. REINKE:

Q.    This is an e-mail sent by Darnell Logan, on March 22nd, 2024, to somebody named Rebecca Braaten.

A.    Braaten.

Q.    Braaten?

A.    Yes.

Q.    Okay.  Who is Darnell Logan?

A.    He is the director of student relations.

Q.    Okay.  And who is Rebecca Braaten?

A.    She is a director in assessments and accountability.

Q.    Okay.  In this e-mail, it looks like Dr. Logan is asking Dr. Braaten to run a report in Infinite Campus to determine the number of discipline referrals that include a reference to social media.  Is that correct?

A.    Yes.

Q.    Do you have any idea what prompted Dr. Logan to send Dr. Braaten this e-mail?

MR. VAUGHN:  I'm just going to object to -- just on the basis that -- if you can

answer the question without providing any sort of background attorney communications, then fine. If not, just be careful not to provide any attorney-client communications.

THE WITNESS: And I don't believe I can answer that.

BY MR. REINKE:

Q. Okay. You can't answer that question without --

A. No.

Q. -- revealing discussions with counsel?

A. Yes.

Q. Okay. Do you know if this request was done in connection with purposes of this case? Or let me ask it a different way. I'll just strike that question.

Is it your understanding that this request was made in connection with this litigation?

A. Yes.

Q. Okay.

MR. REINKE: And if we scroll up to the next e-mail in the chain. Down. Yeah.

BY MR. REINKE:

Q. Okay. So Dr. Braaten responds on March 22nd, 2024, and she says "We are unaware of a

report in Infinite Campus, but we can extract the comments from the Behavior Detail field to see how many references there are to social media." Is that correct?

A. Yes, that's what it reads.

Q. And is that consistent with your understanding of the reporting capabilities of Infinite Campus?

A. Yes.

MR. REINKE: And if we scroll up again. Scroll up again.

BY MR. REINKE:

Q. And this e-mail -- that's the one, that Joseph Benford e-mail.

So there's an e-mail from Joseph Benford, sent on April 8th, 2024, at 7:55 a.m., to Dr. Logan, and copying Elijah Ardister and Rebecca Braaten.

Who is Joseph Benford?

A. He's one of the -- whoops -- coordinators that works in research data evaluation with Dr. Braaten.

Q. Okay. And who is Elijah Adister? Are you familiar with that name?

A. Only that he would work in research and evaluation. I don't work with him directly.

Q. And the e-mail states "Greetings, Dr. Logan. Your request for discipline data involving social media is complete. For this school year (beginning of year through 3-28-2024) we have identified 49 incidents with comments related to social media and other associated terms."

And then there's a link to a report. Do you see that?

A. Yes.

Q. Okay. So based on this e-mail, this data appears to have been collected for the 2023-to-2024 school year. Is that correct?

A. Yes.

Q. When did the 2023-to-2024 school year begin?

A. Around the -- usually the first week of August.

Q. Okay. So first week of August 2023?

A. Yes.

Q. So the report that Mr. Benford pulled would have been for discipline data involving social media from around the first week of August 2023 through March 28 of 2024; is that -- am I understanding that correctly?

A. Yes.

Q. Okay. So approximately an eight-month period?

A. Yes.

Q. Okay. And over that eight-month period, Mr. Benford identified 49 incidents with comments related to social media and other associated terms, correct?

A. Yes.

Q. Okay. Other than the report that is referenced in this e-mail, has DeKalb ever undertaken to pull a report from Infinite Campus on the number of disciplinary incidents that refer to social media?

MR. VAUGHN: Object to form.

THE WITNESS: Not that I'm aware of.

BY MR. REINKE:

Q. Okay. You can set that aside.

I want to show you a document that we'll mark as Exhibit 14. And this is Tab 48, and it will be an electronic document.

(DeKalb-Towns Exhibit 14 was marked for identification.)

BY MR. REINKE:

Q. And this tab is a document that DeKalb has produced in this case, where -- it's titled "DeKalb County Schools, Discipline Incidents (Offenses)

Reported to the State, 20-year Comparison."

Do you see that?

A. Yes.

Q. Is this a document that you're familiar with?

A. Yes.

Q. Okay. And how are you familiar with this document?

A. This is a document that we would use in the office to monitor the number of State incidents across years.

Q. Okay. And when you say "State incidents," you're referring to incidents that are reportable for the State of Georgia?

A. That's correct.

Q. And that would include the incidents that are captured in Infinite Campus?

A. Yes.

Q. Okay. Does it include any type of incidents other than those that are captured in Infinite Campus?

A. No.

Q. Okay. Are there incidents in Infinite Campus that would not be included in this report?

A. Not that I'm aware of.

Q. Okay. Bear with me for just one second.

So the first page of the document that I've marked as Exhibit 14 lists the total number of discipline incidents reported to the State from -- it looks like the 2001-to-2002 school year through the 2010-to-2011 school year. Correct?

A. Yes.

Q. Okay. And in the left-hand column, there are "State Incident Codes." Do you see that?

A. Yes.

Q. Those codes are different than the codes that DeKalb uses in Infinite Campus?

A. So the State incident codes are the codes that the State uses, so it's different. The State also has some codes that they use that don't necessarily align to the Code of Conduct, is how this works.

So when they go into the system, they will also see details of that particular offense. And the administrators are trained to take a look at those and make sure they mark the -- the correct offense. So they're not always aligned to the State numbers.

Q. Understood.

And if you go to the second page, "Discipline Incidents (Offenses) Reported to the

State," looks like the second page provides data for the 2011 through 2012 school year through the 2019 through 2020 school year. Correct?

A. Yes.

Q. Okay. And the very bottom row of this chart provides total incidents reported to the State for each of those school years. Is that correct?

A. Yes.

Q. Okay. And so --

MR. REINKE: Can you zoom out a little bit, so we can see the year?

DOCUMENT TECHNICIAN: Sure. Year at the top?

MR. REINKE: Yeah.

DOCUMENT TECHNICIAN: Sure. Just a second.

BY MR. REINKE:

Q. Okay. Can you still read that document, with it zoomed out? Okay, great.

So for the 2012 through 2013 school year, the total number of discipline incidents reported to the State was 54,472. Correct?

A. Yes.

Q. Okay. And then for 2013 through 2014, total number of discipline incidents reported to the

State, 53,008.  Correct?

A.  Yes.

Q.  2014 through 2015, total disciplinary incidents reported to the State was 52,884.  Correct?

A.  Yes.

Q.  2015 through 2016, total disciplinary incidents reported to the State was 47,770?

A.  Yes.

Q.  2016 through 2017, total disciplinary incidents reported to the State was 32,169?

A.  Yes.

Q.  2017 through 2018, total disciplinary incidents reported to the State was 29,721?

A.  Yes.

Q.  And then 2018 through 2019, total disciplinary incidents reported to the State was 28,809.  Correct?

A.  Yes.

Q.  Okay.  So the total number of disciplinary incidents reported to the State in the 2018 through 2019 school year was a little bit more than half of the total discipline incidents reported to the state in the 2012 through 2013 school year, correct?

A.  Yes.

Q. You previously testified that social media has caused an increase in disciplinary incidents in the DeKalb County School District. Do you recall that testimony?

A. Yes.

Q. How do you reconcile that testimony with this chart showing that there's been a decrease in the disciplinary incidents reported to the State?

MR. VAUGHN: Object to form.

THE WITNESS: Can you repeat the question?

BY MR. REINKE:

Q. Sure. Yeah, I'm trying to understand what appears to be an inconsistency here, right? Because this chart shows that the disciplinary incidents that were reported to the State have decreased from the 2012 to 2013 school year through the 2018 through 2019 school year. And you previously testified that disciplinary incidents were increasing as a result of social media addiction.

So I guess my question is, how do you reconcile that testimony with the numbers in this chart?

MR. VAUGHN: Object to form.

THE WITNESS: So although they've been decreasing -- and this doesn't specifically

indicate why a student may have been in violation of alcohol, or why the student may have been in -- in violation of vandalism, or what that cause was, it still stands that -- I still stand that it has increased, based on social media.

These don't demonstrate specifically, again, what the cause was. It just tells you what this -- you know, what the violation was. We do see threat and intimidation on social media, but that's not delineated out here.

And we've worked very hard to decrease the number of discipline incidents. We've had to work very hard with our students. We've had to, again, put in personnel to deal with those incidents; provide spaces for students; provide resources for students, training for staff. There have been various things that we have done to mitigate these situations, to ensure the students remain in school.

Alternative discipline, which doesn't include pushing students out but pulling them into the schools, to ensure, again, that they have the most instruction that's possible.

So although the numbers are decreasing,

we're working very hard to ensure that we give our students a chance to be in school and in hopes that they don't violate the rules.

BY MR. REINKE:

Q. Sure. You mentioned threats and intimidation on social media. If you look at line 17 on this chart, threat and intimidation --

A. Uh-huh.

Q. -- 2012 through 2013, there were 1,591 reported incidents. True?

A. Uh-huh. Yes.

Q. 2013 through 2014, there were 1,399 reported incidents. Correct?

A. Yes.

Q. 2014 through 2015, 1,792?

A. Yes.

Q. 2015 through 2016, 1,553?

A. Yes.

Q. 2016 through 2017, 1,120?

A. Yes.

Q. 2017 through 2018, 1,069?

A. Yes.

Q. And 2018 through 2019, 1,093?

A. Yes.

Q. So other than kind of the increase in the

2014 through 2015 school year, it's fair to say, isn't it, that the number of reported incidents of threat and intimidation has decreased from the 2012 through 2013 school year to the 2018 through 2019 school year?

A. Yes. We put in some guidelines at that time. I think back in 2016, we put in some guidelines. So that could be a possibility as to why these things decreased.

Q. And when you say you put in some guidelines back in 2016, are you referring to the social media guidelines that we looked at earlier in the deposition?

A. Yes.

Q. Which -- I can't remember the exhibit number, so I apologize; but that was the 2016 version of the social media guidelines, correct?

A. Yes.

MS. CARDEN: Exhibit 4.

MR. REINKE: Exhibit 4. Thank you.

Let's go off the record.

VIDEOGRAPHER: We are now going off the video record. The time is currently 12:30 p.m.

(A luncheon recess transpired

from 12:30 p.m. until 1:07 p.m.)

VIDEOGRAPHER: We are now back on the video record. The time is currently 1:07 p.m.

BY MR. REINKE:

Q. All right. Dr. Towns, did you bring any documents with you to your deposition today?

A. No.

Q. Did you bring any notes with you to your deposition?

A. No.

Q. Okay. Now, I understand that DeKalb County School District has undertaken several efforts to attempt to address student use of cell phones or social media during school hours. Is that correct?

A. Yes.

Q. One of those efforts is cell phone lockers?

A. Yes.

Q. And another one is Yondr bags?

A. Yes.

Q. Other than kind of the cell phone lockers and the Yondr bags, are you aware of any specific programs that the DeKalb County School District has implemented to address student use of social media?

A. As it relates to programs, we have Second Step, which is our social emotional learning

program. We have GRIP, Growing Responsibility: Increasing Possibilities, which is a Saturday program. And we have Aspire -- I'm sorry, not Aspire.

We have PREPaRE, which is a program, a training program for psychologists to deal with students with mental health issues. We have our Bullying Stops Here! campaign, which also includes cyberbullying. We have My Brother's Keeper, previously called My Sister's Keeper, but Our Sister's Keeper -- mentoring program.

So we have various programs to assist students.

Q. Okay. You mentioned a Second Step program. What is that program?

A. It's a social emotional learning curriculum --

Q. And what did you mean --

A. -- that addresses --

Q. Sorry, go ahead.

A. That addresses different areas of responsible socialization, social awareness, self-awareness. Different tenets of capacity.

So -- all those things to help a student gain self-confidence and -- and socialize

responsibly, have responsible relationships. Responsibility to themselves.

Q. Is this Second Step program something that all DeKalb students go through?

A. So currently it is for K through 8.

Q. Is it something that all K-through-8 students in DeKalb go through?

A. It is a program that is intended for all K-through-8 students.

Q. And when did DeKalb start this program?

A. We started it approximately -- I want to say maybe ten years ago, but then we stopped it, due to funding. And we just recently -- are now providing it again in the past -- I believe this is our second year.

Q. So if this is the second year, does that mean the second school year?

A. Second school year.

Q. All right. So then DeKalb started offering the program again in the 2023 and 2024 school year?

A. Yes.

Q. Was it at the beginning of that school year?

A. Yes. I believe the board approved it --

I'm not quite sure of the month; I want to say maybe -- August. Maybe August. Sometime in the summertime, I think.

Q. Okay. So maybe around August 2023?

A. I think so.

Q. And I think you mentioned that this is a curriculum that addresses area of responsible interactions with people; things of that nature. Is that right?

A. Responsible relationships. Yes.

Q. Is there a component of that curriculum that addresses social media?

A. No. Not -- not to my knowledge. But we may have turned in some documents that have the different modules.

Q. Okay. But as you're aware of as you sit here right now, you're not aware of any component of that program that specifically addresses social media?

A. No.

Q. "No" meaning you're not aware of it?

A. I'm not aware of it.

Q. Okay. That was a bad question on my part. You also mentioned the GRIP program.

A. Yes.

Q. What is the GRIP program?

A. Growing Responsibly: Increasing Possibilities. So it's a program that is run on Saturdays, designated Saturdays, for students who may have violated the Code of Conduct as it relates to violence, weapons, drug infractions, or any other infraction that the principal deemed the student would benefit from going to that program. It is run by social work and public safety, and parents are required to attend.

Q. Okay. So this program is a means of addressing student infractions?

A. Yes.

Q. Are there any particular types of infractions that this program is used to address?

A. Yes. Violence. Drug violations. Weapons violations. Or just -- it may be any other type of violation; it could very well be any of those things that may have been due to social media, but it doesn't explicit -- we don't have anything that says explicitly social media.

Q. Okay. Is the GRIP program used to address violations of the District's policy on student use of cell phones or electronic devices?

A. I don't have specific knowledge of that,

but if it is in collaboration with any of the things that I named, certainly it could be.

Q. Okay. But if you had an instance where a student was using a cell phone during class but not associated with violence or threats or weapons or anything of that nature, fair to say that that student would not participate in the GRIP program?

A. Yes, that's fair to say.

Q. Okay. You mentioned PREPaRE. What is PREPaRE?

A. I believe that is a training curriculum for psychologists. I believe Dr. Sauce would be able to speak more to that.

Q. Okay. And when you say "a training curriculum for school psychologists," do you mean that's like a training that DeKalb County School District offers to school psychologists that it employs?

A. Yes.

Q. Okay. And do you know what this training covers?

A. I don't have any -- the details on that.

Q. Do you know if there are any aspects of this training that specifically train school psychologists on addressing issues related to social

media?

A. It has, I believe -- the most that I know is that it's a training to assist with students with mental health issues.

Q. Okay. And -- and when you say "to assist students with mental health issues," that could include students that are experiencing mental health issues because of social media?

A. It could.

Q. But it could also include students that are experiencing mental health issues for some other reason?

A. It could.

Q. Okay. When did DeKalb implement this PREPaRE program?

A. I'm not quite sure. I think it's probably in some documents that we provided.

Q. Do you know approximately when DeKalb implemented it?

A. I don't.

Q. You mentioned My Brother's Keeper.

A. Yes.

Q. And I think you said that that program has maybe gone by some different names?

A. Yes. So My Brother's Keeper has always

had that name.  The sister group to that program was Our Sister's Keeper, officially.  It was an iteration of My Sister's Keeper, under the leadership of Mrs. Watson Harris, and we returned back to Our Sister's Keeper.  That was the board-approved name.

Q.   Okay.  So there's two different programs, then?

A.   Yes.

Q.   My Brother's Keeper and Our Sister's Keeper?

A.   Yes.

Q.   And Our Sister's Keeper was known for some period of time as My Sister's Keeper?

A.   Yes.

Q.   But it's currently known as Our Sister's Keeper?

A.   Yes.

Q.   I'll just refer to it as "Our Sister's Keeper."

So My Brother's Keeper:  What is that program?

A.   It's a program -- a mentoring program, where each school chose to have what we call chapters.  Young men; it's for young men.  And it's -- probably about 2nd grade through 12th grade.

And they meet a minimum of four times a year with a designated personnel from DeKalb County School District, known as a Champion. And that Champion really serves as a mentor for those students.

And they participate in a variety of activities. They may check on the students academically; they check on them, you know, as far as behavior, attendance, et cetera. So they're a trusted adult in the building that the students can go to.

They attend different functions. They have a summer program, where we have volunteers from the community come in and just do different things: How to tie a tie. Table etiquette.

We have authors come in, and they have books that they read and discuss with them. So it's a summer program that lasts about four days, and they typically enjoy -- they play basketball with them. Those types of things.

Q. You mentioned that this is a program for students in 2nd through to 12th grade?

A. Yes.

Q. Are all students within that grade range participants in this program?

A. No, it's -- it's selected students. I'm

not sure about the criteria of each and every school, but it's on a volunteer basis, so it's not a mandated program.

Q. Do you know approximately how many students are currently participating in this program?

A. I don't have that number.

Q. Does Our Brother's Keeper have -- or My Brother's Keeper have any programming that is specific to social media?

A. Not that I'm aware of.

Q. Okay. And then you also mentioned Our Sister's Keeper.

A. Yes.

Q. What is that program?

A. So, similarly to My Brother's Keeper, it's a group of young ladies in the district, and they do summer activities. They have summer programming and different events that they attend with a trusted female in the building to assist them and check on them. Academic behavior, attendance.

Q. Is it also a mentoring program?

A. It is.

Q. Is it also for students in the 2nd through 12th grade?

A. Yes, I believe so. I believe so.

Q. Does Our Sister's Keeper have any programming that's specific to social media?

A. Not that I'm aware of.

Q. I want to show you a document that we'll mark as Exhibit 15.

(DeKalb-Towns Exhibit 15 was marked for identification.)

MR. REINKE: Let me see if I have a hard copy of it. Looks like this one is missing, but it's Tab 79.

BY MR. REINKE:

Q. Okay, Dr. Towns, can you see the document that I've marked as Exhibit 15 --

A. Yes.

Q. -- on your screen?

A. Yes.

Q. Okay. This is a PowerPoint presentation that was produced by DeKalb in this case. And the title slide says "Reducing Cell Phone Use in High School, Enhancing Academic Performance and Supporting Well-Being." Do you see that?

A. Yes.

Q. And there is a logo that says "Disconnect to Reconnect, DeKalb County School District." Do you see that?

A.    Yes.

Q.    Are you familiar with that phrase, Disconnect to Reconnect?

A.    Yes.

Q.    And is that a program that is offered by DeKalb County School District?

A.    So this is an initiative that we started -- I guess -- clarification:  Can you give me clarification on "program"?

Q.    Well, you used the term "initiative," so let's go with that.

A.    Okay.

Q.    So is -- is Disconnect to Reconnect an initiative offered by the DeKalb County School District?

A.    Yes.

Q.    Okay.  And -- and what is this initiative?

A.    So this initiative is brought forth to stop children from utilizing cell phones during the school day, to bring them back to being connected to not only each other but to learning, to the teacher, increasing student engagement in the classroom, decreasing noninstructional distractions.  And so this is one of the -- the ways that we're trying to mitigate these instances of students on social media.

Q. Okay. Can you go to Slide 3, please?

And Slide 3 says "The Impact of Cell Phone Usage." And the bullet point reads "Cell phone usage in schools impacts students' academic performance, mental health, and classroom dynamics. As educators and administrators, it's crucial to consider effective policies and strategies to manage cell phone use in educational settings."

And then there's three bullet points that are labeled as "Statistics." Do you see that?

A. Yes.

Q. The first one says "Studies show that students distracted by their phones in class are more likely to perform worse academically."

The second one says "Research indicates a rise in anxiety and depression among students who use phones excessively."

And the third one says "Teachers report frequent disruptions caused by ringing phones, texting, and social media use during lessons."

Do you see that?

A. Yes.

Q. Okay. So this slide is discussing cell phone use generally, right? It's not specific to social media?

MR. VAUGHN: Object to form.

THE WITNESS: No, it's not specific to social media.

BY MR. REINKE:

Q. Right. And the slide notes that teachers report frequent disruptions from things such as ringing phones, right?

A. Yes.

But it does indicate that the teachers are reporting frequent use on social media during lessons. So it does say specifically that.

Q. It does, yes.

A. Yeah.

Q. But it also says that teachers report frequent disruptions caused by ringing phones?

A. Yes.

Q. And by -- and by texting?

A. Yes, it says that.

Q. And is it -- is it fair to say that this Disconnect to Reconnect program is attempting to address all aspects of cell phone use among students in the classroom?

A. Yes. But primarily the use of a cell phone by students being on social media.

Q. And when you say "primarily the use of a

cell phone by students being on social media," what do you mean by that?

A. Typically, students aren't on the phone having conversations. So they're not in class on the phone having conversations as -- as viewed by the teacher. They're not on the phone having a conversation in the middle of class.

So they're on the cell phones, I guess, on a nonphone-call purpose.

Q. Okay.

A. If that's -- if I can say that word.

Q. Sure. Sure. And nonphone-call purposes could include social media?

A. Yes.

Q. But it could also include other things, right?

A. It could.

Q. And if we go to the next slide, Slide 4, we see "Results from DCSD Information Collection."

A. Yes.

Q. And based on this slide, it looks like information or data was collected from nine different schools within the District --

A. Yes.

Q. -- is that -- is that right?

A.    Yes.

Q.    And it looks like there was a 30-minute data collection session.

A.    Yes.

Q.    Are you familiar with how this data was collected?

A.    I didn't personally collect the data, but as I understand it, staff went into the individual schools and just went in the classrooms and noted how often kids received notifications via text messages, e-mails, games, social media --

Q.    Did --

A.    -- phone calls.

Q.    Sorry.  I didn't mean to interrupt you.

A.    Uh-huh.

Q.    And this data was collected over a 30-minute session, correct?

A.    Yes.

Q.    So were the students' phones collected and given to the staff member so the staff member could collect this data?

A.    No.  They actually spoke with the students.

Q.    Okay.

A.    They were able to speak with the students.

Q. So I'm just trying to understand how they counted the number of notifications that a student got during this particular 30-minute session.

A. So I don't have the specific directions that were given, but I do know that they -- I believe they spoke with the students prior to.

But I don't have the specific directions. It may be something that has been reported by the documentation we provided. Dr. Logan was heading this, so . . .

Q. Okay. Yeah, that was going to be my next question, is who at DeKalb would be the most familiar with this --

A. Dr. Logan.

Q. Okay.

A. Uh-huh.

Q. So the slide notes that notifications were tallied. True?

A. Yes.

Q. And these notifications included text messages?

A. Yes.

Q. Included e-mails?

A. Yes.

Q. They included gaming notifications?

A. Yes.

Q. Yes?

A. Yes.

Q. They included social media notifications?

A. Yes.

Q. And they included phone call notifications?

A. Yes.

Q. And the next slide, Slide 5, is results. Correct? Or the -- you know, the results of the data that was collected?

A. Yes.

Q. It says "Combined Notifications: 5,372."

And if I'm understanding this correctly -- but you can tell me if I'm wrong -- but is that 5,372 combined notifications the total number of notifications across the 306 students who participated in this data collection?

A. I -- I can't say that, because -- well, it -- I guess it would be that group of students that they collected that information from. It wouldn't certainly be these averages, because they don't add up to that number. But those 306 students that participated. I would assume that that would be it.

Q. And the students that participated in this

particular data collection exercise, do you know how those students were selected?

A. I do not.

Q. Okay. Is that something that you think Dr. Logan would be aware of?

A. Absolutely, yes.

Q. Back to Slide 5, it says text messages and social media notification represents 76 percent of all notifications that were observed during this study, correct?

A. Yes.

Q. And -- but it does not break down what proportion of that 76 percent was attributable to text message notifications and what proportion was attributable to social media notifications, does it?

A. No.

Q. Do you know if DeKalb ever broke down the data in that way?

A. I don't know, but I'm -- Dr. Logan may be the person to have that additional specific information.

Q. Okay. Then if we can scroll down -- well, let me ask you this: When did DeKalb collect this data?

A. This was, I believe, in August of 2024.

Q. August of 2024?

A. Yes, I believe.

Q. Okay. And when did DeKalb begin this Disconnect to Reconnect initiative?

A. It began -- we began discussing it and outlining what it would look like somewhere -- September, October.

Q. Of what year?

A. 2024.

Q. Okay. So after the data was collected?

A. Yes.

Q. If we can scroll down to Slide 17.

This slide states "The DeKalb County School District has launched a new initiative to reduce student cell phone use during the school day. This initiative involves a pilot program utilizing two different approaches: Yondr Pouches and Cell Phone Lockers." Do you see that?

A. Yes.

Q. Okay. Was the DeKalb County School District pilot program, utilizing these Yondr pouches and cell phone lockers, is that considered part of the Disconnect to Reconnect initiative?

A. Yes.

Q. Okay. And the text on this slide says

"The primary goal of this initiative is to improve student focus and reduce distractions in the classroom by limiting cell phone access during school hours.  This initiative aligns with similar efforts in other districts aiming to reclaim the classroom environment for intellectual engagement and personal growth."

Is that an accurate description of the goal of the Disconnect to Reconnect initiative?

A.    Yes.

Q.    Okay.  And is that an accurate description of the goal that DeKalb hoped to achieve by implementing Yondr pouches and cell phone lockers?

A.    Yes.  It's not all-inclusive, but yes.

Q.    Okay.  And when you say "it's not all-inclusive," what do you mean by that?

A.    You know, in addition to looking at reducing distractions and limiting classroom access to cell phones, we are looking at re-establishing the ability of students to socialize on a person-to-person basis.  We certainly wanted to use it to reduce different negative behaviors, but allow for more teaching and learning to take place, and not having to deal with the negative behaviors that place a great distraction in the classroom or in the school

classes, so . . .

Q. Now, the Yondr pouch program, as it's described on this slide says "At selected middle and high schools, students will place their cell phones in lockable Yondr pouches. These pouches will remain locked throughout the school day and can only be unlocked at the end of the day using a special device."

Is that an accurate description of what the Yondr pouch program is?

A. Yes. That's accurate.

Q. And it references selected middle and high schools. Do you know how many schools are using Yondr pouches?

A. So there are 10 schools. I believe it's five middle schools and five high schools.

Q. And if you go to the next slide, Slide 18.

Are these the ten -- the "10 Pilot Pouch Schools"; are those the ten schools --

A. Yes.

Q. -- that are using the Yondr pouches in the DeKalb County School District?

A. Yes.

Q. Are there any other schools within the DeKalb County School District, other than these ten

that are listed here, that are currently using Yondr pouches?

A. Not Yondr pouches, no.

Q. Okay. How were these ten schools selected?

A. I believe that may be a better question for Dr. Logan, but of course we take a look at data.

Q. Do you know what data was reviewed to select these schools?

A. No, I -- I don't.

Q. But you believe Dr. Logan would be aware of that?

A. Yes.

Q. Okay. If we go back up to Slide 17. There's "Cell Phone Lockers"?

A. Uh-huh.

Q. And it states "Another approach involves the use of cell phone lockers, where students will store their phones at the beginning of the day and retrieve them at the end."

Is that an accurate description of the cell phone locker program that's being used in some DeKalb County schools?

A. Yes. So they store the phones in the lockers. Those -- those lockers are per class.

Q. Okay. So in other words, if the student is staying in the same classroom all day, they would put their locker -- their cell phone in the locker at the beginning of the day --

A. Yes.

Q. -- and then just take it out at the end?

A. Yes.

Q. But if they're moving from one classroom to another, do they then take their cell phone out of the locker and move it with them to their next classroom?

A. Yes, I believe that's the case.

Q. Okay. And then if we scroll down to Slide 18, there are 8 pilot locker schools. Is that correct?

A. Yes.

Q. And these are the schools that were selected for the pilot program for cell phone lockers, true?

A. Yes.

Q. Other than these eight schools listed on this slide, are you aware of any other DeKalb County schools that are using cell phone lockers?

A. Not cell phone lockers. But I will share that we have schools that -- because this is such a

pervasive issue, and teachers are really, really struggling to continue to minimize these distractions that are occurring, you know, because of the use of social media, they're trying to minimize the distractions, keep kids engaged; they just cannot compete with social media. They can't compete.

So although they may not have the pouches or the lockers, they do have some -- some of the schools will have other ways of retrieving those cell phones during the school day. So they may go to a class, and they may have the -- and I can't remember the specific name of it, but it's just a pouch that hangs on the wall; they're typically numbered or alphabetized, and the students put their cell phones in the little pouch and go to their seats. They can view the pouches.

So, many of our schools are doing that. I don't have a number or name of all of the schools, but I know, from speaking to administrators and teachers, that these are things that they're doing, and also reinforcing the rules themselves.

Q. Okay. So I want to just make sure I understand that, then.

So there are some schools -- particularly ten schools in DeKalb County School District -- that

are using Yondr pouches currently, correct?

A. Yes.

Q. And there are eight schools that are using cell phone lockers currently, correct?

A. Yes.

Q. And then there are some other schools that have devised their own means of addressing cell phone use in class. True?

A. Yes.

Q. And that includes pouches that students will put their cell phone in and put them in a designated place during instructional time?

A. Yes.

Q. Okay. Are you aware of any other means that schools have used to try to address cell phone use during instructional time?

A. Well, certainly we've tried to enforce the rule, and it's very difficult to enforce the rule. Again, because students are -- they're on social media. They're on those phones. They're scrolling, scrolling, scrolling. And so it's been very difficult, but -- you know. So, yeah.

Q. And when you say you've tried to enforce the rule, are there specific actions that the School District has taken to try to enforce the rule?

A. Well, certainly. I mean, again, we review the Code of Conduct. You know, we speak regularly to the children about it, and probably -- I'm going to use the term "irregularly" because it's constant. It's constant. It's every day. It's, you know, it's all day, as reported to us at the District, the teachers have to -- if they had to stop for each child that may be using a phone, no teaching and learning would take place.

So it's a constant battle for teachers, you know, to compete with social media and teach a lesson. It's a constant battle.

Q. Have the Yondr pouches been effective in reducing cell phone use in classrooms?

A. We have found -- and this is -- I won't say it's a direct correlation, but yes.

Q. So yes, they have been effective?

A. Yes.

Q. Okay. Have the cell phone lockers been effective at reducing student cell phone use in classrooms?

A. So we're still looking at that data. That's kind of ongoing.

Q. Okay. So at this point, fair to say DeKalb has not reached a conclusion about whether

that is -- whether the cell phone lockers have been effective or not?

A. We have not.

Q. Have these other means that you have described, that schools have used to address cell phone use in classrooms, have -- have those been effective in doing so?

MR. VAUGHN: Object to form.

THE WITNESS: Tell me what you mean by "effective."

BY MR. REINKE:

Q. I mean have they reduced the incidences of cell phone use in classrooms?

A. I really can't -- I can't say. Again, we're looking at 18 schools out of, I believe, a hundred and -- I'm sorry, about 42 schools, because we're doing this in middle and high. But then if we include our elementary schools, we're around a hundred and I guess 37 schools -- there's 18 schools, I would say.

It's a battle. We're -- and the battle we're fighting is a battle we shouldn't have to. We're utilizing resources and redirecting them to battle with the attention from social media back to learning and standards that we're trying to teach.

And those resources could be directed to teaching and learning, programming that will help our students graduate.  And so -- I don't know that it's -- it's really effective.

Q.   Okay.  So I want to just clarify my question, because you mentioned the 18 schools, right?

A.   Uh-huh.

Q.   So I think you were referring to the ten schools that use the Yondr pouches plus the eight schools that use the cell phone lockers.  Correct?

A.   Uh-huh.  Yes.

Q.   So my question was different.  My question was about the schools that have sort of devised their own solution.  Right?  So with the ones where I think you mentioned like the teacher would provide a pouch that the student sticks their phone in and they hang it on the wall during class time?

A.   Uh-huh.

Q.   My question is, have those solutions been effective in reducing cell phone use in classrooms?

A.   We haven't tallied that in any way, necessarily.  We don't have that information.

Q.   You haven't collected data on that?

A.   No.

Q. I'm going to show you another document, that we'll mark as Exhibit 16, which is Tab 80.

(DeKalb-Towns Exhibit 16 was marked for identification.)

BY MR. REINKE:

Q. And this is a presentation that is entitled "Enhancing Student Engagement: Implementing Cell Phone Pouches in Schools," June 2024.

Is this a presentation that you're familiar with?

A. Yes, somewhat. I believe that this may be a presentation to the board; there were a couple of presentations to the Board of Education.

Q. Correct. And I'll represent to you that we downloaded this presentation from the School Board's website. So I -- I do believe you're correct, that it's a presentation that was given to the Board of Education about the Yondr program.

A. Uh-huh.

Q. Do you know who gave this presentation to the Board of Education?

A. I believe it was Dr. Logan.

Q. Okay. If you scroll down to the second slide, where it says "The Challenge," it says "In today's digital age, smartphones have become

omnipresent, posing a significant challenge to classroom engagement and academic performance.

"The constant temptation to check notifications, text messages, and social media platforms disrupts learning environments and impedes student concentration."  Correct?

A.   Yes.

Q.   And so the next slide is titled "Introduction."  And it says "Understanding the negative impact of cell phone usage on children during school hours."

And "Introducing Yondr as a solution to manage cell phone usage and enhance the learning environment."  Is that correct?

A.   Yes.

Q.   So was the purpose of this presentation to educate the school board about the Yondr program?

A.    It was to educate them about the Yondr program, and -- and educating them also to bring forth possibly the approval of the use of those Yondr pouches.

Q.   Okay.  So the Yondr pouches, is it correct that before DeKalb County School District was able to implement that program in its schools, the board had to approve that?

A.    They did, because of the substantial cost that is attached to these cell phone pouches, which is, again, resources that we are diverting from teaching and learning to deal with a problem that's external to the School District.

So, yes, we had to bring it before the board for approval.

Q.    Okay.  And I just want to make sure I understand that, because -- are you saying that the school board had to approve it because of the cost associated with purchasing the pouches?

A.    Yes.

Q.    Okay.  If we go to Slide 7, this one, yes.

So this one is titled "Baseline Data Collection Information."  It says "School:  Southwest DeKalb High School.

"Two classroom observations.

"Classroom Number 1:  Spanish.

"Classroom Number 2:  ELA."

What does "ELA" stand for?

A.    English Language Arts.

Q.    So --

A.    We have a lot of acronyms in education.

Q.    Yes, yes.  And I may ask you about some of them, because I'm not an educator, so I -- I did not

know that. I could have taken a guess, but I think I would have been wrong.

So it says Classroom Number 1, Spanish, consisted of 10th and 11th graders, with 24 students? Yes?

A. Yes.

Q. And then Classroom Number 2, English and Language Arts, consisted of 10th-grade students, and there were 25 students in the classroom?

A. Yes.

Q. So a total of 49 students, and data was collected for 30 minutes per class. Correct?

A. Yes.

Q. The next slide shows cell phone usage data collected from Classroom Number 1. And it looks like there were 567 notifications collected during that 30 minutes. Is that true?

A. Yes.

Q. And 319 of those were text messages?

A. Yes.

Q. 151 were social media notifications?

A. Yes.

Q. From Classroom Number 2, the next slide, this is the English and Language Arts class.

MR. REINKE: Can you go to the next slide

on the Zoom?

DOCUMENT TECHNICIAN: Is it not on there? This is Classroom Number 2?

MR. REINKE: Okay. On my screen it's different for some reason, but -- I think my screen froze, but -- it's okay.

BY MR. REINKE:

Q. So Classroom Number 2, there were 413 notifications tallied during the 30 minutes, correct?

A. Yes.

Q. 257 of those notifications were text messages?

A. Yes.

Q. And 139 of those notifications were social media notifications?

A. Yes.

Q. So in both of these classrooms, there were more text message notifications during this 30-minute period than social media notifications, true?

A. That's true.

Q. Okay. You can set that aside.

So the board ultimately approved implementing the Yondr pilot program, true?

A. True.

Q. And when did the Yondr pouches start rolling out to schools that are part of the pilot program?

A. So I don't have the exact date. But I believe we started rolling them out the Monday after -- the Tuesday after Labor Day would have been one of the key times because we were going to give the students an opportunity, and parents an opportunity to hear all the information about the pouches, opportunity for schools to be trained to utilize those pouches and to set up the logistics for utilizing those pouches.

Because it was -- it was important to us that we provide the best opportunity, and the fidelity, such that we could get some good data on it. But as that data implied, it was the second-highest issue that we have in the classrooms, as it relates to distraction.

And that's within a 30-minute window. Within a 30-minute window, that's tough for a student -- for teachers to compete with, and trying to learn.

Q. And when you say "it was the second-highest issue that we have in the classrooms, as it relates to distraction," what specifically are

you referring to?

A.   The previous data that was on the presentation, that showed that there were 139 distractions in one class and -- a similar number.

Q.   That showed the 139 social media notifications?

A.   Uh-huh.

Q.   All right.

A.   Yes.

Q.   And you said that was the second-highest issue.  The highest issue:  Were you referring to the text messages?

A.   Yeah, based -- based on the data that we saw.

Q.   Right.  Because the data showed that within those particular classes --

A.   Yes.

Q.   -- there were more text message notifications than social media notifications?

A.   Yes.

MR. VAUGHN:  Dr. Towns, you're doing a great job; just let him get the question out first, and then -- and then give your answer.

THE WITNESS:  Yes.  Thank you.

BY MR. REINKE:

Q. How has the Yondr program been received within the District?

A. We've had positive reviews. Some not so positive, but we've had positive reviews, particularly from the parents; I think Dr. Logan may have collected some information on that. He would be better to speak to that.

Parents have indicated that they are pleased with the pouch initiative. Students have indicated that they have begun to engage more in class; that their academics have improved.

Of course this is from visiting various schools and speaking to the students directly. Personnel would be speaking to the students directly. They're saying they're more engaged.

Principals are saying that they're seeing less negative information being posted during the day, during instructional time. And so -- we're getting that type of feedback.

Q. Has there also been negative feedback about the Yondr program?

A. Yes.

Q. And do you recall any specific negative feedback about the program?

A.    I do recall that some students were concerned that if there was an emergency, how would they contact their parents?  That was one that was a concern of our students.

Q.    And do you recall if that concern was addressed in any way?

A.    I believe that there was some information provided -- our teachers in those schools where the Yondr initiative, the Disconnect-Reconnect initiative was implemented; they actually went through a presentation with the students.  And I can't say that it specifically covered that, but I believe the students were told that they could utilize the front office phone, and there would be some type of designation to get to a phone to communicate that emergency to a parent, or the parent can call into the school if they needed to contact them.

Q.    Other than the concerns you've just talked about, you know, with relation to having access to a phone during an emergency, are you aware of any other negative feedback about the Yondr program?

A.    No.

Q.    Now, we looked at --

A.    Let me --

Q.    Sure.

A.   If I could go back?

Q.   Go ahead.

A.   There has been some feedback about the cost of the Yondr pouches.  It's an extraordinary cost for us to use those resources to deal with this issue, and that -- because this could be considered a consumable, which means it would need to be replaced if lost; if, you know, somehow it became inoperable.

And so the cost of that type of resource that's being diverted from teaching and learning, yes, is the other one.

Q.   And who was it that expressed negative feedback about the cost of the program?

A.   Primarily parents, which would be constituents, the taxpayers.

Q.   You mentioned that the Yondr pouches are a consumable.  Have there been incidents in the DeKalb County School District where pouches have been lost or damaged?

A.   There have been, at different schools.

Q.   How many incidents have there been?

A.   I don't -- I don't have that number.

Q.   Do you have an approximate number?

A.   I do not.

Q.   How many total Yondr pouches have been

issued to DeKalb students?

A. I don't have that number, but I'm sure we -- we have that in the documentation.

Q. Okay. Now, I want to go back to the previous exhibit, which I think was 15.

DOCUMENT TECHNICIAN: Sorry, which tab was that?

MR. REINKE: That was Tab 80.

BY MR. REINKE:

Q. And I want to look specifically at the classroom cell phone usage data, which I think is Slide 8. Or -- yeah.

DOCUMENT TECHNICIAN: First or second one?

MR. REINKE: First one.

BY MR. REINKE:

Q. So -- so this data, that is reflected in this presentation which we've marked as Exhibit 15, is data that was collected before the Yondr program was implemented, correct?

A. Yes.

Q. Has DeKalb similarly collected data on the number of notifications that students are receiving in class after the Yondr program was implemented?

A. Yes, and I believe Dr. Logan would be able to answer more specifically to that data.

Q. Okay. Do you know, as you sit here today, what that data showed?

A. I don't.

Q. Okay. So other than the data that we've looked at in connection with the Disconnect to Reconnect initiative and the Yondr program, has DeKalb collected any other data on student cell phone use?

A. So this -- personnel regularly, you know, go in and collect data regarding cell phone usage. Beyond the Yondr pouches, they go and speak with the students and interview the students. They may interview teachers at various schools to determine cell phone usage and its negative impacts in the schools.

Q. Who -- who is conducting these interviews?

A. It could be various district-level personnel.

Q. Okay. And is this something that they're doing as part of like the Yondr pilot program?

A. It's part of the Disconnect to Reconnect initiative.

Q. Okay. So outside of the Disconnect to Reconnect initiative, has DeKalb collected any data on student cell phone use?

A. So not beyond -- beyond if a student is in violation.

Q. Right. Right. So --

A. Yeah.

Q. -- other than disciplinary incidents that are logged in Infinite Campus, and the data that we looked at for the Disconnect to Reconnect initiative, other than that, DeKalb has not collected any other data on student cell phone use?

MR. VAUGHN: Object to form.

THE WITNESS: It's a -- so when you're saying collecting data in any other form, can you clarify?

BY MR. REINKE:

Q. I'm just trying to understand like -- we looked at like charts that showed the number of notifications in a 30-minute class period, right?

A. Uh-huh.

Q. And so I would imagine there could be other types of data that you could collect, right? I mean, somebody could observe a class and write down the number of times a student picks up a cell phone, or something along those lines.

And so what I'm just trying to understand is if DeKalb has collected any data, other than the

disciplinary incidents in Infinite Campus and the data that's associated with this Disconnect to Reconnect initiative, DeKalb has collected any other data on cell phone use.

MR. VAUGHN: Object to form.

THE WITNESS: I think, anecdotally, we have, as it relates to teachers, again, having to stop teaching because kids are disengaged in class, or having to stop kids in their hallways using cell phones inappropriately; having, you know, students, you know, tell us, you know -- or actually visually seeing students using cell phones when we walk into the buildings, having parents communicate up, as far as to the District office, issues related to cell phones.

So yes, certainly we are seeing, you know, this collection of information related to cell phones.

BY MR. REINKE:

Q. Sure. So this -- this anecdotal data that you just described, is that logged or tracked anywhere?

MR. VAUGHN: Object to form.

THE WITNESS: So when you say "logged or tracked"?

BY MR. REINKE:

Q. Is it written down and, you know, saved on some computer?

A. I imagine it could be, in Infinite Campus, it could be. Or in an e-mail, for example.

Q. So, again, when you say "it could be," what I'm trying to understand, my question is just, has DeKalb recorded this anecdotal data that you just described and kept it in a centralized place?

MR. VAUGHN: Object to form.

THE WITNESS: I don't know.

BY MR. REINKE:

Q. We've talked about a few things that DeKalb has done to address student cell phone use during instructional time. Has DeKalb undertaken any efforts to address student cell phone use outside of school?

MR. VAUGHN: Object to form.

THE WITNESS: Outside of school? Could you clarify, "outside of school"?

BY MR. REINKE:

Q. Like when a student is not physically present in the school building.

A. Instances of cyberbullying, we've had to mitigate those issues.

Q.   Okay.  And what has DeKalb done to
mitigate those issues?

A.   Of course we've had to have personnel meet
with students that could cause a possible referral,
which would at minimum take about 30 minutes of time.
Personnel:  We're now getting teachers involved,
students involved.  Administrators.

If there are issues with threats, now we
have public safety involved.  It could involve local
agencies.  Police agencies.

And so we've done all of those things.

Q.   Okay.  So -- so -- right.  And I think
what you've sort of just described is, you know,
disciplinary issues, right?  So you -- you may have a
disciplinary issue for a student who's engaged in
cyberbullying when they're not physically present on
the school campus, right?

A.   Yes.

Q.   Okay.  And the same is true with respect
to a threat directed at the school, correct?

A.   Yes.

Q.   So other than sort of addressing
disciplinary issues, has DeKalb -- let me just ask a
different question:  Has DeKalb done anything to try
to prevent its students from using social media when

they're not at school?

A. I don't -- I don't -- other than communicating -- we provide communications to parents. In some instances we've provided virtual communications outside of school hours.

Q. Okay. And these communications would be things like the guidelines that we looked at earlier today?

A. Meetings. Letters to parents.

Q. Okay. Other than that, has DeKalb done anything to prevent students from using social media outside of school?

A. It may vary, per school. So -- we have 137 schools. Can't name, you know, all of the different activities.

Q. Are you aware of anything that any particular school is doing to try to prevent students from using social media outside of school?

A. As a district, no, not for any individuals -- any individual school.

Q. Okay. So DeKalb County School District itself uses social media, correct?

A. Yes.

Q. Does DeKalb County School District have a Facebook account?

A. Yes.

Q. Does DeKalb County School District regularly post content on Facebook?

A. Yes.

Q. Does DeKalb County School District have an Instagram account?

A. Yes.

Q. Does DeKalb County School District regularly post on Instagram?

A. Yes.

Q. Does DeKalb County School District have a YouTube page?

A. Yes.

Q. Does DeKalb County School District regularly post content on YouTube?

A. Yes. And on all these platforms, it's educationally based. It's positive. It's to highlight activities that are occurring in the School District. It could be specific schools. It could be to honor or recognize personnel. Initiatives. Job postings, et cetera.

Q. Does DeKalb County School District have a TikTok account?

A. I'm -- I'm not sure.

Q. Does DeKalb County School District have a

Snapchat account?

A. I'm not sure about that.

MR. REINKE: I'm going to show you a document that we'll mark as Exhibit 16.

(DeKalb-Towns Exhibit 17 was marked for identification.)

BY MR. REINKE:

Q. I'll hand you what we've marked as Exhibit 17. It is Tab 117.

And this document was produced by DeKalb County School District in this case. And at the top of the page, it says "Empowering Education Through Technology. Overview of DeKalb County School District Technology Plan for 2015 through 2018." Correct?

A. Yes.

Q. Are you familiar with the DeKalb County School District technology plan?

A. I'm as familiar as -- I see this document, yeah, but it's been ten years ago.

Q. Right.

A. So --

Q. Right. And I recognize that this is from 2015 through 2018.

A. Yes.

Q. Does DeKalb County School District have -- still have a technology plan today?

A. I'm not sure if they have a technology plan that is like this, no, I don't know that.

Q. Okay.

A. If they do, it would have been in the documents that were provided.

Q. Right. Right. If you look at -- so on the bottom right hand of the page, there's a number beginning with DEKALB, and then one page is 133314 and the other one is 133315. And the pages look quite similar, so I just want to direct you to the correct page: I'm on the page that ends in 314.

A. Okay.

Q. So it's also the one that --

A. Okay.

Q. The one that says "An Overview for Actionable Success" at the top of the page.

A. Yes.

Q. And it also states, if you -- if you go down to like the second section of the document -- third section, I guess -- "Anywhere, Any Time Access"; do you see that?

A. Yes.

Q. It says "Continuous access to digital

content -- and the ability to communicate and collaborate -- are key components that deliver an engaging learning environment.  Equally important is removing any barriers imposed by time, place, and processes."  Did I read that correctly?

A.  Yes.

Q.  And it says -- "A Vision to Move Forward" is the next section.  It says "Extensive feedback was gathered from DCSD stakeholders to help prepare this technology plan.  Their insights included:

"A modern digital learning environment and enhanced virtual educational opportunities.

"Integrated technology solutions to improve communication.

"Equitable access to devices and a robust wireless network.

"Community engagement -- a necessity to gain support for a shift toward a digital learning environment.

"Numerous ongoing opportunities for everyone to learn about technology."

This document reflects various goals for DeKalb County School District from a period from 2015 through 2018, correct?

A.  Yes.

Q.   And those goals include what I just read from the document?

A.   Yes, reading what's in the document, yes.

Q.   Right.  And would you agree that the DeKalb County School District recognizes the importance of technology in achieving these goals?

A.   Yeah, I would agree, ten years ago, that this -- these were the goals ten years ago.

Q.   Okay.  Do you believe that it is no longer important to use technology to -- to achieve these goals?

MR. VAUGHN:  Object to form.

THE WITNESS:  As a district, the goals that I see here are ten years ago.  I don't have a document indicating the goals that are -- there's a -- an updated document reflecting this information.

BY MR. REINKE:

Q.   Would you agree that it's still a goal of the DeKalb County School District to engage with the community?

A.   Yes.

Q.   And would you agree that technology is one way that the District can do that?

A.   Yes.

Q. And specifically social media is a way that the District can engage with the community, true?

A. Yes.

Q. I want to draw your attention to a document that we will mark as Exhibit 18.

(DeKalb-Towns Exhibit 18 was marked for identification.)

MR. REINKE: And this is Tab 129. Okay.

BY MR. REINKE:

Q. The document that I have marked as Exhibit 18 is titled "Superintendent Dr. Devon Horton 90-Day Plan."

Dr. Devon Horton is the current superintendent of DeKalb County schools, true?

A. Yes.

Q. And when did Dr. Horton become superintendent?

A. In 2023.

Q. Okay. Have you seen this document before?

A. I have.

Q. What is a 90-day plan?

A. A 90-day plan is giving the goals that the superintendent plans to achieve within 90 days of his superintendency.

Q. Okay. And so it's a document that sets forth goals for -- is it the first 90 days --

A. Yes.

Q. -- of becoming a new superintendent?

A. Uh-huh.

Q. So this is a document that, based on Dr. Horton becoming superintendent in 2023, would have been his goals for the first 90 days of his term?

A. Yes.

Q. Okay. Who creates these goals?

A. I believe they're created by the superintendent, in conjunction with the Board of Education.

Q. Okay. Is it fair to say that these are important priorities for the school district, if they're reflected in the superintendent's 90-day plan?

A. If I could take some time and just -- to review it. I haven't seen the document in a while.

Q. Of course.

A. Thank you.

Q. Sure. So my question was, is it fair to say that the goals reflected in the superintendent's 90-day plan are important priorities for the school

district?

A. Yes.

Q. And if you could turn to page 8 of the plan, please.

And there's a section on page 8 with the heading "Empower." Do you see that?

A. Yes.

Q. And it says "I will use social media platforms like Twitter, Facebook, and LinkedIn to share updates, news, and events with the district community. Social media is an excellent tool to engage with a large audience and promote transparency and open communication." Did I read that correctly?

A. Yes.

Q. So is it fair to say that one of Dr. Horton's top priorities for his first 90 days as superintendent was to engage with the community on social media?

MR. VAUGHN: Object the form.

THE WITNESS: When you say "engage," in -- in what way? What do you mean by "engage"?

BY MR. REINKE:

Q. Well, the document uses the term "engage with a large audience and promote transparency and open communication." So I guess another way to look

at it would be it's an excellent -- well, would you agree that social media is a tool by which Dr. Horton can communicate with the community?

A. Yes. He would communicate educational services, educational information, honors, recognitions; those positive things that uplift the educational community.

Q. And social media is also a tool where the community can engage directly with Dr. Horton, true?

A. Yes.

Q. Okay. And so using social media platforms like Twitter, Facebook, and LinkedIn is one of Dr. Horton's priorities for his 90-day plan, correct?

MR. VAUGHN: Object to form.

THE WITNESS: I mean, it's a way that he uses information to share updates.

BY MR. REINKE:

Q. Right.

A. Yes.

Q. And it's a priority that was included in his 90-day plan?

MR. VAUGHN: Same objection.

THE WITNESS: Yes.

BY MR. REINKE:

Q. Okay. I'm going to show you a document

that we will mark as Exhibit 19.

(DeKalb-Towns Exhibit 19 was marked for identification.)

MR. REINKE: And this is Tab 130.

BY MR. REINKE:

Q. All right. And if I could direct your attention to the e-mail that's at the bottom of the e-mail string, which is the first-in-time e-mail on Exhibit 19.

This is an e-mail dated September 26th, 2022, from Portia Kirkland to Vasanne Tinsley, or Vasanne Tinsley, correct?

A. Yes.

Q. And at the time, Dr. Tinsley was the interim superintendent; is that correct?

A. Yes.

Q. And do you know who Portia Kirkland is?

A. Yes. She was the former director of communications.

Q. Do you know what time period Ms. Kirkland was the director of communications for?

A. I -- I don't know that, but maybe -- there may be a document in human resources that would say that.

Q. And who is the current director of

communications?

A. I don't have that information.

Q. So this e-mail, dated September 26th of 2022, is -- the "Subject" line is "DCSD Stop the Violence Campaign." Do you see that?

It's on the second page -- there's a subject of the e-mail.

A. Oh, thank you. Yes.

Q. Okay. Are you familiar with the DeKalb County School District Stop the Violence campaign?

A. I recall the campaign. I don't have specific details. It was two, three years ago.

Q. Sure. What do you recall about the campaign?

A. I recall that students were coming back to school, and because they had been out on virtual learning, that -- and because they were interacting negatively on social media a lot, because they were not in school, when they came back to school, we did see an escalation of violence, keeping in mind the students were in homes and apartments, and they were not physically able to socialize. And so there was a lot of negative information that was transpired -- transpiring across social media. And so when they came back to school, we saw an increase in fights,

physical altercations, et cetera.

And I know we had discussed doing some type of campaign to mitigate that.

Q. So the purpose of this campaign was to, I guess, reduce the incidences of violence that you were seeing among these students?

A. Yeah. Yes.

Q. And in order to do that, it looks like DeKalb County School District used social media. Is that right?

A. Yes.

Q. All right. And it says "This 12-week media campaign will comprise original student TikTok videos, school and community-based YouTube videos, paid advertising (social media, television, radio, online and print, billboards), and other marketing support and resources." Did I read that correctly?

A. Yes.

Q. And then the next paragraph says "There will be two contests to support this campaign. The first contest will entail students, who work with the DSTV production team to create short TikTok videos that feature key messaging such as the following: See something say something, the bullying stops here, stop the violence, stop the fighting, each one teach

one, and stop heading for self-destruction. The best student videos, approved by DCSD leadership, will be published to district social media channels in native and paid advertising posts. These posts will serve as direct messaging to empower students to shift their focus back to academic achievement."

Did I read that correctly?

A. Yes.

Q. Did DeKalb follow through with enacting this campaign?

A. To the best of my knowledge, they did.

Q. Okay.

A. Again, this was -- again, we -- we're utilizing this -- we're utilizing social media to fight against social media, because we know that's where students are utilizing all of their time, on social media.

So we're using these avenues. We know that's what they're looking at. We know they're looking at social media, so we're also, as a District, utilizing social media to almost fight against social media, because we know students are looking at that.

So as a school district, we are placing positive messaging on social media, positive ways

that students can mitigate these issues that we're having.  And as I said, we wanted to -- the purpose of this was to empower students to shift their focus back to academic achievement.  So the whole goal of this is to shift students' focus back to academic achievement.

Again, it's very difficult for the school district to compete with social media in trying to mitigate the -- the negative impact that it's having.  So now we're again -- these are resources that we had to use to bring our kids back to this positive academic achievement.

But nevertheless, that -- we were trying to make sure kids utilize it in a -- in a positive way.  And so we have these different initiatives.

We're always coming up with these different initiatives, and programming, and curriculum, and it's -- it's a lot of resources towards something that does not really have to do with teaching and learning.

Again, we're -- we're fighting against social media, and we're diverting a lot of resources we could use for something educational.

Q.   But the District recognizes that social media can be an effective way to reach students; is

that true?

A. Yes. Yes.

Q. And -- and social media can be an effective way to distribute a positive message to students?

A. Yes, but we're seeing more distribution of negative messaging. So that's what -- the whole title of this, where it's Stop the Violence; Stop the Violence campaign.

So the premise of this is because of something negative. And -- and we're trying to utilize what kids -- we know kids are looking at often, over and over and over again. Again, to mitigate this negative impact that we're seeing with social media.

Q. All right. So -- so the premise of this campaign was to stop violence, right?

A. Yeah. The premise of it is to stop the violence. But that violence -- and I'm looking at the date, September 26th, 2022 -- again, when students returned back from the pandemic, and their major form of communication was through the computer, and not person-to-person interaction, we did see an increase in student negative physical interactions.

Q. All right. And in order to stop the

violence, the District used social media to distribute positive messaging to its students?

A. Yes.

Q. All right.

MR. REINKE: Let's go off the record.

VIDEOGRAPHER: We are now going off the video record. The time is currently 2:32 p.m.

(A recess transpired from 2:32 p.m. until 2:59 p.m.)

VIDEOGRAPHER: We are now back on the video record. The time is currently 2:59 p.m.

BY MR. REINKE:

Q. All right, Dr. Towns, would you agree with me that even before social media existed, adolescents and teenagers had to deal with various behavioral and emotional issues?

MR. VAUGHN: Object to form.

THE WITNESS: Yes.

BY MR. REINKE:

Q. Okay. And even before social media existed, growing up could present certain types of mental health challenges for -- for adolescents and teenagers?

MR. VAUGHN: Object to form.

THE WITNESS: Yes.

BY MR. REINKE:

Q. Some of these things could include mental health challenges as a result of puberty, for example?

A. Yes.

Q. It could include mental health challenges as a result of a pressure to succeed?

A. Yes.

Q. It could include mental health challenges as a result of bullying?

A. Yes.

Q. And all of these things could have affected students' mental health before social media even existed. Do you agree with that?

MR. VAUGHN: Object to form.

THE WITNESS: Yes, but it -- we've seen increase since social media. Social media's helping that along.

BY MR. REINKE:

Q. Okay.

A. To -- there's an avenue for students to bully and have these mental health issues, anxiety and -- perpetual scrolling and scrolling and scrolling on social media. Students who feel that they are not good enough; they don't look good

enough.

And all these things that are attributed to social media that otherwise wasn't the case before we had social media. Typically the bullying wasn't 24 hours, 7 days a week, on social media. So it was kind of -- some limitations to that.

Q. Okay. Fair enough. And when you say -- I think you said social media is helping that along, right? Like what did you mean by that?

A. So as a district, we've seen these things on social media. We've seen these kids being impacted by texts on social media. School environment being impacted by social media. This is the avenue -- this is what students use in order to communicate these negative interactions that occurred prior to social media, but this is a new and -- the way that these students are now communicating these things, or -- or I guess doing -- doing these things.

Q. You mentioned threats. Fair to say that DeKalb County School District has received threats through means other than social media?

A. Yes.

Q. And those threats that are received through means of other than social media could also be disruptive to the learning environment, true?

A. True.

Q. Now, in addition to kind of some of the general things we were discussing about, you know, things that can cause stress among adolescents, you would agree with me that this current generation has -- has been experiencing some additional stressors that maybe didn't exist in the past, correct?

MR. VAUGHN: Object to form.

THE WITNESS: When you say "additional," what do you mean? Clarify.

BY MR. REINKE:

Q. Well, for example, like the COVID-19 pandemic, right? You would agree with me that that is a stressor that has affected student mental health, correct?

A. That's a stressor that affected students' mental health, but by -- we can't blame the pandemic on everything, right? We can't blame it on everything.

And so what we've seen is during the pandemic, however, students were on social media, and they had access to social media. This is the way that they communicated, because they did not physically interact.

ONFIDENTIAL

Page 233

So yes, there are stressors from pandemic, but there were also stressors from social media.

Q. Sure. And I understand that. And I want to ask you specifically -- you've said a couple times that during the pandemic, students had access to social media and were on social media. Does DeKalb County School District have any data on how much time students were spending on social media during the pandemic?

A. Not to my knowledge. But -- let me ask you a question: Well, we had teachers reporting that students were on social media, and they were distracted from learning -- from that virtual learning environment. And by them not being in the classroom at the time, it was difficult for teachers to monitor the use of those devices, and really, I guess, enforce those rules that we have as it relates to the utilization of electronic communication devices appropriately.

Q. Understood. And I guess that was sort of what I was trying to get at, right? Because during the COVID-19 pandemic, there was a time period in which students in the DeKalb County School District were engaged in virtual learning. Isn't that true?

A. That's true.

olkow Technologies,
877-370-3377                    A Veritext Division                    www.veritext.com

Q. Okay. And about how long did that time period last?

A. Almost a year, when students were not physically in a school. We've had online learning prior to that. We've had some type of online learning.

Q. Okay. But there -- but there was a period of almost a year that students were not in person in school at all because of the COVID-19 pandemic, true?

A. Yes.

Q. And -- and during that one-year time period, is it fair to say that the students would not generally have interacted face to face with their teachers?

A. Yes.

Q. So it would be difficult, would you agree, that -- for the teachers to know how students were using social media during that time period, if they're not interacting face to face?

MR. VAUGHN: Object to form.

THE WITNESS: They would know based on communication from the parents. That didn't stop. We had ways of communicating with the parents.

So they sometimes would know. We had

virtual office hours.  We had virtual emotional support times for students.  And so those were ways that we could not -- and the teachers could communicate to the administrators, to district-level personnel, to other personnel that dealt with mental health issues.  Mental health referrals continued to be reported.

So we had avenues virtually for those things.

BY MR. REINKE:

Q.   Sure.  But is it fair to say that teachers would not have as much information about how much time their students were spending on social media during instructional time as they do when they're able to observe them face to face?

A.   I don't know that we measured, measured it in that way.

Q.   Would you agree with me that incidents of school violence, such as school shootings, are more prevalent now than they were 20 years ago?

MR. VAUGHN:  Object to form.

THE WITNESS:  I don't have the exact numbers.  I'm -- I'm sure that's -- that's something that could be looked up.

BY MR. REINKE:

Q. But as we sit here today, you don't have an understanding of -- or a belief as to whether school violence is more prevalent now than it was 20 years ago?

MR. VAUGHN: Same objection.

THE WITNESS: I don't have -- I don't have the numbers. I don't have the data.

BY MR. REINKE:

Q. So I want to talk about the COVID-19 pandemic a little bit more, in a little bit more detail.

You would agree with me that the COVID-19 pandemic was a completely unprecedented situation for a lot of people, true?

A. Yes.

Q. And that includes students in the DeKalb County School District?

A. Yes.

Q. Would you agree with me generally that the COVID-19 pandemic caused people to experience anxiety?

A. Yes.

Q. Would you agree that it caused people to experience uncertainty?

A. Yes.

Q. Would you agree that it caused people to experience feelings of isolation?

A. Yes.

Q. Would you agree that the COVID-19 pandemic caused people to experience increased rates of depression?

A. Yes, it could have.

Q. And these things that we just discussed -- anxiety, uncertainty, feelings of isolation, depression -- would you agree with me that students in the DeKalb County School District experienced those things as a result of the COVID-19 pandemic?

A. Yes, I believe that two things can be true at the same time. They could be experiencing from COVID as well as from social media.

Q. Sure. And right now I just want to focus on --

A. In those times.

Q. Sure. Understood. And right now I just want to focus on the COVID-19 pandemic.

So you previously testified that DeKalb County schools in-person learning was shut down for nearly a year because of the COVID-19 pandemic, correct?

A.   Yes.

Q.   When did DeKalb first close its schools?

A.   I believe March 16th of 2021.

Q.   Okay.  And if you can pull up Exhibit 10, which is Tab 5.  This is a document we previously looked at.  It's an electronic document.

A.   Oh, okay.

Q.   And the portion that I want to look at specifically is, I believe, page 32.

A.   I think I said 2021; I'm sorry.  So I stand corrected.  I mean March 16th, 2020.

Q.   Thank you.  I didn't even notice.

A.   No problem.

Q.   But -- so Question 43 -- this is the Plaintiff fact sheet, by the way; Exhibit 10 is the Plaintiff fact sheet that DeKalb County School District submitted in connection with this litigation.

And Question 43 asks if:  "Was your district ever closed to in-person learning during the COVID-19 pandemic?"

And you responded "Yes."  Correct?

A.   Yes.

Q.   And it says "If yes, please generally describe when schools were closed, when remote

learning was offered, and when students came back to in-person learning.

"Please also provide any written district-wide policies implementing remote learning."

And it states "Schools were closed effective March 16th, 2020, and reopened in March 2021. Soon after schools closed, the District shifted to digital learning. The District sent a letter to parents on March 13, 2020, titled Digital Learning Days Guidance explaining that teachers will post assignments on VERGE and students who do not have access to computers or WiFi will have hard copies delivered. On March 28th, 2020, the District published different teacher resources on how to teach virtually. The District held a teacher planning day on March 31st, 2020, to discuss how to implement remote learning." Did I read that correctly?

A. Yes.

Q. Okay. So it states "Soon after schools closed, the District shifted to digital learning."

How much time passed between schools closing, effective March 16th, 2020, and when digital learning began?

A. We shifted -- we shifted immediately, particularly for the students who had already

received Chromebooks and laptops. And I believe we continued with hard copies, because not all of our students had Chromebooks.

I want to say our elementary students did not have Chromebooks, and so we were able to get a grant for them to have Chromebooks. But in some way, we shifted virtually, where kids were not face to face. So they were able to look at hard copies of assignments, or they were able to learn virtually.

Q. Okay. And that start of digital learning for the people who were, you know, doing the digital learning through district-issued devices --

A. Yes.

Q. -- or other personal devices, that would have been within a few days of when schools closed?

A. I don't know exactly how many days. I don't want to say how many days. But we had to pivot pretty quickly, and we certainly did the best we could. Yeah, at that time, we did the best we could.

Q. How did digital learning work, generally speaking?

A. Probably our chief academic officer, Ms. Stacy Stepney, could answer in more detail about how that worked.

But essentially students were in a virtual

classroom with their teacher. They had to log in on a platform, as a class. I believe they were required to turn on their cameras, so the teacher could see them in the class, as a part of check-in, so to speak.

Teachers were teaching; the students had opportunity to ask questions. That's essentially what it was.

Q. So when the students were doing this digital learning, the way you've described it, did they spend the same amount of time in their virtual classes as they would have in their in-person classes?

A. They would have. And so we had different amounts of time, depending on the school level -- elementary, middle, and high -- and then some cases, high school, they'll have different times for classes; they may be on the black schedule, which -- they may have 90 minutes for a class, versus 55 minutes on set period day. So . . .

Q. Okay. Generally speaking, for the students who were participating in virtual learning, was their schedule during virtual learning generally the same as their schedule would have been during in-person learning?

A.    Yes.

Q.    Okay.  It was just occurring virtually instead of in person?

A.    (Nodding head up and down.)

Q.    The -- the Plaintiff fact sheet also mentions something called VERGE.

A.    Yes.

Q.    What is VERGE?

A.    That is a platform where teachers would post the assignments, and students could post their completed assignments on VERGE.  A way for the teachers to check the assignments.

Q.    Okay.  When you say that was a platform, was it like a website that somebody would log into?

A.    So I'm not sure if it was web-based or not.  It wasn't anything that was created by DeKalb County; it was some vendor that provided that platform.

Q.    Was DeKalb using VERGE before the COVID-19 pandemic?

A.    I'm not sure.

Q.    Okay.  But as of the COVID-19 pandemic, is VERGE kind of the primary way that assignments were communicated to students who were engaged in digital learning?

A. Yes, during COVID.

Q. And would students -- so teachers would post assignments in VERGE?

A. Yes.

Q. And would students submit their assignments through VERGE as well?

A. Yes.

Q. Now, for students who didn't have access to computers or WiFi during this time, they were not able to participate in digital learning the same way as the students who did have access to computers or WiFi; is that true?

A. Yes. It would have been different.

Q. Okay.

A. Hard copies.

Q. Right. And so about -- do you know about what percentage of DeKalb's students were -- didn't have access to computers or WiFi to participate in the online virtual learning?

A. So outside of the students receiving that one-to-one student-to-device, I believe our pre-K through 5 would not have had Chromebooks. I'm going to say maybe they represent half of the student population. So at that time, if we had about 98,000 students, that maybe half of those students would not

have had a device, a district-issued device.

Q. Right. And so for those students that didn't have a district-issued device, if they had a personal device, could they participate in virtual learning through their personal device?

A. They could.

Q. Okay. And did students actually do that?

A. I don't have the -- the data to show if they did or -- you know, how many, or if they did. But they could.

Q. So -- so for the students who didn't have a computer or WiFi, and weren't able to participate in the online virtual learning, this Plaintiff fact sheet mentions having hard copies delivered --

A. Yes.

Q. -- to them; how did that process work?

A. So this is -- this is an example. Because we had many -- we had about 78 elementary schools. And so the school had the autonomy to decide what that would look like.

So, for example, one school would have certain days that parents could come and pick up the hard copies, and then they'd have a day where they could drop them back off to be graded, and pick up another packet.

So that would have been the logistics of the online school, for example.

Q. Okay. And for the students who were participating in like these hard-copy assignments instead of the online virtual learning program, did these students have any way of interacting with their teachers?

A. Certainly they could call the school. Possibly -- I don't know to what detail they were able to interact with their teachers. That probably would be a better question for either the chief academic officer or -- Ms. Davis.

Q. Okay. And who was the chief academic officer at the time?

A. Monica Davis.

Q. Monica Davis was the chief academic officer?

A. I'm sorry, she was the chief information officer. I believe Stacy Stepney was the chief academic officer at the time.

Q. Is she still the chief academic officer?

A. She is.

Q. Now, you mentioned that I believe middle school and high school students had district-issued Chromebooks before school shut down for the COVID-19

pandemic?

A. I believe so.

Q. Okay. Did elementary school students get district-issued Chromebooks during the COVID-19 pandemic?

A. As stated here, we did give -- receive a grant that allowed for the purchasing of those devices for pre-K through 5. And WiFi hotspots, and some additional instructional software.

Q. And that grant, according to the Plaintiff fact sheet, was awarded on April 28th, 2020?

A. Yes.

Q. When were those devices that were obtained through that grant distributed to students?

A. I don't know the exact date. I'm not sure if it's on this document; I can only see so far. But -- I don't know the exact date. But we didn't hold up the distribution of it.

Q. Okay. Do you recall if it was during the 2019-2020 school year?

A. I don't recall.

Q. And then it says "For the 2020 through 2021 school year, the District started distance learning/remote learning on August 17th, 2020."

A. I'm not seeing it scroll. I'm sorry.

DOCUMENT TECHNICIAN: I'm sorry, where are you trying to get?

MR. REINKE: It's like -- scroll down a little. There we go. So the second paragraph from the bottom.

BY MR. REINKE:

Q. It says "For the 2020-2021 school year, the District started distance learning/remote learning on August 17th, 2020." Correct?

A. Yes.

Q. Okay.

By the time the 2020-2021 school year had started, had these additional Chromebooks been distributed to students?

A. I don't have that data, but I believe so. Yes.

Q. Okay.

A. I believe so.

Q. So your best recollection, as you sit here today, is that by the time the 2020-2021 school year had started, all DeKalb students had district-issued Chromebooks?

A. I can't say all DeKalb students had a Chromebook. Yeah, I'm not able to say that. I'm sure we have some documentation --

Q. Sure.

A. -- to provide all -- because all is all.

Q. Right.

A. So I can't say that.

Q. I'm just saying, you know, as you recall today, do you recall that as of the beginning of the 2020-2021 school year, do you recall if there were, you know, categories of students who had not been provided district-issued Chromebooks?

A. I recall that it was -- some of this was the option of the parent, to have the Chromebook or not. However, if a student requested a Chromebook, they had a Chromebook. We tried to make it available to them.

Q. Okay. And then the last paragraph here says "The students returned to face-to-face learning in March 2021 on a staggered schedule, with all students returning in person March 29th, 2021."

Tell me about this staggered schedule. What does that mean?

A. So I believe the Board of Education, and Mrs. -- I believe Mrs. Watson Harris was the superintendent at the time -- decided to stagger the returning of those students so it wouldn't be so difficult, logistically, to return those students

back to the schools.

So I don't know -- and there may be a document indicating who returns to school first. I do recall that they were, I believe, given the option to return or not, if they wanted to remain on virtual at that time. I believe they were also given the option to remain on virtual.

Q. So initially, when schools reopened, students had the option to remain on virtual or to return in person to school?

A. I believe so.

Q. Okay. Do students still have the option to remain on virtual learning today?

A. No, they -- no. They do not.

Q. Do you recall when students no longer had that option, to remain on virtual learning?

A. I do not recall a specific date.

Q. Now, this staggered opening, was it school by school?

A. I believe it was by grade bands. Maybe the elementary students, then the middle school, then high. I don't remember the order in which that happened.

Q. So during the time period when students had the option of staying on virtual learning or

returning to school in person, how did that work, sort of from a logistical perspective?

A.   I believe some teachers were teaching virtually, but I believe they had to report to the physical building and teach virtually.

Q.   Okay.

A.   And then there were teachers who were teaching face-to-face instruction.

Q.   So the teachers would have to report to the physical building?

A.   Yes.

Q.   But if they were teaching virtually, their students were not in the physical school building?

A.   Not necessarily.  So logistically, it could have been possible; and I don't -- I don't have the documentation, but again, Ms. Davis would probably -- or Ms. Stepney would be better with the details of this, because of limitations with the number of teachers, and then being face to face and then virtual.

It could have been that they may have had a class in -- at that time, and they may have also been teaching virtually.  So they could have possibly been a class in the classroom, face to face with a teacher, as well as those students interacting with

that teacher during that time virtually.

Q.   Okay.  Were there classes where a single teacher was teaching both in-person students and virtual students at the same time?

A.   Again, I think Ms. Davis or Ms. Stepney would be able to answer that question.  But as I recall, because of the limitations on the number of teachers we had, and these tricky logistics of students opting to stay at home, I think we were trying to manage that limited number of personnel to try to address both situations.

Q.   Okay.  Right.  And so in trying to manage the limited number of personnel, how did you try to do that?

A.   Again, it's my recollection that in some cases, teachers had a classroom that was physically present, and they may have had kids looking on virtually.

Q.   Okay.  Understood.

During the time that schools were shut down during the COVID-19 pandemic, did that affect the extracurricular activities that were available to students?

A.   To my knowledge, yes.

Q.   Okay.  Were there any extracurricular

activities available to students during the time period when schools were shut down as a result of the COVID-19 pandemic?

A. I don't believe so.

Q. And then those extracurricular activities only resumed once the -- the District had reopened schools for face-to-face learning; is that true?

A. I believe that's true.

Q. I want to show you another document, that we'll mark as Exhibit 20.

MR. REINKE: And this is Tab 41, which I think we're going to have to pull up electronically.

(DeKalb-Towns Exhibit 20 was marked for identification.)

BY MR. REINKE:

Q. All right. And this is a series of e-mails. And I want to draw your attention in particular to the second e-mail on the first page -- that one.

MR. REINKE: If you can scroll up to like the header information. Right.

BY MR. REINKE:

Q. And so this is an e-mail that is -- that DeKalb has produced in this case. And this is from

you, Dr. Towns, to Dr. Horton. Correct?

A. Yes.

Q. And it's dated October 31st, 2023?

A. Yes.

Q. Dr. Horton is the superintendent of DeKalb County schools, correct?

A. Yes.

Q. And he was the superintendent on October 31st, 2023?

A. Yes.

Q. It's also directed toward Yolanda Williamson?

A. Yes.

Q. Who is that?

A. At the time, she was the Board of Education executive director. She's currently the chief of communications.

Q. What is the role of the Board of Education executive director?

A. I don't have the job description. That may have been turned in to you. I don't have the specific --

Q. Do you have a general understanding of what her job was when she had that role?

A. Generally overseeing the directives and

responsibilities of assisting the Board of Education members.

Q. And the third person on the "To" line of this e-mail is Michelle Dillard.

A. Yes.

Q. Who is Michelle Dillard?

A. She's the chief of schools.

Q. And what is the chief of schools?

A. So generally she's -- oversees the daily operations of schools.

Q. And this is -- there's a person copied on this e-mail named Maria Marquez?

A. Uh-huh.

Q. Who is Maria Marquez?

A. She's the executive assistant to the superintendent.

Q. And what is generally her role?

A. She's acting as the assistant to the superintendent. Scheduling, calendaring, things like that.

Q. Okay. In the second paragraph of this e-mail, after the bold text, where it says "Why was a culture and climate department created?"

So the second paragraph after that, it begins with "In DeKalb County School District." Do

you see that?

A. Yes.

Q. Okay. And it says "In DeKalb County School District, there has been an increase in State reported incidents with fighting, battery (fighting with injuries), threats and intimidation, student incivility, and disorderly conduct being the highest rule violations post-pandemic. The impact of the COVID-19 pandemic on the mental health of our students has been significant and includes anxiety, depression, loneliness, stress, and tension which in some cases, may manifest in the aforementioned behaviors. Prior to the pandemic, with the use of positive behavioral interventions and supports, violations decreased over a seven-year period."

Did I read that correctly?

A. Yes.

Q. And this was an e-mail that you wrote to Dr. Horton?

A. Yes.

Q. Do you recall why you wrote this e-mail?

A. If you could scroll back up -- I've not reviewed this e-mail in -- I imagine since I wrote it.

Q. Sure.

A.   So . . .

Q.   Yeah.

MR. REINKE:  If you want to scroll through from the bottom, and let Dr. Towns review the e-mail.

DOCUMENT TECHNICIAN:  Beginning with the last e-mail?

THE WITNESS:  If you could go up some.

DOCUMENT TECHNICIAN:  Go up?

THE WITNESS:  Yes.

Is there anything before this?

DOCUMENT TECHNICIAN:  Yes, just this one.

THE WITNESS:  Okay.

DOCUMENT TECHNICIAN:  And the last page.

THE WITNESS:  If you go up to the original one.

DOCUMENT TECHNICIAN:  This is the second one, and this is the first one.

THE WITNESS:  Okay.  I'm sorry.  Can you go back?  I didn't see the last paragraph of what I had typed to Dr. Horton to address that.

DOCUMENT TECHNICIAN:  Down this way?

THE WITNESS:  This is part of an e-mail. Okay.  Yes.  Yes, yes, yes, yes.  Okay.

I think my -- my context is off, because

I'm responding to Dr. Horton; but I'm trying to figure out -- I think I'm answering a question that was asked through a town hall by -- I don't know whom. So is it -- something else that can clear this context for me?

BY MR. REINKE:

Q. No, I just have the e-mail. And my question is just, do you recall writing this e-mail?

A. Yes.

Q. You do?

A. Yes.

Q. Okay. And you recall doing it in connection with a town hall, but you don't recall the specifics of that. Is that fair?

A. Yes.

Q. Okay.

A. If you could scroll down so -- and then scroll down some more. So I can -- I just wanted to read the entire e-mail.

Q. Sure.

A. Okay.

Q. And if you just let me know when you finish.

A. Okay. Thank you.

If you could scroll down some more. Thank

you. Okay, you can scroll again. Okay.

Q. Okay. Have you finished reviewing that e-mail?

A. Yes.

Q. Okay. So going back to what you wrote in this e-mail, you wrote that there was an increase in State reported incidents with fighting, battery, threats and intimidation, student incivility, and disorderly conduct being the highest rule violations post-pandemic.

A. Uh-huh.

Q. Is it true that since the pandemic, the number of State reported disciplinary incidents in the DeKalb County School District has been increasing?

A. It has increased. It varies. There is a state report that's available. If you have that, I'll be glad to review it with specific data.

Q. Okay. And the e-mail specifically -- your e-mail specifically mentions fighting, battery, threats and intimidation, student incivility, and disorderly conduct as being the highest rule violations post-pandemic.

Is it your understanding that those categories that I've just described are the highest

rule violations in the DeKalb County School District since the pandemic?

A. Yes, based the reports that would have been submitted.

Q. You also wrote "The impact of the COVID-19 pandemic on the mental health of our students has been significant and includes anxiety, depression, loneliness, stress, and tension which in some cases may manifest in the aforementioned behaviors."

Do you still agree with that statement today?

A. I do agree with that.

Q. Let's take a look at another document, which I will mark as Exhibit 21. And this is Tab 43.

And again, it will be an electronic . . .

(DeKalb-Towns Exhibit 21 was marked for identification.)

BY MR. REINKE:

Q. Okay. This is a document that DeKalb County School District has produced in this case. And it's titled "Governor's Office of Planning and Budget. Public Safety and Community Violence Reduction Grant Proposal." Do you see that?

A. Yes.

Q. And there is a "Proposal Summary" on the

first page. Do you see that?

A. Yes.

Q. And under "Proposal Summary," the second paragraph begins "The DeKalb County School District." Do you see that?

A. Yes.

Q. And it says "The DeKalb County School District (DCSD), the third largest school district in Georgia, is focused on keeping students first as school safety is a major priority. School safety has become a local, state and national public conversation and is a major concern of the School District. After the onset of the pandemic on January 27, 2020, mental health concerns related to school shootings and violence have taken center stage and after more than 18 months of school closures and social isolation of students, these incidents have increased in DCSD schools." Did I read that correctly?

A. Yes.

Q. Have incidents of violence increased in DeKalb County School District schools since the COVID-19 pandemic?

A. Yes. I don't know the exact numbers, and again, that would vary. But there is documentation

from Infinite Campus that would demonstrate that.

Q. But generally speaking, they have increased since the pandemic?

A. In my recollection, they increased. And they may have started to decrease. You know, we're looking at middle of a school year, but prior to the students returning, of course they weren't face to face, so those numbers, if I can recall, were pretty low. And when they returned, they I think more than doubled, if not tripled.

Q. The next sentence states "The grief, anxiety and depression students experienced during the pandemic have created challenges in the classrooms and hallways, resulting in disruptive behavior in many younger kids and increased violence and bullying among older students." Did I read that correctly?

A. Yes.

Q. Is that a statement that is consistent with -- well, let me -- let me ask: Do you agree with that statement?

A. I'm not sure -- well, I'm not sure who wrote this statement. Seems like it was a summary of such to receive some type of, I believe, funding, if we go down. I guess I need to -- to try, before I

answer any additional questions, just kind of read what this all says.  Is there --

MR. VAUGHN:  Sorry.  Just to add -- I'm just going to lodge an objection, to the extent that this is a funding request, and it's a request for funding, so that has been designated as Mr. Schueneman's testimony.

I understand you're asking her about COVID questions, but to the extent that this is a funding document being used, just laying that objection out there, that Mr. Schueneman was designated to talk about applications for grants, which I believe is what this document is.

Just making that objection for the record.

MR. REINKE:  Sure.

BY MR. REINKE:

Q.  Okay.  So you -- you can take a moment to review the document, if you need to, Dr. Towns, and then I'll ask you my question again.

A.  Thank you.

If you can scroll.  If you could scroll. Okay.  If you can scroll.  Do you have a number for how many pages this document is?  Twelve pages. Okay, if you could scroll.  Okay.

If needed, can I continue to read this --

Q. Absolutely.

A. -- as related to your questions?

Q. Absolutely.

So my question -- I just want to go back to this second paragraph, under "Proposal Summary," on page 1.

This statement here: "The grief, anxiety and depression students experienced during the pandemic have created challenges in the classrooms and hallways, resulting in disruptive behavior in many younger kids and increased violence and bullying among older students."

This statement was made in connection with a grant proposal. Correct?

A. And again, I'm not familiar with this grant. I didn't write it.

Q. Right. But --

A. As it states, is -- yes.

Q. The document states --

A. Yeah. The document states exactly what you said.

Q. It states that it's a grant proposal, correct?

A. Yes.

Q.   And you don't have any reason to dispute that, do you?

A.   No.

Q.   Okay.  Do you agree with that statement, "The grief, anxiety and depression students experienced during the pandemic have created challenges in the classrooms and hallways, resulting in disruptive behavior in many younger kids and increased violence and bullying among older students"?

MR. VAUGHN:  I'm just going to just make an objection, again, to the fact that this is from a grant, so this is not a topic she's designated to testify to.  Topics 45 and 46 relate to COVID and what she was designated to testify to.

I'm not instructing you not to answer; if you -- if you can answer, then you can.  But again, I would just state that this grant application was designated as Dr. -- I'm sorry, Mr. Schueneman's testimony.

So, just making that objection.

MR. REINKE:  Sure.  And I'll just say for the record, I don't think that this document itself was designated as a particular topic.

But let me just repeat my question.

BY MR. REINKE:

Q. So my question is, this document states "The grief, anxiety and depression students experienced during the pandemic have created challenges in the classrooms and hallways, resulting in disruptive behavior in many younger kids and increased violence and bullying among older students."

My question is just -- do you agree with that statement?

A. I agree that the pandemic has created some challenges.

Q. Okay. And do you agree that students have experienced grief, anxiety, and depression as a result of the pandemic?

A. Yes.

Q. And do you agree that as a result of the challenges and the grief, anxiety, and depression that students have experienced from the pandemic, that some of this has resulted in disruptive behavior?

A. Yes.

Q. And that it has increased violence and bullying among older students?

A.   Yes, and I -- and I'll share that that increased violence and bullying -- and this is coming from, you know, after the pandemic -- a lot of these challenges were created through use of social media.

Because again, those students were not in physical contact with each other.  And so a lot of this grief and depression and anxiety was as a result of students utilizing social media in those ways.

Q.   Okay.  And what is the basis for your belief that the grief, anxiety, and depression students have experienced during the pandemic is related to social media?

A.   You know, well, in some cases, again, as stated previously, we did have virtual office hours. We had either virtual emotional -- stress rooms, such that students could discuss this information with staff members.

And so, again, two things could be true: They could be experiencing the grief and anxiety and depression because of the pandemic, but then there could be some other issues going on with that.  And social media was -- was one of them.

Q.   Okay.  You mentioned virtual office hours.

A.   Uh-huh.

Q.   What is that?

A.   The staff members, teachers and additional personnel, would have virtual hours, such as social worker, psychologist, et cetera.

Q.   Are there -- is there any documentation of what was discussed with students during these virtual office hours?

A.   Certainly that would be confidential.  So if there were any type of staffing notes, that would be confidential.

Q.   My question is just, to your knowledge, is there any documentation of what was discussed with students during these virtual office hours?

A.   If -- if it is, that would be -- there are some reporting mechanisms for that.  Infinite Campus, for example.

Q.   Okay.  And so, again, you started your answer "If it is."  My question is, is there any documentation of what was discussed with students during these virtual office hours?

A.    If students discussed anything that would be reported to a school social worker, that would be in Infinite Campus; or if they discussed it with a third-party agency, they would house those staffing notes.

I believe we turned in a report, some

documentation of those agencies, and may have even turned in some documentation related to the number of referrals to those agencies and the time frame in which they were notified of those referrals.

Q.   Okay.  You mentioned if students discussed anything that would be reported to a social worker --

A.   Uh-huh.

Q.   -- it would be logged in Infinite Campus.

What types of things would be reported to social workers?

MR. VAUGHN:  Object to form.

THE WITNESS:  Oh, gah, I don't have those specific topics that the students would have discussed.

BY MR. REINKE:

Q.   Right.  But so -- what would, I guess, trigger a teacher or a staff member to report something in Infinite Campus?

A.   As a social worker, it could be students not attending class.  Students being abused. Students suffering from mental health issues.  Could be due to social media.  It could be abuse happening in the home, et cetera.

Q.   Okay.  Let me try --

A.   Several things.

Q.    Let me try to ask this a different way.

Are you aware of any specific documents that link the grief, anxiety, and depression students experienced during the pandemic to social media?

A.    I am aware, as shown earlier, in Infinite Campus, where there were referrals in Infinite Campus that may have linked social media to some type of behavior.

Now, as listed, grief, anxiety, and depression, I was not able to review all of those reasons, those 49 cases.  But that would be an instance where we could look at those 49 cases to determine that.

Q.    Okay.

A.    And it would have been reported in Infinite Campus.

Q.    Okay.  Other than data in Infinite Campus, are you aware of any other specific documents that link grief, anxiety, and depression students experienced during the pandemic to social media?

A.    No, not specifically.  There is a report in Infinite Campus, called SWARM, that social workers use.

Q.    And what is the SWARM report?

A.    That's where they place the allegation and

the notes as to why students are being referred.

Q. So that is a --

A. Access to that.

Q. So that is a report in Infinite Campus that lists referrals to social workers?

A. That is a report that is made by social workers, and students are referred to them.

Q. Okay. And so is it a way of sort of logging the social worker's interaction with a particular student?

A. Yes.

Q. And within one of these SWARM reports, are there any particular categories of types of interactions?

A. I don't have the specifics, but I'm sure we provided that documentation.

Q. Are you aware of if there are any specific categories that link particular instances in a SWARM report to social media?

A. I don't have that specific knowledge, but we've -- if we've produced that report, it may state that.

Q. Okay. But you don't know one way or the other?

A. No.

Q. Okay. During the last ten years, other than the COVID-19 pandemic, has DeKalb County School District closed its schools to in-person learning for more than five consecutive days?

A. Not that I'm aware of.

MR. REINKE: Let's go off the record.

VIDEOGRAPHER: We are now going off the video record. The time is currently 3:58 p.m.

(A recess transpired from 3:58 p.m. until 4:25 p.m.)

VIDEOGRAPHER: We are now back on the video record. The time is currently 4:26 p.m.

BY MR. REINKE:

Q. All right, Dr. Towns, I want to draw your attention to the document that I previously marked as Exhibit 16, which is Tab 80.

And if we could, please, go back and look at -- give you the slide number in just a second.

So the first one is Classroom Number 1, Cell Phone Usage Data. And this was data that we previously looked at, Dr. Towns, that gives us the number of notifications that were observed in this particular classroom during this particular 30-minute period. Correct?

A. Yes.

Q.   Okay.  And there were 151 social media notifications, correct?

A.   Yes.

Q.   This chart does not break down those notifications by social media platform, correct?

A.   No.

Q.   Do you know if there is any data that DeKalb has that breaks down which platform those notifications came from?

A.   We know verbally by teachers telling us, you know, which platforms that students are using most often.  And most often they are using Instagram; they're using Snapchat, because things disappear on Snapchat; they're using TikTok, participating in challenges.  They're -- suppose not as much Facebook, but Facebook as well.

So those -- those are the things that are being reported up to teachers, administrators. Negative uses of those platforms.

Q.   Okay.  And my question just was specific to the data that we're looking at on this slide. Right?

A.   Yes.

Q.   The data that was collected from Classroom Number 1 during the 30-minute period.

A. It may be -- it may be specific. But Dr. Logan will have that information.

Q. Okay.

A. Yeah, it's possible he will have that information.

Q. Okay. And then same -- for Classroom Number 2, on the next slide, 139 social media notifications were collected over the 30-minute period in Classroom Number 2, correct?

A. Yes.

Q. And this chart does not provide a breakdown of which platforms those notifications were from, correct?

A. It does not. But that, again, would be possibly reported through Dr. Logan.

Q. You don't know one way or another right now? We had have to ask Dr. Logan that?

A. Or if there are any documents that were provided.

Q. Okay. All right. We can set that aside.

I'm going to show you a document that we will mark as Exhibit 21, which is Tab 67 -- Exhibit 22, which is Tab 67. Thank you.

(DeKalb-Towns Exhibit 22 was marked for identification.)

MR. REINKE: And we'll need to pull this one up electronically as well. And you can zoom out just a little bit, just so we can see that this is the only e-mail on the page.

BY MR. REINKE:

Q. So Exhibit 22 is an e-mail from Denise Revels to Deborah Moore-Sanders, dated February 24th, 2022, correct?

A. Yes.

Q. We've already talked about Ms. Revels, but do you know who Deborah Moore-Sanders is?

A. At the time -- and this is 2022; her title changed quite -- some time within this period. So at this time, I believe she may have been the interim deputy superintendent for student support and intervention.

Q. Okay. And then she has also held other positions in the District within the last ten years?

A. She has.

Q. Do you recall what any of those other positions she has held are?

A. Yes. She was the director for student support and intervention. Then she was the executive director for student support.

And then she was the interim deputy

superintendent, and then the deputy superintendent.

Q. When she was deputy superintendent, was she deputy superintendent for a particular department?

A. Yes, for the division of student support services and intervention. And then the name changed, and possibly some of the departments changed as well, moved as well. I don't recall all the logistics and movement that took place while she was . . .

Q. Okay. What is the department of student support services and intervention?

A. So very similar to wrap-around services. It's my recollection that at this time it may have also -- it would have also included psychological services. I don't recall, but it at one time included public safety.

Q. Okay. Does that department, student -- student support services and intervention department, does that still exist today?

A. Not in name. It exists as wrap-around services and interventions.

Q. Understood. And so the wrap-around services department is the department that you oversee, correct?

A. So Ms. Denise Revels oversees the department. That department sits within the division of wrap-around services.

Q. Understood. Thank you for that -- that clarification.

A. Yes, sir.

Q. So this 20 -- or February 2024, 2022, e-mail from Ms. Revels to Dr. Moore-Sanders states "The school social work department has received 9,199 referrals as of February 24th, 2022."

That 9,199 referrals, do you have any understanding of -- and I know it doesn't say this in the document, but do you have any understanding of what time period that would be for?

A. No, I -- I don't. But it says "as of February 2024," so I don't know if that's over the course of ten years. It's not stated.

Q. Do you know approximately how many social work referrals the department receives in a school year?

A. I don't know exactly, but I know that they're -- the reports -- when it's reported, it is documented. And that's available.

Q. Right. Yeah, and I -- and I understand that. I'm just wondering if you, as you sit here

today, have an approximate number.

A. It varies. It varies. Attendance, economic aid, and family concerns; those could vary from year to year.

Q. Sure. Right. And I'm just wondering about the total number, if you know the approximate number of social work referrals within a school year.

A. I don't.

Q. Okay. This e-mail goes on to say "The top three categories are attendance, economic aid, and family concerns." Do you have an understanding of what is encompassed within each of those categories?

A. Very generally speaking.

Q. Okay. What would the "Attendance" category encompass?

A. Could be a -- a variety of reasons why students are not coming to school. So if they're not in school, they are referred to the social worker for an attendance change.

Q. The next category listed in the e-mail is "Economic Aid." What types of situations would be encompassed within that category?

A. That could be food insecurities. That could be the need for housing. That could be clothing, et cetera.

Q. When you say "food insecurities," what does that mean?

A. Students may not have food to eat, and they may be coming to -- the parents may be coming to the social worker because they don't have food to eat.

Q. Is that a significant problem within the DeKalb County School District?

MR. VAUGHN: Object to form.

THE WITNESS: I think not having food to eat is a significant problem even if it's one student.

BY MR. REINKE:

Q. Do you know approximately how many students within the DeKalb County School District are eligible for free or reduced lunch?

A. I know there is a report that is provided that's -- that shows that, so I don't have the exact number.

Q. Okay. But do you have an approximate number, as you sit here today?

A. I don't have an approximate number, but I will say that with free or reduced lunch, it entitles us to be a Title I school, to receive federal funds, and we are a Title I district.

Q. Okay. What does it mean to be a Title I district?

A. Receiving -- as I understand it, to receive federal funds, in order to -- and other resources, in order to close that opportunity gap that exists when we have poverty and underserved districts.

Q. You also mentioned a need for housing as one of the reasons why a student could be referred to the school social work department for economic aid.

A. Yes.

Q. Is students not having housing a significant problem within the DeKalb County School District?

MR. VAUGHN: Object to form.

THE WITNESS: I would say if one child was unhoused, it is significant, and it could impact them significantly.

BY MR. REINKE:

Q. As you sit here today, understanding you don't have exact numbers, do you have an approximation of the number of students within the DeKalb County School District currently that are unhoused?

A. It varies from month to month. I guess

the last time I checked, it may have been upwards of 500, or more.

Q. The next category of referrals listed in the e-mail is "Family Concerns." What types of situations would be encompassed within the "Family Concerns" category?

A. That could just be a variety of things. I mean, students not getting along with their parents. Just -- a variety of issues could be family concerns.

Q. Could it include things like custody issues?

A. It could.

Q. In addition -- or the next sentence of the e-mail says "Additionally, the department has received 484 cases of child abuse, 131 cases of sexual abuse, 447 cases of suicidal ideation and 90 staff allegations."

This category, "Staff Allegations," do you have an understanding of what that category is?

A. As it reads, a staff allegation would be any I guess unethical or negative behaviors perpetrated by a staff member.

Q. Okay. So this -- these referrals would be, I guess, in connection with allegations that a teacher or other staff member in the DeKalb County

School District engaged in some type of misconduct?

A. Yes.

Q. All right.

A. Allegedly.

Q. Right. Allegations.

I want to draw your attention to a document that we will mark as Exhibit 22, which is Tab 4.

(DeKalb-Towns Exhibit 23 was marked for identification.)

MR. REINKE: And this is DeKalb County's first amended supplemental Plaintiff fact sheet.

MR. VAUGHN: I think we're at 23.

MR. REINKE: 23, sorry. I can't count.

So we're marking Tab 4 as Exhibit 23. And just again, for the record, Exhibit 23 is the first amended supplemental Plaintiff fact sheet that DeKalb County School District produced in this litigation.

BY MR. REINKE:

Q. Do you recognize this document, Dr. Towns?

A. Yes.

Q. Okay. And if you go to the very last page of Exhibit 23, there's a certification. Do you see that?

A. Yes.

Q. And this certification says "I have made reasonable inquiries to answer the foregoing questions. Based on my personal knowledge and the information provided by other district employees, I declare under penalty of perjury that the information provided in this Plaintiff fact sheet is complete, true, and correct to the best of my knowledge and information, and that I have provided all of the requested documents that are reasonably accessible to me and/or my attorneys, to the best of my knowledge." Correct?

A. Yes.

Q. And is this your electronic signature on this certification?

A. Yes.

Q. And it's dated August 12th, 2024?

A. Yes.

Q. All right. If I can draw your attention to Question Number 9. Do you see that?

A. Yes.

Q. Okay. Question Number 9 says "Provide the number of students in your district referred for mental health services, if such referrals are tracked. Note: This question is not designed to

require review of underlying individual student records."

And then the number of students are provided for 2017 through 2018 school year through the 2023 through 2024 school year. Correct?

A. Yes.

Q. So this data is for the number of students referred for mental health services, correct?

A. Yes.

Q. How does DeKalb County School District define a referral for mental health services?

A. I believe these are referrals to either a social worker, that would be found in SWARM, or -- yeah, I believe that's it.

Q. Okay. Could it also include referrals to school psychologists?

A. If it is, we would have shared those documents related to those numbers.

Q. Okay. But as you sit here right now, you don't know for sure; fair to say that?

A. Okay. Give me that question again? I'm sorry.

Q. Yeah. As you sit here right now, you don't know for sure if these numbers would include students who were referred to school psychologists?

A. No. It just indicates they're referred for mental health services.

Q. Okay. When a student in DeKalb County School District is referred to a social worker, is that student required to go see the social worker?

A. No, they're not, actually.

Q. Okay.

A. No.

Q. So a student could be referred to go see a social worker, and then either they or their parents make a decision that they're not going to go see the social worker?

A. That's correct.

Q. Okay. This data in this chart, does the number of referrals include students who were -- who were referred to social workers but not -- but didn't end up going to see a social worker?

A. I'm not clear on the question.

Q. Sure. So what I'm trying to understand -- I think you previously testified that these numbers in this chart include students who were referred to social workers, correct?

A. Well, they were referred for mental health services.

Q. Okay.

A.    It could have been social workers, but as stated, the number of students that were referred for mental health services.

Q.    And my question is, when you look at the number of referrals, does that number include students who were referred but then didn't end up going to obtain the mental health services?

A.    I'm not able to answer that question.

Q.    You don't know?

Is that right?  You don't know?

A.    Yes.  I'm not able to delineate those numbers.

Q.    Okay.  When a student -- well, are there instances in which students in the DeKalb County School District are referred to school psychologists?

A.    Yes.

Q.    Okay.  If a student is referred to a school psychologist, is that student required to go see the school psychologist?

A.    No, it's not mandated that a student go see personnel regarding that.

Q.    Okay.  So that student, or their parent or guardian, could decide not to go see a school psychologist?

A.    Yes.

Q. I'll show you a document that we'll mark as Exhibit 24, which is Tab 8. And it's going to be electronic.

(DeKalb-Towns Exhibit 24 was marked for identification.)

BY MR. REINKE:

Q. So this document states "Primary Referral Reason Report 2022." And this is a document that was produced by DeKalb County School District in this case.

Are you familiar with this type of document?

A. I'm not sure where the -- the report is coming from, how it's generated.

Q. Okay. Yeah, and it was just this single page, so -- have you seen a report like this before?

A. No. I haven't seen a report like this before.

Q. These referral reasons on the left-hand column, is that a list of reasons why students in the DeKalb County School District might be referred to social workers?

A. Yes.

Q. Okay. And these -- these reasons track with the e-mail that we were looking at from

Ms. Revels earlier, correct?

A. Uh-huh.

Q. At least some of them are the same?

A. Not sure. Are we talking about the numbers being the same, or the topics? The referral reasons?

Q. Right. Just some of the referral reasons.

A. Some of them are mentioned, yes.

Q. Correct.

A. Yes.

Q. So does that help refresh your recollection about whether this document lists reasons why DeKalb County School District students were referred to social workers?

A. Yes.

Q. Okay.

And there's -- let's see. There's a number of "Referral Reason" categories listed on this document, correct?

A. Yes.

Q. Are there any other referral reasons that DeKalb County School District tracks that are not listed on this document?

MR. VAUGHN: Object to form.

THE WITNESS: If there is -- if there is a

reason, it is reported up. However, students report various reasons for why they have mental health issues, or they are referred -- this is not necessarily an exhaustive list --

BY MR. REINKE:

Q. All right.

A. -- of --

Q. Are you aware of any -- I'm sorry. Go ahead.

A. Exhaustive list of referral reasons.

Q. Okay.

Are you aware of whether DeKalb County School District specifically tracks referrals for social workers that are related to social media?

A. No.

Q. And does DeKalb County School District specifically track referrals for school psychologists that are related to social media?

A. No.

Q. Now, the DeKalb County School District employs a number of individuals whose job responsibility includes addressing students' mental health. Is that true?

A. That's true.

Q. Is there a particular person within the

School District who has overall responsibility of student mental health?

A. Because of the amount of work that we're doing as it relates to mental health issues, particularly these challenges that we're facing, we have employed several personnel that would not be necessarily the traditional social workers, psychologists, mental health specialists, mental health coordinators, social worker liaisons, engagement advocates.

These are personnel that we have had to redirect our resources towards dealing with mental health challenges. And so we have additional personnel that work with students, along with mentors in the building, volunteers from local agencies.

Q. Okay. And my question was just a little bit different.

So my question -- you've listed out a number of different types of mental health professionals that the DeKalb County School District employs.

A. Uh-huh.

Q. My question is about, is there a particular administrator in the District who oversees all of these mental health professionals?

A. No, because they sit in different divisions. So no one specific administrator to oversee. They -- they sit in different divisions, working in different capacities.

Q. Understood.

One of the positions that you mentioned that DeKalb has employed to address student mental health is school psychologists, correct?

A. Yes.

Q. And what division are the school psychologists under?

A. The division of student services, overseen by Dr. Norman Sauce.

Q. And what is the general job description of a school psychologist?

A. There is a job description. I don't have the specifics of it, but, you know, as it relates to DeKalb County School District evaluations of students.

Q. When you say "evaluations of students," what do you mean by --

A. Psychological evaluation.

Q. I think another position that you mentioned was social workers.

A. Uh-huh.

Q. Which division do social workers fall under?

A. Division of wrap-around services.

Q. And that's the division that you are in charge of?

A. Yes.

Q. And what is the job description of a social worker?

A. So I believe that job description was provided. But just overall, they are there to ensure health and well-being of students, and dealing with reporting of child abuse, dealing with issues of poverty, food, housing, clothing insecurities.

Also they deal with attendance and attendance protocol. Preparing packets to the Solicitor General's office if the students are showing chronic absenteeism. Those types of things.

Q. Another -- another position that you mentioned was mental health specialists.

A. Yes.

Q. What division do mental health specialists fall under?

A. The division of schools and leadership.

Q. And who is in charge of that division?

A. Michelle Dillard.

Q.    I think we said her position is chief of schools?

A.    Yes.

Q.    What is the role of a mental health specialist?

A.    Again, they provide support by area; we have seven areas.  And not therapeutic support, but again, provide support at the District level to schools, by way of training, taking a look at any issues they may have, to solve day-to-day challenges.

Q.    Do mental health specialists provide counseling to students?

A.    They may provide some level of counseling. They don't provide any type of therapeutic services. They may have some role in individual or small-group counseling alongside the counselor.

Q.    Okay.  And when -- when you say "alongside the counselor," are you referring to a school counselor?

A.    A school counselor.

Q.    Is that the term that DeKalb uses for that position, "school counselor"?

A.    Yes.

Q.    Okay.

A.    Yeah, because we have professional

counselors that will -- oftentimes they work with adults. And so we would delineate that by saying a "school counselor."

Q. Okay. And I know other schools sometimes use the term "guidance counselor."

A. Yeah.

Q. Is that a term that DeKalb uses?

A. It's kind of interchangeable. Interchangeable.

Q. So the term "guidance counselor" and "school counselor" would be interchangeable?

A. Yeah. I think "guidance counselor" is an older term.

Q. I want to go back to Exhibit 10, which is Tab 5.

MR. REINKE: And if you can go to page 11, please; it's an electronic -- yes.

BY MR. REINKE:

Q. And this is DeKalb County School District's Plaintiff fact sheet in this case --

A. Yes.

Q. -- which we've looked at a couple times.

A. Yes.

Q. I want to draw your attention specifically to Question 16, which says "Provide the total number

of health care workers (for example, social workers, nurses, psychologists, psychiatrists, counselors) employed by the District whose primary responsibilities include addressing student mental health issues from 2017 to 2018 to present or to the year for which data is most currently available and their positions, as well as the total number of volunteers in these positions, if any."

And then there's a chart that provides this information for the DeKalb County School District.  Correct?

A.   Yes.

Q.   And the chart has a line, or separate lines, for the 2017 through 2018 school year through the 2023 through 2024 school year.  Correct?

A.   Yes.

Q.   And for the 2017 through 2018 school year, the chart indicates that there were 501 employees among the following positions, right?  Social workers, psychologists, counselors, and nurses. Correct?

A.   Yes.  Based on this documentation.

Q.   That's right.  And the chart provides similar information through each year from 2017 through 2018 to the 2023-2024 school year, correct?

A. Yes.

Q. And for each year, the positions that are captured within the number of employees on the chart are the same four positions, right? Social workers, psychologists, counselors, and nurses?

A. Yes.

Q. Okay. So for the most recent year on this chart, 2023 to 2024 school year, DeKalb County School District reported employing 554 employees in those four positions, correct?

A. Yes.

Q. Do you know approximately how many of those 554 employees were nurses?

A. I think about 80 or so.

Q. Okay.

A. Somewhere between 80 and 100.

Q. Do you know approximately how many of those 554 employees were counselors?

A. Probably upwards of 280 or so.

Q. Do you know approximately how many of those 554 employees were social workers?

A. I would say about 75 or so.

Q. And do you know approximately how many of those 554 employees were psychologists?

A. So I would have to assume the difference,

but they're not -- yeah, they're not under my division, so I wouldn't have an exact amount of psychologists.

Q. Do you know --

A. Roughly -- I guess roughly around -- gosh -- roughly, maybe 100 or less.

Q. Okay.

A. I believe we do have a report from human resources that could delineate those numbers.

Q. Understood. And I'll show you another document, that I will mark as Exhibit 25, which is Tab 9.

Yes, Tab 9.

(DeKalb-Towns Exhibit 25 was marked for identification.)

BY MR. REINKE:

Q. And this document is a memo that DeKalb County School District produced in this case. Looks like it's to Cheryl Watson-Harris, who was the superintendent at the time --

A. Yes.

Q. -- from Deborah Moore-Sanders, who at the time had the title interim deputy superintendent of equity and student empowerment. Correct?

A. Yes.

Q. And the "Subject" line of the memo is "School Psychologists and Social Work Ratio Meeting"?

A. Yes.

Q. And it's dated January 13th of 2022?

A. Yes.

Q. And underneath the heading "Psychological Services Department," it states "The Psychological Services Department is comprised of 47 school psychologists when completely staffed. (There are currently 2 vacancies.)" Did I read that correctly?

A. Yes.

Q. Does that refresh your recollection as to approximately how many school psychologists DeKalb County School District employs?

A. Yes, based on this document.

Q. Okay. Now, scrolling down in the document, there's a section that says "School Psychologist to Student Ratio." Do you see that section?

A. Yes.

Q. And it states "The below chart reflects the school psychologist to student ratio from the National Association of School Psychologists (NASP), the nationwide actual average, the Georgia funding for school psychologists, and the current DeKalb

County School District ratio." Correct?

A. Yes.

Q. And the NASP recommended ratio is listed as 1 to 500, correct?

A. Yes.

Q. The nationwide average is listed as 1 to 1,211, correct?

A. Yes.

Q. And DeKalb was employing 1 school psychologist, according to this memo, for every 2,003 students. Correct?

A. Yes.

Q. And then if we scroll down to the next page, it says "School Social Work Department." And it states "The School Social Work Department" -- excuse me; "The School Social Work (SSW) Department is comprised of 40 master level, school-based social workers, and 2 homeless social work liaisons. SSW's are assigned between three to five schools and the department handles approximately 12,600 student referrals annually."

Does that number refresh your recollection about the number of student social work referrals that we were discussing earlier?

A. Based on this document, it's submitted by

DeKalb, so . . .

Q. Yes, and this --

A. You would . . .

Q. Right. And this is a memo that was written by Dr. Moore-Sanders and sent to Cheryl Watson-Harris and produced by DeKalb County School District in this case?

A. I have no reason to refute this data.

Q. Okay. And there's a chart on this section of the memo as well that says the National Association of Social Workers (NASW) recommended ratio is 1 social worker for over 250 students. Correct?

A. Yes.

Q. And at the time of this memo, DeKalb was employing 1 social worker for every 2,353 students, correct?

A. Yes.

Q. Now, we previously talked about a position called "mental health specialist."

A. Yes.

Q. Does DeKalb also employ somebody with the title "mental health coordinator"?

A. Yes.

Q. Is that different than a mental health

specialist?

A. Yes, those are -- I don't have the specifics to their job descriptions, but those should have been provided in the documentation that we have.

Q. Okay. Yes, and --

A. We have mental health coordinators, mental health specialists, and so that the specifics of those jobs are available to you.

Q. Right. And I understand that there may be a job description within a document that DeKalb has produced in this case; but as you sit here today, do you have a general understanding of what the role of a mental health coordinator is?

A. I believe that they oversee the specialist. Again, they're working at the District level, supporting schools in various areas.

Q. Understood.

So other than the positions that we've just discussed, are you aware of any other positions within the DeKalb County School District whose primary job responsibilities include addressing student mental health issues?

A. I guess, clarification: When you say their job, hired for that specific task?

Q. Not necessarily hired for that specific

task, but whether, you know, they spend a significant portion of their time addressing student mental health issues.

A. I would say, on any given day, a teacher could spend time dealing with students that may be struggling from mental health challenges. Trusting adults in the building; we always tell students that "You should seek out one trusted adult in the building if you're having challenges."

So on any given day, there could be someone in our buildings dealing with a student that had mental health challenges.

Q. Understood.

A. Even a school resource officer. Even -- a custodian even. All of these people are important to us.

Q. Yeah. And so I think my definition didn't really accurately capture the information I was looking for.

A. Okay.

Q. So kind of other than the positions that we have discussed, are there any other types of positions that the DeKalb County School District employs for the primary purpose of addressing student mental health?

A.   Not to my recollection.

Q.   Okay.  I want to show you a document that I will mark as Exhibit 26 -- 27?  26 -- which is Tab 37.  Exhibit 26, Tab 37.

MR. REINKE:  Now I'm hopelessly confused.

(DeKalb-Towns Exhibit 26 was marked for identification.)

MR. REINKE:  And this document was produced by DeKalb County School District in this case, and it is titled "DeKalb County School District, Project SERV Grant Application."

BY MR. REINKE:

Q.   And first of all, let me just ask you this:  Are you familiar with Project SERV?

A.   I'm not.  I would have to read this document.

Q.   Okay.  If you would like to take a minute to review it, you're more than welcome to do so.

MR. VAUGHN:  Adam, while she's reviewing the document, to the extent that questions related to a grant application fall under Topic 30, Mr. Schueneman was disclosed to speak to Topic 30.  So just making that objection for the record.

MR. REINKE: Thank you.

THE WITNESS: Okay.

BY MR. REINKE:

Q. Okay. Have you finished reviewing that document?

A. Yes.

Q. Okay. And so this is a Project SERV grant application. And if you flip to the page with the Bates number ending in 41821. That's the number in the lower right-hand corner.

A. Yes.

Q. And then near the very bottom of that page, there's a heading that says "Proposed End Date of the Grant Award." And it says "August '23 to August 2024 -- The grant award will allow the establishment of two new SAFE Centers and calming rooms for students and staff in two additional high schools in the DeKalb County School District." Correct?

A. Yes.

Q. Are you familiar with the term SAFE Center?

A. I am.

Q. Okay. What is a SAFE Center?

A. So a SAFE Center is a -- is a center that

is housed in a high school, and it could be comprised of more than one room that includes a calming area for students, with mood lighting, comfortable furniture.  We refer to them as like Zen Dens.

It may have another area, where students are allowed to come in during lunchtime, to engage with other students, complete assignments, decompress.  It also may include a food pantry.  It may include a clothing closet, and then also may include an office area for personnel who will man that SAFE Center daily.

Q.   Okay.  You mentioned personnel manning the SAFE Center?

A.   Yes.

Q.   Is there a particular -- is there an employee who is, you know, assigned to the SAFE Center full time?

A.   Yes.

Q.   And who is that employee, or -- you know, sort of what category is that employee?

MR. VAUGHN:  Object to form.

THE WITNESS:  A social work liaison.

BY MR. REINKE:

Q.   Social work liaison.  Okay.

When did DeKalb first create a

SAFE Center?

A. I don't have the exact date. I don't have the exact date. I'm sure it's in a document that we've provided.

Q. Do you recall approximately when it was?

A. I want to say maybe 2022. 2022-2023.

Q. Okay. And I think you mentioned that a SAFE Center is a center in certain high schools?

A. Yes.

Q. How many high schools currently have a SAFE Center?

A. Six, currently.

Q. And how were these high schools chosen to get a SAFE Center?

A. It was dependent upon space, if the school had space. The designer of the administration.

Q. Was the decision as to like which high schools to put these SAFE Centers in dependent in any way on like the number of mental health issues that students were experiencing in that particular school?

A. I don't have the exact -- again, all the listed reasons. But as identified in this document, we have had challenges with mental health, and that this was one of the resources that we decided to utilize to address them.

Q. Okay. Sure. And I understand --

A. Certainly could have happened in any of those six schools named.

Q. Okay. I understand that, and I think my question is a little bit different.

So my question is, did DeKalb undertake to do any type of analysis of which high schools have the most serious mental health concerns, in determining where to put these SAFE Centers?

A. I wouldn't -- I wouldn't have that specific information at the time. I wasn't as close to the -- I wasn't serving in that capacity I think when they began in 2022. I was a director for student relations, so I wouldn't have the specificity. But I'm sure there may be some document that has that.

Q. And who, to your knowledge, at DeKalb would be most familiar with the process of establishing these SAFE Centers?

A. Either Dr. Moore-Sanders or Ms. Denise Revels.

Q. You mentioned that the SAFE Center is sort of like a calming area within these high schools. Is the SAFE Center a place that is open to students at all times that school is in session?

A.   Generally it is open during the instructional day.

Q.   So can a student excuse themselves from class and go to the SAFE Center?

A.   If needed, yes.

Q.   Do they need to obtain any kind of permission to do that?

A.   Generally they do.  If it's during instructional time, certainly they would have to obtain permission.  If it's during lunchtime, which is considered instructional time, but -- yes, because we need to know where students are in the building. So yes.

Q.   Okay.  And who would have to provide permission for a student to go to a SAFE Center during --

A.   That could be the current teacher of record at the time, or an administrator that's on staff in a location other than a classroom. Generally, when a student requests to go to the SAFE Center, they are granted that request.

Q.   When a student goes to the SAFE Center, is there a limit on the amount of time that they can spend there?

A.    I'm not aware of a limit.  I think it's

on a case-by-case basis, depending on why they're there.

Q. Is there any restrictions on what they can do when they're in the SAFE Center?

A. Certainly it's restricted to behavior expectations in the Code of Student Conduct.

Q. Would students be allowed to bring in like a school-issued electronic device into the SAFE Center?

A. If it's during the instructional day, a Chromebook.

Q. Okay. Would students be allowed to bring a personal electronic device into the SAFE Center?

A. Depending on the logistics of the school, if it is a school that is implementing Disconnect to Reconnect, the pouches, within a pouch.

Q. Would students be allowed to use a personal electronic device while they're in a SAFE Center?

A. They shouldn't be able to use them, based on the rules. They should not be using a personal device during -- that is considered instructional time, so they should not be using those.

Q. Are you aware of any instances of students using personal electronic devices while they're in

the SAFE Centers?

A.    If it's reported and documented, it would be found in Infinite Campus.

Q.    But as you sit here today, are you aware of any?

A.    Not -- we don't tick every single time children are using cell phones throughout the building.  We would not be able to get any teaching and learning done, or address the mental health challenges they are having.

Q.    Going back to Exhibit 26, the Project SERV grant application.  Underneath --

DOCUMENT TECHNICIAN:  What tab is that?

MS. CARDEN:  37.

DOCUMENT TECHNICIAN:  Thank you.  Sorry for that.

BY MR. REINKE:

Q.    On the very first page, there's a heading that says "Description of the incident."  And it says "As a result of the pandemic, students and staff experienced trauma through the loss of loved ones and other traumatic events that occurred while they were sheltering in place.  It is necessary that we accelerate our efforts to address the challenges exacerbated by the pandemic that make the need to

reengage families, reenter students, and accelerate academic outcomes more important than ever. Additionally, students experienced trauma from abusive situations in the home, lack of food and other resources, displacement out of their homes and a disruption of learning. The funds will directly support the district's efforts to improve school culture which will impact the emotional well-being of staff members and students. Due to the pandemic, school district employees have experienced an overwhelming sense of loss, anxiety and overall stress. Through the grant, schools will be able to increase compassion fatigue workshops for staff members, create teacher lounges that are warm and inviting and make teachers feel valued. School with available space will be able to create a mindfulness room for staff members, where they can practice mental health techniques, including meditation, reading, journaling and other calming activities that will help them feel centered and reenergized to continue teaching and motivating students."

Did I read that correctly?

A. Yes.

Q. Does that paragraph accurately describe why DeKalb County School District implemented SAFE

Centers?

A. If it's based on this grant, and the grant is specific to this incident, like we would have to have this incident occur for us to be eligible for the grant, then that is the description that is provided.

Q. Okay. So my question is a little bit different. It's not really about this grant; I'm just wondering if this description here accurately describes why DeKalb County School District implemented SAFE Centers.

MR. VAUGHN: Object to form.

THE WITNESS: Based on the grant application, that grant will allow them to develop a SAFE Center.

BY MR. REINKE:

Q. I understand that. But my question is, does this accurately describe the reasons why DeKalb implemented SAFE Centers?

MR. VAUGHN: Object to form.

THE WITNESS: There are -- these are not the only reasons.

BY MR. REINKE:

Q. Okay. What are the other reasons?

A. Various reasons. So based on this grant,

that I -- again, I didn't write this grant. And so the intention of the grant, and the qualifications for being granted these funds, are based on -- I guess as a result of the pandemic, but -- we have since expanded those SAFE Centers. And because of the growing number of issues we are seeing and challenges we are seeing with mental health, and those challenges from social media, we have now had to expand and utilize our resources to address those issues.

And so while this grant, as it is stated, will be -- the funds will be utilized to support SAFE Centers, that is not the only reason why students are being seen in the SAFE Centers, particularly at this point.

Q. Okay. So I want to make sure I understand that.

Are you saying that SAFE Centers were originally created because of the effects of the pandemic?

A. I'm saying --

MR. VAUGHN: Form.

THE WITNESS: -- based on the document that's in front of me, they were awarding -- or potentially awarding the District SAFE Centers

because of the pandemic, based on this document in front of me.

BY MR. REINKE:

Q.  Okay.  And since that time, they've been expanded, because of the issues that the District is facing as a result of social media?

A.  Yes.

Q.  Okay.  You also mentioned the term "Zen Den."  I have seen that term in some documents as well.  Is -- is a Zen Den and a SAFE Center the same thing?

A.  So a Zen Den sits inside the SAFE Center. It is a room -- a description of a room that would have mood lighting, comfortable furniture, I guess colors that would be calming.  It could possibly have some type of music that would be considered calming to students.

Q.  And then I've seen documents that use the term "SAFE Room."  Have you heard that term?

A.  Yes.

Q.  What is a SAFE Room?

A.  So in instances where there aren't enough spaces to have a SAFE Center which comprised of at least two or more rooms, we have had to also incorporate SAFE spaces, again, due to the challenges

that students are having related to mental health.

We, as a District, are trying to mitigate these issues and provide a safe and healthy environment for our students. And so, though we don't have the space in the -- in the buildings, we may very well have a room. So we're doing everything we can to mitigate these issues, because they are challenges throughout the District.

And again, the rooms in the -- in the schools are for teaching and learning. And so we have now had to readjust, because of these challenges, to now create these SAFE Rooms for students. And so those are generally found in middle schools or elementary schools.

Q. Okay. So I think you testified -- I want to make sure I understand this correctly -- there are six high schools that currently have SAFE Centers?

A. Yes.

Q. Are there any high schools that have SAFE Rooms but not a SAFE Center?

A. I don't know that number off -- off the top of my head. I don't know if that's in a report or not.

Q. Okay. So there may be some high schools --

A. There may be.

Q. Okay. And then I think you testified that certain middle schools have SAFE Rooms. Do you know how many middle schools have SAFE Rooms?

A. I don't have the number, off -- off the top of my head.

Q. Do you know if it's more than ten?

A. No. I don't know that.

Q. Okay. And then you testified that some elementary schools have SAFE Rooms. Do you know --

A. They may also be called "calming rooms."

Q. Okay.

A. "Opportunity rooms." They have different names.

Q. So I'm just going to use the term "SAFE Rooms" to refer to all of those.

A. Okay.

Q. But do you know how many elementary schools have SAFE Rooms?

A. I don't -- I don't have that number.

Q. Do you know if it's more than ten?

A. I don't have that number.

MR. REINKE: All right. Let's go off the record.

VIDEOGRAPHER: We are now going off the

video record.  The time is currently 5:32 p.m.

(A recess transpired from 5:32 p.m. until 5:47 p.m.)

VIDEOGRAPHER:  We are now back on the video record.  The time is currently 5:47 p.m.

MR. REINKE:  Okay.  Dr. Towns, I don't have any further questions for you right now.  I understand that one of the other Defendants' attorneys is going to ask you some questions.  But thank you for your time today.

THE WITNESS:  You're welcome.  Thank you.

EXAMINATION

BY MR. WHITELEY:

Q.  Good afternoon, Dr. Towns.

A.  Good afternoon.

Q.  My name is Daniel Whiteley.  I represent the Google and YouTube Defendants in this case, and I've got a few questions for you about some of their products.  I will keep it short.

So in the time period 2017 to present, has DeKalb School district ever blocked access to YouTube on its School District network?

MR. VAUGHN:  Object to form.

THE WITNESS:  Can you clarify?  Have they bought -- bought access?

BY MR. WHITELEY:

Q. Blocked.

A. Oh, "blocked"; I'm sorry. Blocked access.

To the extent that students can see educational material, yes.

Q. Okay. So any noneducational material, students cannot access on the School District network?

A. I believe there's a filter such that they cannot.

Q. Okay. Do you know the name of the filter or filtering software that DeKalb uses?

A. I do not. Ms. Monica Davis, who is the former chief information officer, or Dr. Kermit Belcher, who is the current chief information officer, would have that information.

Q. Do you know when that restriction, about what type of content on YouTube could be accessed, was first put into place?

A. I don't have that information. That would come from technology, the division of technology.

Q. Understood. And I think you talked about earlier how, through the -- "something" Dreamers program, the School District provides Chromebooks to students?

A.  Yes, the --

Q.  Is that right?

A.  -- Digital Dreamers.  That's correct.

Q.  Digital Dreamers.  Okay.

And on the -- are there any other electronic communications devices that DeKalb provides to students, other than the Chromebooks we just talked about?

A.  Just Chromebooks.  They provide -- sometimes they will provide WiFi hotspots. Peripheral devices.

Q.  Okay.  And on the District-provided Chromebooks, does the District block access to YouTube in any way?

A.  They filter, so students can see educational materials.  Educational and instructional materials.

Q.  And is that true today for the Chromebooks that the District is giving out to districts -- or to students today?

A.  Yes.

Q.  And is it also still true today that DeKalb blocks access to certain content on YouTube on its network, but allows access on its network to educational content on YouTube?

A.   I would -- I would have to defer to Dr. Belcher, who's our chief information officer.

Q.   Okay.  So you don't know what the status of that filtering is, as of today?

A.   No.

Q.   Do you know if that was true for the 2023 to 2024 school year, meaning that during the 2023 to 2024 school year, DeKalb allowed access to educational content on YouTube on its School District network?

A.   Yes.

MR. VAUGHN:  Object to form.

BY MR. WHITELEY:

Q.   Has DeKalb ever purchased Google Workspace for Education?

A.   That would be a question for Dr. Belcher. I don't have that information on all of the specific purchases.

MR. WHITELEY:  Can you pull up, James, the deposition notice, which I believe is Exhibit 2?

MR. REINKE:  Yes.  Tab 1.

MR. WHITELEY:  And if you would go down to the bottom of page 8, going on to the top of page 9.

BY MR. WHITELEY:

Q. So I'd like to direct your attention to Topic 7 here. And this topic reads "district-wide (and school-wide, to the extent they differ) policies, procedures, or practices regarding the use of Google Chromebook, Google Workspace, Google Workspace for Education, Google for Education, Google Apps for Education, and/or Google Suite Enterprise for Education (or any variation or predecessor of the aforementioned platforms and online tools) by you, your schools, or your staff."

So do you understand that you are designated to testify as a corporate representative on this topic?

A. Yes.

Q. Okay. You still don't know if DeKalb has ever purchased Google Workspace for Education?

A. Yes, they -- they have purchased it. There would be some documentation to that effect.

Q. Sitting here today, do you know when DeKalb purchased Google Workspace for Education?

A. I do not know the date.

Q. Okay. Do you know which license or particular type of product DeKalb purchased?

A. I don't know.

MR. VAUGHN:  Object to form.

BY MR. WHITELEY:

Q.  Do you know if DeKalb enabled YouTube through Google Workspace for Education?

A.  No.  I do know that YouTube is accessible to students for educational purposes.

Q.  And do you know if that's enabled through Google Workspace for Education versus through content filtering software like you talked about earlier?

MR. VAUGHN:  Object to form.

THE WITNESS:  I think that would be better answered by Dr. Belcher.

BY MR. WHITELEY:

Q.  Were you involved at all in the decision to allow access to educational content on YouTube on the school network or school-issued -- or excuse me; the District network or District-issued Chromebooks?

MR. VAUGHN:  Object to form.

THE WITNESS:  When you say if I was -- can you repeat that question?

BY MR. WHITELEY:

Q.  Yeah.  Were you involved in the decision to allow access to educational content on YouTube on the School District network and School District Chromebooks?

A. No.

Q. I'm sorry. Say again?

A. No.

Q. Okay. Do you know who was involved in that decision?

A. That would be the chief information officer, as one -- one of their persons, which would be -- at the time, could have been Ms. Monica Davis; or if there are any new opportunities, would be Dr. Kermit Belcher, who is the current chief information officer.

Q. Do you know if any teachers or staff advocated to allow access to educational content on YouTube on the School District network or School District Chromebooks?

MR. VAUGHN: Object to form.

THE WITNESS: No, I wouldn't have that information.

BY MR. WHITELEY:

Q. Does the DeKalb School District need to obtain permissions or authorizations from parents or guardians for students to access YouTube on the School District network or School District Chromebooks?

A. Can you clarify "permission"?

Q. Yeah. Do they have like a yearly permission, or authorization form, that the parent or guardian will submit and say "Yes, my child can allow -- or can access or can't access YouTube content on the School District network or School District Chromebooks"?

A. So we do have an Internet access agreement, and some policies around that, as well as social media policy, like parents --

Q. Okay. That parents --

A. Are --

Q. -- sign that form?

A. I'm sorry?

Q. Do parents also sign that form?

A. Yes, I believe they do sign that Internet agreement form.

Q. Okay.

MR. WHITELEY: Thank you, Dr. Towns. Those are all the questions I have.

THE WITNESS: Thank you.

MR. REINKE: I don't think -- I don't think other Defendants' counsel have questions, but please feel free to chime in if I'm wrong about that.

MS. STRUEBY: No questions for me.

MR. REINKE:  Okay.  And then I assume you're going to have some questions?

MR. VAUGHN:  Yes.  And can we go off -- are you all passing the witness now?

MR. REINKE:  Yeah, we're passing the witness.

MR. VAUGHN:  Reserving -- reserving your time, I understand, but passing the witness?

Okay.  Yeah.  Can we go off the record, then?

VIDEOGRAPHER:  We are now going off the video record.  The time is currently 5:58 p.m.

(A recess transpired from 5:58 p.m. until 6:14 p.m.)

VIDEOGRAPHER:  We are now back on the video record.  The time is currently 6:14 p.m.

MR. REINKE:  And Davis, I understand you're going to have some questions for the witness.  Before you do that, I wanted to memorialize our agreement that an objection on behalf of one Defendant will count for all Defendants.

MR. VAUGHN:  Yes, agreed.  And thank you for that.

MR. REINKE:  Sure.  Thank you.

EXAMINATION

BY MR. VAUGHN:

Q. All right, Dr. Towns, I know it's been a long day. I appreciate your time. Are you able to answer more questions at this time?

A. Yes.

Q. Have you done your best today to provide testimony about each of the designated topics that you were questioned about?

A. Yes.

Q. Do you recall providing testimony about the Infinite Campus reporting system?

A. Yes.

Q. Is every instance of a teacher stopping class, for a student disrupting the class because of social media, reflected in Infinite Campus?

A. No. Students have conversations with teachers regarding social media. Teachers have conversations and discussions, lift it up to administrators; and administrators lift it up to our district-level administrators. So there are instances when these issues take place that may not be recorded.

Q. Is there a uniform language in Infinite Campus that all of DeKalb personnel must use when

documenting incidents relating to social media?

A. No.

Q. Okay. Do you recall providing testimony about the COVID-19 pandemic and its effect on DeKalb's students?

A. Yes.

Q. Okay. Is it DeKalb's position that the COVID-19 pandemic is the only cause of mental health problems related to its students?

A. No.

Q. Okay. Do you recall seeing a presentation from Dr. Logan that contained two classrooms of data?

A. Yes.

Q. And those two classrooms of data had text messages and social media, amongst other notifications, correct?

A. Yes.

Q. Does the District have a position on the difference between a text message notification and a social media notification?

MR. REINKE: Object to the form.

THE WITNESS: So with a text message, that is coming of course to a child's personal device. Something that's read; move on.

With social media, it is information that

students are consistently on, and it's -- I guess it is -- what's the word I'm looking for?

It is -- it is created to keep the attention of the students, to continue to have them scrolling and scrolling on there, with likes and -- you know, missing out on what someone on social media -- things that are tailored towards children. It is on during the school day, when it could be off during the school day.

But it -- that continuation of utilization and disengagement utilized in social media is very different than a text message that comes in for a student.

BY MR. VAUGHN:

Q. During that same Dr. Logan presentation, was there other information, studies, or research that was shown to the board to support the Yondr bag and cell phone locker program?

MR. REINKE: Object to the form.

THE WITNESS: I believe there was data shown. There's research shown. The Surgeon General -- nationally indicating that social media is causing harm to students. So those things were shown.

BY MR. VAUGHN:

Q.   Dr. Towns, you were shown several documents that discussed DeKalb wanting to educate students in today's technological environment, or in today's digital age.  Do you recall those -- those documents?

A.   Yes.

Q.   What -- what does it mean for DeKalb to want to educate a student in the digital age?

A.   And so certainly we don't want our students to have any opportunity gaps, and we want students to be able to access education in an ethical way, which means like, you know, looking up information for research; we may have students that may need accommodation for note-taking.

These things are positive, in helping our students to become more educated as it relates to the use of technology.  And so those are the things that we're looking to increase our students' technological awareness.

Q.   Does educating a student in today's digital age include, you know, making sure students, as you just mentioned, have available resources to complete assignments?

MR. REINKE:  Object to the form.

THE WITNESS: Yes.

BY MR. VAUGHN:

Q. Okay. Do you recall looking at a 2022 document that showed the number of psychologists and social workers per-student ratio?

A. Yes.

Q. Okay. Is that the current ratio as DeKalb -- strike that. Let me rephrase.

As of March 2025, is that the same ratio that DeKalb saw in 2022?

A. No. It would be -- that ratio would be lower. We've made a strong push to provide additional mental health personnel, additional psychologists. We've made a strong push to provide additional social workers.

Because one of the things that came to the top was mental health, when we sent out a survey to our parents on things that should be important to the District as it relates to our strategic plan, and overwhelmingly, it was mental health concerns.

And so we've made a concerted push to hire not only personnel, but to increase opportunity for students to have a place in the school to go to to deal with those mental health challenges, such as SAFE Rooms.

Q. You just mentioned SAFE Rooms. So does -- does the District have a desire to increase the number of SAFE Rooms it currently has?

A. It is our desire for each high school to have a SAFE Center. It is our desire for every middle school to have a SAFE Center if space allows; if not, to have a SAFE Room.

Q. And just to confirm, is it the District's desire to increase the number of mental health support staff providers -- i.e., social workers and psychologists -- to provide to students?

MR. REINKE: Object to the form.

THE WITNESS: Yes.

BY MR. VAUGHN:

Q. Okay. Is it the District's desire to increase the amount of schools covered by the Yondr and cell phone locker programs?

A. It is -- it is the District's desire, yes.

Q. Okay. And for these items we've just discussed, where the District desires to increase staffing or increase support, why does the District have that desire?

MR. REINKE: Object to the form.

THE WITNESS: It is our desire because, again, we're seeing a lot of mental health

challenges. As it relates to, you know, students being on social media, we're -- we're fighting against the challenges, and we -- you know, we don't have the resources to dedicate to these issues. We have a limited budget, limited of course by taxpayers' dollars, and we're just -- we're fighting against it each and every day.

MR. VAUGHN: Thank you, Dr. Towns. I don't have any further questions for you.

VIDEOGRAPHER: Any follow-ups?

MR. REINKE: Can we just go off the record real quick?

VIDEOGRAPHER: We are now going off the video record. The time is currently 6:23 p.m.

(A recess transpired from 6:23 p.m. until 6:29 p.m.)

VIDEOGRAPHER: We are now back on the video record. The time is currently 6:29 p.m.

MR. REINKE: No further questions from Defendants. Thank you for your time, Dr. Towns.

THE WITNESS: All right. Thank you.

VIDEOGRAPHER: Okay. We are -- this now concludes today's proceeding. The time on the record for Defense counsel for TikTok was 7 hours, 4 minutes, and 30 seconds. The time on

the record for Defense counsel for Google was 10 minutes and 30 seconds, for a total time of 7 hours and 15 minutes.

The time on the record for Plaintiff was 8 minutes and 45 seconds, for a total time of 7 hours, 24 minutes.

We are now going off the record.  The time is currently 6:30 p.m.

MR. WHITELEY:  Thank you, Dr. Towns.

THE WITNESS:  Thank you.

(Time Noted:  6:30 p.m.)